# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

DIGNA RUIZ, et al.,

Plaintiffs,

v. 10 CV 5950 (JGK)

CITIBANK, N.A.,

Defendant.

------------------------------x

FREDERICK WINFIELD, et al.,

Plaintiffs,

v. 10 CV 7304 (JGK)

CITIBANK, N.A.,

Defendant.

------------------------------x

New York, N.Y.
November 2, 2010
10:35 a.m.

Before:

HON. MICHAEL H. DOLINGER,

Magistrate Judge

APPEARANCES

POMERANTZ HAUDEK GROSSMAN & GROSS LLP
Attorneys for Ruiz Plaintiffs
MURIELLE STEVEN WALSH

RIGRODSKY LONG, PA
Attorneys for Winfield Plaintiffs
TIMOTHY MacFALL

APPEARANCES (Continued)

EGELSTON LAW FIRM
Attorneys for Winfield Plaintiffs
GREGORY M EGELSTON

MORGAN LEWIS & BOCKIUS LLP
Attorneys for Citibank, N.A.
THOMAS A. LINTHORST

(In open court)

THE COURT: What is the current status of these two cases?

MR. MacFALL: Your Honor, if I may, Timothy MacFall with Rigrodsky Long, on behalf of the Winfield plaintiffs. Our case was filed somewhat later than the Ruiz case. We've had conversations with counsel for the Ruiz plaintiffs, Ms. Walsh. We think it probably makes sense here to consolidate the two cases. We are mindful that we need to do a little catch-up. I believe -- and Ms. Walsh can correct me if I am wrong, and Mr. Linthorst -- that there is a proposed scheduling order and case management plan that has been submitted to the Court.

THE COURT: In which case?

MR. MacFALL: That was in the Ruiz case, your Honor. We weren't quite up to that part in connection with the Winfield case.

THE COURT: If it has, it has not made its way into the court file.

MS. WALSH: Your Honor, if I may, I'd be happy to update you on the course of discovery so far in the case.

THE COURT: Yes.

MS. WALSH: We filed the first case. We've had a Rule 26(f) conference with defense counsel. We've tried to hammer out a scheduling order and case management plan. I think we've been largely successful except for one big issue that we can't

agree with defense counsel, and that is the scope of appropriate discovery at this stage of the litigation. The plaintiffs have issued document requests to defendants. Defendants have issued document requests to Ms. Ruiz. We're in the process of preparing our responses to that, and they are due this Friday. And next week our client will be deposed.

THE COURT: And has defendant produced, in response to your request?

MS. WALSH: Their responses are not quite due yet but they are due soon.

THE COURT: Within a week or two?

MS. WALSH: I believe in about a week, your Honor.

I have a copy of the proposed scheduling order, if I may pass it up?

THE COURT: Sure.

MS. WALSH: If your Honor is inclined to consolidate the cases, I think there's probably just one deadline that's currently set for this Friday, and that's the disclosures, initial disclosures. We would ask that that be moved back a bit if we're going to consolidate both cases.

THE COURT: And you mentioned that there is a disagreement concerning the scope of discovery. That doesn't seem to be reflected in the proposed scheduling order. I'm not sure if it would necessarily be anyway.

MS. WALSH: It's actually reflected in paragraph 2,

your Honor, under "Fact Discovery." The defendants would like to propose essentially bifurcated discovery. They've advised me that they would like to produce only class certification related discovery and some merits discovery insofar as it relates to class certification. We have had some discussion on what defendants consider to be class certification discovery, and I wasn't really happy to hear what their narrow categories of discovery are that they'd be willing to produce on that issue. So our position is that discovery should be going full force starting now.

THE COURT: Let me turn you back to some of the basics. If you could just indicate your understanding of the scope of the case, at least your case, including the potential size of the class and the volume of documents that you are seeking, of what nature.

MS. WALSH: Well, I think the size of the class is going to be quite substantial, your Honor. The class members are what is known as personal bankers. They are Citibank's sales representative force. And we initially thought there were approximately --

THE COURT: Is that a term that would in olden days be known as someone who sits at the desk, or someone who sits where tellers would sit?

MS. WALSH: It's not the teller position, your Honor.

THE COURT: OK.

MS. WALSH: It's more the people who deal day to day with the customers who come in to open accounts. Opening accounts is a huge part of the job but also they do the day-to-day of helping open the branch, close the branch and deal with the clients' account issues as they come up, which apparently takes a lot of time, and anything else that comes up. I think it's a pretty -- the main job is sales and customer service but I think it encompasses a wide range of responsibilities.

As far as the scope of the class, we think it's quite large. I initially thought it was approximately a thousand personal bankers, but defense counsel corrected me at our last conference before Judge Koeltl; he says it's a substantial amount higher than that. So accordingly, I think that the scope of discovery will be quite expansive.

THE COURT: As I see just in looking at the complaint, you're alleging a failure to keep track of time spent and to pay overtime?

MS. WALSH: That's right.

THE COURT: As far as you know, is there a dispute about the fact that the defendant does not record time worked?

MS. WALSH: Yes, I believe there is a dispute.

THE COURT: And is there a dispute about the fact that the defendant does not pay overtime to this category of workers?

MS. WALSH: Yes, your Honor, there's a dispute.

THE COURT: Just those two issues -- the pure factual issue of do they keep records and, two, do they pay the overtime that would accrue based on whatever the records say -- are those issues susceptible to a narrow focused set of discovery requests?

MS. WALSH: I think we could probably work something out.

THE COURT: Am I wrong in assuming -- and I haven't read the rest of the complaint -- that if the answer to these two questions is, number one, they keep records and, number two, they do pay overtime, that the suit either disappears or shrinks substantially?

MS. WALSH: Yes, I think that's correct, your Honor.

THE COURT: Would there be anything left of the lawsuit then?

MS. WALSH: Well, no, it's purely overtime. There are related ERISA claims that were brought by the Winfield plaintiffs.

THE COURT: OK, but not in your case?

MS. WALSH: Not in my case, no. I do think a big focus of discovery here is figuring out exactly how much time plaintiffs worked versus what they were actually paid for. And it could be quite complicated because the allegations here are that Citibank had this quote-unquote policy of requiring people

to only work 40 hours and record only 40 hours but in effect they made the commission such that plaintiffs and the other class members had to work more than 40 hours just to keep their jobs. So I'd like to say that we could discover those issues with relatively narrow discovery but I'd have to know more about Citibank's document retention practices and what kind of documents they maintain to record time, to really let you know.

THE COURT: And I take it you have not yet had that discussion with defendant's counsel?

MS. WALSH: Well, we had the Rule 26 conference but we really didn't have a detailed discussion about their recordkeeping practices.

THE COURT: Because it seems to me that before one dives into a tremendously large amount of paper discovery, it would be highly desirable that some understanding be reached about what records there are, how they're kept, and the like. Let me ask also this: With regard to e-discovery, I don't know if you have requested such discovery, I will assume that you have --

MS. WALSH: Yes, we have.

THE COURT: -- have you had any discussions with the other side about the scope of such discovery, at least in its initial phase?

MS. WALSH: We had some preliminary discussions about it. And my understanding -- what I took from those

conversations is that defendants haven't really looked into their email retention practices, what kind of emails might be available for the relevant time. I got the general representation that they think they've retained emails for the relevant time, but the scope of the amount of emails they might have on hand is pretty unclear at this point, so we definitely need to have more discussions on that.

THE COURT: OK.

MS. WALSH: And I think your Honor's suggestion makes a lot of sense, that we talk to defense counsel and try to figure out exactly what kind of documents might be relevant that are out there.

THE COURT: If the case goes forward, what sort of discovery -- and what is the scope of the discovery that you would be expecting to pursue?

MS. WALSH: Well, like I mentioned, the general category of documents sufficient to show how many hours plaintiffs actually worked during the workweek. As I believe I mentioned earlier, there would be calendars that would just put in the work schedule for the week that people were supposed to work, but apparently, according to our client, the people actually worked much more than what was on the calendar. So we need documents or some kind of data -- it could be electronic, it could be some kind of clock-in system -- that would show the time that people were actually there. Actually, probably

computer log-in times would be the best way to record that type of information.

THE COURT: And as far as you understand it, the defendant has such records?

MS. WALSH: I'm not sure. We didn't get that far in our discussions. So that would be one very large category of information that we'd be looking for.

THE COURT: And beyond that, what other discovery are you looking at?

MS. WALSH: Payroll records, any records showing how much people were paid in actuality, any documents reflecting complaints by Citibank employees about not being properly paid overtime, any documents relating to Citibank's efforts to require personal bankers to receive compensatory time in lieu of actual overtime monetary compensation -- we requested quite a number more of documents, I'd have to look back at the document request -- obviously any investigations by governments, either formal or informal, government agencies, into Citibank's --

THE COURT: Are you aware of any such investigation?

MS. WALSH: I am not, your Honor.

THE COURT: OK. Beyond the document categories that you mentioned, what else would you be seeking to do in discovery?

MS. WALSH: Well, we'll be seeking to take a number of

depositions. As I mentioned, our client is going forward with her deposition next week. We have another class representative who will be deposed, I believe, in the next two months.

THE COURT: How many class representatives are there currently?

MS. WALSH: Well, there are two people in our case. And there are three representatives in the Winfield action, and I expect defendants will want to be taking their depositions.

THE COURT: Do you have --

MS. WALSH: And we'll be -- I'm sorry, and we would also be looking to depose branch managers, regional managers, anybody who would have an awareness of Citibank's general policies and the way they actually implemented their overtime policies.

And unfortunately, your Honor, I didn't have much time to confer with the Winfield plaintiffs' counsel before this, so if they'd like to jump in with any additional discovery...

MR. MacFALL: Your Honor, the only thing that I can think of, in addition to what Ms. Walsh had mentioned, would be documents relating to ERISA contributions, which would be predicated on the number of hours worked and the gross paid to the various members of the class.

THE COURT: So what is the ERISA claim in your case?

MR. MacFALL: Basically, your Honor, if inaccurate records were kept as a number of hours and pay, is that should

have been forthcoming to those employee, the ERISA contributions made on their behalf were necessarily decreased and they therefore received lower contributions than they should have, based on the number of hours worked. So the factual nexus is essentially the same; it's just that additional layer of paperwork.

THE COURT: And I take it, in terms of depositions, at least at this point, your inquiries would parallel those of the other cases?

MR. MacFALL: Absolutely, your Honor.

MS. WALSH: Your Honor, I'm sorry, I left out an important category. I kind of thought it was obvious, but it wasn't that obvious to defense counsel, so I just wanted to make sure: We would be looking for a list of all personal bankers, their names and addresses and last known contact information.

THE COURT: OK. If the case went to trial, would you expect to be calling any expert witnesses?

MS. WALSH: I'm not sure, your Honor. We haven't considered that at this point. But there's a good chance we could, depending on what discovery unfolds and whether or not we think there are any issues that arise that we would require an expert. As of right now, I don't think so.

THE COURT: All right.

MR. LINTHORST: Good morning, your Honor. If I could

just take it from the top with respect to your Honor's original question about where we are in the cases, I think Ms. Walsh accurately stated where we are in this case. We've answered, we've had the Rule 26(f) conference, we've exchanged discovery requests but not responses, and we've tried to schedule some initial depositions.

In the Winfield case, we haven't yet responded to the complaint, we haven't not yet had the conference or exchanged any written discovery. So that case --

THE COURT: When is an answer due in Winfield?

MR. LINTHORST: I believe we put in a request for an extension -- I don't have the date in front of me, but it was 30 days from the original response date. So maybe October -- sorry, November 20th perhaps.

THE COURT: I take it that hasn't been acted on?

MR. LINTHORST: We haven't received a response to that, but it was submitted with consent.

THE COURT: What was the date that the Winfield plaintiffs consented to?

MR. MacFALL: Your Honor, I'm sorry, I unfortunately don't have that in front of me. I believe it was 30 days from the original answer date, and I believe that does put us somewhere around November 20th. I can certainly get back to your Honor with that.

THE COURT: Well, since we're all here, we may as well

act on that.

MR. MacFALL: Sure.

THE COURT: Is the request for an extension to November 20?

MR. LINTHORST: Yeah. That should be fine. That puts us when --

THE COURT: OK, we'll set November 20 for defendant to respond to the Winfield complaint.

All right.

MR. LINTHORST: So the case is a nationwide FLSA collective action on behalf of all personal bankers. It currently consists of five or six named representatives and one opt-in. There has been no determination as to whether or not the case can proceed as a collective action or whether or not it will proceed solely as individual overtime claims submitted by five or six individuals. The --

THE COURT: By the way, approximately how many folks would fit within this category of employee?

MR. LINTHORST: Yeah, I don't have a hard number but I believe it to be thousands. You're talking about a nationwide group going back three years nationally in places where they have asserted state law actions. For example, in New York, we go back six years for New York personal bankers, and there's a couple other states with varying statutes. But in any event, we're talking about a tremendous number of individuals going

back in time and across the nation, in hundreds of individual branches.

So what our proposal was --

THE COURT: Do you have, by the way, at least a ballpark estimate as to the number of branches where there are live bodies as opposed to these ATM machines?

MR. LINTHORST: Yeah. I don't I believe it to be hundreds, I don't know specifically. But it is across the nation, in many states.

So what our proposal was, was that we would produce documents relating to the claims of the plaintiffs as well as policies, procedures, things that would be generally applicable. The complaints in both cases allege that Citibank had certain policies and procedures applicable to the personal bankers -- the compensation, the job responsibilities, the timekeeping, those types of things -- and we would produce those, so that they can make an initial motion to the Court as to whether or not this case is appropriate to proceed as a collective action.

THE COURT: What are the criteria that a court must consider in determining whether it's an appropriate collective action?

MR. LINTHORST: The standard is whether or not they're similarly situated. And what the Supreme Court has said is, what courts look at is judicial efficiency, it's not a class

certification standard per se but it is similar in the sense that if you have to look at individual by individual to determine liability and damages, then there's no judicial economy and you just have individual claims and they're not similarly situated.

THE COURT: Well, let me ask you this: If the claim or claims in these cases -- we'll put aside for the moment the ERISA issue -- basically rest on the assertion that there is a policy or practice by Citibank to pay only for the regular amount of compensatory pay for a full week, not to pay overtime, but to place on this category of employees burdens that necessarily require that they work additional time, in the context of the certification motion, would the plaintiffs bear any burden to establish the truth of that allegation? I ask that because, if not, then it would seem, if I've correctly defined what they're intending, that on the face of it, it would seem to meet the criteria that you've outlined for certification. And so I'm curious about what the contested issues would be or are likely to be on a certification motion of this sort. That, of course, would then dictate a little bit about what sort of discovery is pertinent to that motion.

MR. LINTHORST: They don't have to win on the merits of their claim to meet that standard. There sometimes is overlap, just as there sometimes is under Rule 23. But what they've alleged -- if there were a policy that said here we

are, you, personal bankers, don't get overtime, and if they demonstrated that they did work overtime and were otherwise entitled to it, well, then they may be similarly situated. But that is not the policy. The policy was, and is, that they are eligible for overtime, they did keep time records, they recorded their own time, they were instructed to record it accurately, and they were paid for all time that they recorded.

So what they're alleging, in essence, is that they individually, together with possibly their own individual manager, decided to violate that policy. Whether they did or didn't violate that policy is the merits-based question, but the question for the Court on conditional certification is, is there common proof that all of the personal bankers were subject to a class-wide policy. And that's why we're willing to talk about and engage in discovery around those policies, the compensation plans, policies around timekeeping, policies around no off-the-clock work, training around the timekeeping policies, and recording all time worked and how that was enforced, because that would inform the Court as to whether or not there is a class-wide policy that's capable of determination by common proof or whether or not you'd have to go individual by individual to say, did you violate the policy around recording all time worked and did you work time without being paid, did your manager know whether or not you worked time without being paid, did you record the time, why or why

not. And if it devolves into that type of an inquiry, then clearly it would not be a collective action.

THE COURT: So as I understand what you're saying, the context of a motion for certification, there is at least some merits litigation, that is, the plaintiffs would have to show some colorable factual basis for their contention that there was a practice or policy?

MR. LINTHORST: Right. There is an evidentiary burden for them to say, this is what my claim is. Now, whether or not I win or lose is for another day, but this is what my claim is: I received a memo from the home office saying, you know, here's your handbook and on page 39 of the handbook it says, personal bankers don't work -- shouldn't record their time for overtime. Oh, and this handbook we see is applicable to all personal bankers. OK, well, now they come to the Court and say, look, here's a common policy applicable to all personal bankers. If, on the other hand, we take Ms. Ruiz's deposition, for example, and she says, well, you know, my manager never told me to stay but I really wanted to get extra incentive compensation, so without telling her, I stayed longer, OK, well, that's not a class-wide policy; that's her deciding to work longer, her deciding to violate the policy around recording all time worked. And clearly, whether or not anybody else did that is not susceptible to common proof. You know, she's alleged, for example, that she was more highly compensated than other

personal bankers, it was harder for her to meet her sales goals. So that's another way in which she is not going to be similarly situated to others. She's also indicated at various times that because she spoke Spanish, she had additional service obligations that made it harder for her to get all her work done during the 40-hour week.

Now, we know that she did record overtime; and when she recorded it, she was paid for it. So the inquiry will be around her claims and whether or not they are susceptible to common proof across the entire class, which is why we say we can dig into the merits of these individuals' claims, and if their claims are, here's a class-wide policy, then they will both do discovery towards their claims as well as towards a motion for collective or class certification.

THE COURT: On the other hand, I would imagine that individuals at the level that they were working at might know what their manager was doing vis-a-vis them. And let's assume the individual plaintiffs were saying, look, a manager is telling us this is the way it is, you can't get more, we're not paying this, even though it's not on page 39 of the handbook -- that in order to determine whether in fact a handful of managers who would have dealt with a handful of plaintiffs and class reps were carrying out a policy, the plaintiffs would need to explore that with higher-ranking Citibank officials, I would think.

MR. LINTHORST: Sure, and --

THE COURT: And if that would be the case, then presumably that, as you outline the burden of plaintiff in certification motion, would open up that form of discovery as well. And if that be the case, then it begins to look like, putting to one side, let's say, the actual payments made to the thousands of personal bankers out there, that at least insofar as the practice of the bank is concerned, that that discovery would unavoidably be opened up from this point on rather than for some later point. Or do you disagree with that?

MR. LINTHORST: Well, I think it's a question of degree. They certainly can, and sounds like they will, go depose the branch manager of the named representative, and they'll say, you know, did you instruct them not to work overtime, or, you know, what policies and procedures did you have. I mean a branch network of hundreds of branches across the country, going back three to six years, you couldn't have a class-wide policy that's just word of mouth or smoke signals or something; there would have to be a policy saying, this is what we wanted you to do. So they can ask the branch manager, did you get a directive from higher up saying, tell the personal bankers not to work overtime. And if the answer is yes, then obviously that's further evidence. But that doesn't mean that we have to go and produce the personnel files, the time records, the payroll records, every single email sent and

received by personal -- thousands of personal bankers across the country, going back three to six years. I view that as still being at the policy level of discovery where -- and, again, there may be overlap with the merits, but it's still not a file-by-file email-by-email discovery because if that's the discovery you have to do, clearly, they're not going to be similarly situated litigated on a representative basis.

THE COURT: Since you mentioned email discovery, let me just touch on that and ask you whether you have an understanding at this point of what kind of searches would be appropriate for the initial discovery, to the extent that the defendant is proposing that there be a distinction between initial discovery and the full range of fact discovery?

MR. LINTHORST: Well, for email, we'd be willing to talk about searches for the named representatives and digging into their email. I don't see why it would be relevant even as to them. The question is, what hours did they work and did they record their time as they were instructed to do, and if they didn't, why not, and who knew about it, and what was the work that they were doing, and did they leave work late one day and leave early another day?

THE COURT: Let me pose this to you: To the extent that you're suggesting that the initial discovery ought to be focused on whether there is some uniformity, that is, a policy or practice, I cannot imagine how you could accomplish that by

limiting email discovery the way you're suggesting. If anywhere there's going to be a sub rosa practice or policy, and evidence of it, presumably you would find it most likely in email correspondence between senior people who are in charge of keeping costs down for this aspect of the commercial banking end of the Citigroup or Citibank entity.

Now, I think the net effect of what you're proposing, in terms of how to define discovery, would mean there would be at least two email searches. The email search pertinent to the existence of a practice or policy -- which I would think would have to include a search for documents at some level of the hierarchy discussing costs, reducing costs and overtime, whatever kind of search you can imagine that would follow that kind of parameter -- would presumably turn up a fair number of emails. Whether they're ultimately pertinent or not, I don't know, but I can't imagine how you can skip that as a predicate to a motion for certification if, as you say, the plaintiffs have to make at least some minimal showing of a policy or practice.

MR. LINTHORST: Well, again --

THE COURT: Unless you're saying that the only way they can make that showing is to point to page 39 of the handbook, which I suspect is not the case. It is at least conceivable --

MR. LINTHORST: Right.

THE COURT: -- it is at least plausible that an entity like Citibank might have some other way of trying to reduce overtime, other than putting on page 39 of the handbook, there will be no overtime. I don't know if that's the case factually or not, but that's certainly a plausible scenario.

MR. LINTHORST: Sure. A couple of points: First of all, there's absolutely nothing unlawful about trying to reduce overtime.

THE COURT: No one's suggesting that it is. It depends on how you implement that.

MR. LINTHORST: What's unlawful is making people work and not paying them for that. So perhaps it would be appropriate to start with the management chain for the named representatives because if there's a class-wide policy that resulted in their managers implementing a policy to making them work off the clock, presumably they got the email that rolled that out in the hypothetical scenario. It doesn't mean we have to scour states where nobody's here, people where nobody's before the Court and no determination has been made. But if there's a class-wide policy that's been implemented by their managers, presumably in deposition they'll ask them about that, and presumably there could be document requests directed toward that. And if they don't find it there, then there would be no reason to go scouring every manager going back three to six years for that.

THE COURT: Another related question, and we'll put aside for the moment whether three to six years would be the appropriate scope of the search for that particular item: You say they are asserting a nationwide class. What if, assuming hypothetically, that within the hierarchy of Citibank there is a subhierarchy, if you will, that is responsible, let's say, for New York State or New York State and a few other states, the Northeast, and they decide somewhere in that hierarchy that for our area, we're going to cut down on overtime, we recognize that they're going to have to work more than perhaps would be authorized for straight time but we're going to do X, Y and Z things to kind of get around that problem, that will ultimately involve at least potentially not paying them all that they're owed -- would not an email search for that subgroup, if you will, be appropriate in these circumstances, or does the fact that they are alleging a nationwide group preclude the Court from ultimately certifying a narrower group, if there's evidence of a narrower, geographically narrower, policy?

MR. LINTHORST: Clearly, the Court is not precluded in that respect. But, again, I think if we start with the named representatives and explore discovery through their management chain, that will either lead nowhere, because either it didn't happen or their manager did something they weren't supposed to do, or it will lead to something else, whether that's a region or a branch, an individual branch or wherever that leads.

Again, it should start with the people who were before the Court and a determination of what it was that led to their allegations and whether or not that's applicable to others on any type of a common proof.

So if we do an email search appropriately tailored for Ms. Ruiz's manager, for example, we'll see what we find, and they'll take her deposition and they'll see what they find. And if they find evidence of a class-wide policy applicable to the branch or to something else, then we go from there. But to say, we're going to start with everyone, everywhere, going back in time when we know today we have five or six individuals and we don't know whether we're ever going to have more than that, that's taking it backwards, from our perspective.

THE COURT: OK. Apart from deposing the named representatives, what other discovery does the defendant contemplate?

MR. LINTHORST: I don't know that we'll need to depose anyone other than the representatives. We've served document requests on them. There may be certain third-party discovery relating to other employers or background, anything that they might have been doing, at the time that they were employed by Citibank, that might indicate how much time they had at Citibank or not had. That would be what we would contemplate.

THE COURT: OK. How about discovery testimony, would you expect, if the case were litigated to trial, that the

defendant would call any experts?

MR. LINTHORST: I don't know. I typically don't start with the proposition that we need that. I don't see any need for it prior to a determination on class or collective action. I certainly don't see a need for it if the case is determined not to be able to proceed on a class or collective action, and so I would say we don't have any expectation of that. But if the case were to be certified, we'd want to evaluate it there. And obviously if the plaintiff were to designate, we would want to reevaluate as well.

THE COURT: By the way, are you aware of any rules or requirements or general nostrums about the timing of the certification motion in the context of an ongoing litigation?

MR. LINTHORST: There's no hard deadlines for that, for the FLSA collective action. Plaintiffs usually file after they've had a chance to get some initial discovery around class-wide policies or the allegations that they've made. We have proposed, I think, a date in the proposed scheduling order by which they will have filed the collective and class certification motions and set forth a proposed schedule for those motions.

THE COURT: I see June 30, 2011 is in paragraph 4 of this document?

MR. LINTHORST: That's correct, your Honor.

THE COURT: All right.

MS. WALSH: Your Honor, may I be heard on class certification --

THE COURT: Yes.

MS. WALSH: -- as it relates to discovery?

In this type of case, there are really two levels of class certification. There's the initial motion for conditional class certification. That's done relatively early in the litigation, and the standards that plaintiffs have to meet at this stage are very lenient. We just have to make a minimal showing that our clients are similarly situated to other people that are out there. And once we can get an order granting conditional class certification, the Court will issue a notice to putative classes members advising them that the class has been conditionally certified and giving them the opportunity to opt into the class, and that the timing of this motion is very important because we do have a statute of limitations issue at least with respect to the federal claims because there are collective opt-in claims, the statute keeps running until each individual members opts into the class.

So we like to get going on the conditional class certification motion as quickly as possible. We do need a certain amount of discovery in order to give a support for that motion. And I just mention that because we'd like that get our discovery sooner rather than later, your Honor.

THE COURT: I understand that. Actually, I was a

little bit surprised that the proposal was not later than June 30. It seems like a long time. That doesn't preclude you, I guess, from making an earlier motion?

MS. WALSH: It doesn't. I believe it says we can file at any time but no later than June 30th.

THE COURT: And the proposed scheduling order does at least seem to suggest agreement that there be bifurcated discovery because it says the parties propose an initial period of fact discovery to be completed by April 15.

MS. WALSH: I think -- what plaintiffs meant by that, actually, is that fact discovery shall be completed by April 15th and it shall not be limited, initial -- including the word "initial" I believe was misleading, it wasn't intended, not by us at least. The paragraph later states that we propose that discovery during the period shall not be limited.

THE COURT: OK, let me ask you this: If the discovery that you contemplate would include ultimately going through the payment records and the time records of all of the personal bankers, who apparently number in the thousands, why would you need that for the certification motion?

MS. WALSH: Well, it goes to the issue of whether or not our plaintiffs are similarly situated. That's definitely one issue. The numerosity aspect of class certification, it goes to that issue.

THE COURT: It seems to me effectively then what you do is you engage in discovery as if the class had been certified before you determine whether the class is going to be certified.

MS. WALSH: Well --

THE COURT: Why do you need it if your burden is only minimal, as you describe it, for purposes of the conditional certification?

MS. WALSH: You're probably right, your Honor; we probably wouldn't need that expansive discovery at this stage. I think what's most important at this stage is really anything that shows the time that was actually worked by class members, and not what was recorded, and obviously the list of personal bankers and their last known contact information.

And I believe your Honor had a great suggestion about the emails; if there's going to be a sub rosa practice of not paying people overtime because Citibank wants to keep its costs down, then I think that is something that would be discussed at the higher levels of management within Citibank, and I think email searches of those people's files would be appropriate. And those searches should not be limited just to Ms. Ruiz's branch manager. We have several additional branch managers now. We have people ranging as far out as California, so this is clearly not limited to New York; it's California, Illinois, D.C., Virginia.

THE COURT: Let me ask you this: What is the factual basis or premise for your assertion that there was a Citibank-wide policy or practice rather than, as defense counsel suggests, something that went on between the handful of named plaintiffs and their branch managers?

MS. WALSH: Well, during our investigation, obviously we have clients -- we had conversations with our client but our client -- those conversations gave us ample belief that this was a widespread practice. And after we filed the case, we talked to additional potential class members who confirmed our suspicions, and these are people that worked at branches other than the branch that Ms. Ruiz worked at. And then of course the Winfield plaintiffs filed their case with --

THE COURT: Geographically, what area do the named class reps cover?

MS. WALSH: All of them? California, New York, Illinois, D.C., and Virginia.

MR. LINTHORST: Your Honor, can I just be heard on the class list issue?

THE COURT: Yes.

MR. LINTHORST: As Ms. Walsh indicated, the FLSA certification process is a two-step process. There's the initial motion for conditional certification, but that's based on an initial finding, however lenient, whatever the standard is, that the class is similarly situated, whether that's a

nationwide class or something much more narrow.

Once that determination has been made, the Court orders a class list to be produced, and notice goes out to whatever class the Court would find, a notice that is reviewed and authorized by the Court. And so this is an orderly process that happens under the Court's supervision. To require us to produce the class list before any determination of similarly situated in this, for plaintiffs counsel to send their own notice or have whatever contacts or attempt to recruit others to join the case really puts the cart before the horse. That's done as soon as, and only if, the Court finds that they're similarly situated to others and only to the extent that -- of the group that it finds is similarly situated.

THE COURT: By the way, I assume this issue has come up before. Does either side have some legal authority on any of this?

MS. WALSH: Actually, your Honor, there's a recent decision. I don't have it with me today but I'm happy to send it on to the Court later. It's in a case involving Wolfgang Puck in the Southern District of New York -- possibly Eastern District, I believe it's Southern District of New York -- and the Court ordered discovery of class members' identify for the very purpose of determining whether or not they are similarly situated.

THE COURT: Well, let me leave that particular issue

in the following status: I'd be happy to receive legal authority from both sides. If you can fax me something by the end of today, that would obviously be helpful. I'd like to at least address that quickly. If there's anything you want to respond to the other side's submission, do it tomorrow.

MR. LINTHORST: May I ask, can we have until tomorrow to make the submission?

MS. WALSH: I would join in that request. I have another brief due, your Honor.

THE COURT: I don't want to overly press you. So Wednesday for initial submission, Thursday for responses.

As far as the time frame is concerned, what I think I will do is, direct that fact discovery proceed, that it be presumptively limited to the pertinent issues relating to the certification motion. However, my working assumption is that it will include the areas that we have covered, which will, as I think the parties agree, encompass documentation and testimony by and about the class reps, documentation and testimony concerning any possible practice or policy, which in my view is likely to extend well beyond branch managers. The parties are to sit down promptly to work out a mutually agreed e-discovery protocol for this purpose. I've already indicated to you my own view about the appropriate general scope of that, and I expect that standard will be enforced in this case absent compelling argument to the contrary from either side.

It sounds as if, frankly, if we exclude -- and I think we will for now -- exclude discovery of all of the many class members' personal files concerning their time spent and the like, for purposes at least of class cert, that the fact discovery ought to be completed earlier than April 15. I would set at least initially the end of February to do that.

Let me also make clear that if any discovery at least arguably relevant to the class certification issues, even if it is also relevant to the merits, is to be open to pursuit by the parties, so that we not end up spawning a tidal wave of disputes about whether particular requests or questions is or isn't pertinent to merits discovery as opposed to class cert discovery.

It sounds to me as if the large part of discovery that is not necessarily going to be crucial to the certification motion, particularly in view of the self-described minimum burden of plaintiffs, is the detailed discovery of the particular payments made to individuals across the country. There may be some specific individuals that you want to target, and, if so, assuming you can't get agreement by the other side about that, I will be available to deal with any such disputes. But I am trying, at least at this stage, to streamline things as best we can. If the discovery I've outlined is to be completed by the end of February, then it is appropriate, I would think, for the motion to be made by no later than the end

                                                                  of March.

Finally, I will ask you whether you think, given that general approach, it makes sense to set a deadline for all remaining discovery at this time?

MS. WALSH: Sure.

MR. LINTHORST: Your Honor, I would respectfully submit that maybe we meet and confer after the Court's ruling on a motion for conditional and/or class certification, since the case could be drastically different, depending on how that motion turns out.

MS. WALSH: And I would say that it certainly does not have to have a deadline put in the order; and if the class certification motion is denied, then it will be denied.

THE COURT: I think what I will do is ask that you provide copies of the motion to me before I set a cutoff for fact discovery. Based on that, we may have another conference in any event to make some sensible determination of when the end of discovery should occur. My working assumption is that Judge Koeltl, when he gets full briefing on the certification motion, will act rather quickly. So I don't think there's going to be a lag simply by virtue of the fact that we don't set a cutoff today. So when you file your motion, please provide me with a courtesy copy, and then we'll be in touch to set another date for another conference.

Let me also now touch on a couple of points about

discovery matters and the logistics generally with regard to pretrial issues, much of which I suspect had been well-known to counsel on both sides but I think it's worth reiterating at this stage.

First of all, if there are any disagreements between the parties concerning any pretrial matter -- whether it be the appropriateness of a discovery request, the adequacy of the discovery response or anything else having to do with pretrial -- before you come to the Court for a ruling, you are required to attempt to resolve the disagreement between yourselves. That obligation is not satisfied by wafting letters at each other; you actually have to talk to each other either on the phone or in person. If there's any issue that you cannot resolve in this fashion, for which either side wishes a Court resolution, I suggest that you come reasonably promptly to the Court. I'm available on short notice for conferences and I can do telephone conferences if that's more convenient for the parties.

Generally speaking, I found that these sort of disputes, if presented to the Court, can be resolved in a fairly informal fashion, either by letter or by conference or by some combination of the two. The principal exception would be if there's a claim of privilege, in which case the party invoking the privilege has the burden of proving the facts on which the privilege claim is based, and must do so by competent

evidence. So for that, we generally require affidavits or equivalent evidentiary proffers.

Finally, have there been any settlement discussions?

MS. WALSH: No.

THE COURT: OK. If at any point you think it would be helpful to have the Court involved in such discussions, let me know and we can always arrange something along those lines.

Is there anything else that we should address at this time?

MS. WALSH: I don't think so. I think that covers it, your Honor.

MR. LINTHORST: I think that covers it. Thank you.

THE COURT: Thank you very much.

Actually, there is one other thing. It occurs to me there is one other item that we left articulated but not addressed explicitly, and, that is, the consolidation question. I think it's implicit in what we've discussed that for purposes of discovery, the cases are appropriately consolidated. We will be acting on that basis.

MS. WALSH: Thank you, your Honor.

THE COURT: Thank you.

MR. MacFALL: Thank you.

* * *