Sam S. Shaulson (SS-0460)
sshaulson@morganlewis.com
Thomas A. Linthorst (TL-3345)
tlinthorst@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6718 (Telephone)
(212) 309-6001 (Fax)
Attorneys for Defendant

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIGNA RUIZ, on behalf of herself and all others similarly situated, | : <br> : <br> : |
| Plaintiff, | : **Civ. A. No. 10-cv-5950 (JGK) (THK)** <br> : |
| v. | : <br> : |
| Citibank, N.A., | : <br> : |
| Defendant | : |
| FREDERICK WINFIELD, on behalf of himself and all others similarly situated, | : <br> : <br> : |
| Plaintiff, | : **Civ. A. No. 10-cv-7304 (JGK) (THK)** <br> : |
| v. | : <br> : |
| Citibank, N.A., | : <br> : |
| Defendant | : |

## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION
## AS AN FLSA COLLECTIVE ACTION AND FOR COURT-AUTHORIZED
## <u>NOTICE TO SIMILARLY SITUATED INDIVIDUALS</u>

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................................ 1

I.      STATEMENT OF FACTS ...................................................................................... 3

    A.      The Citibank Branch Network And The Personal Banker Position ............................... 3

    B.      Each PB Had Different Sales Goals And Different Opportunities To Meet Them ........ 4

    C.      Citibank Requires Personal Bankers To Record All Time Worked And Pays
        Time-And-A-Half For All Overtime. ............................................................................ 6

    D.      Plaintiffs' Individual Allegations ................................................................................. 7

II.     ARGUMENT ........................................................................................................ 11

    A.      The Court Should Exercise Its Discretion To Deny Collective Action Certification ... 11

    B.      Under Circumstances Similar To Those In This Case, Courts Have Denied
        Conditional Certification. ............................................................................................ 13

    C.      Plaintiffs And The Putative Class Of PBs Are Not Similarly Situated ........................ 16

        1.      Plaintiffs and the putative class are not similarly situated with respect to whether
             and to what extent they worked overtime. ....................................................... 18

        2.      Plaintiffs and the putative class are not similarly situated with respect to whether
             overtime was requested, approved, recorded, and/or paid ............................... 22

        3.      Plaintiffs and the putative class are not similarly situated with respect to whether or
             how a manager would know (or should know) that a PB worked overtime that they
             did not record ................................................................................................. 23

    D.      Plaintiffs Have Failed To Demonstrate That Their Disparate Experiences Were
        Part Of A Class-Wide Policy And Practice. .................................................................. 24

    E.      The Cases Cited By Plaintiffs Are Readily Distinguishable ........................................ 28

    F.      The Notice Requested By Plaintiff Is Inappropriate .................................................... 29

III.    CONCLUSION ..................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

### CASES

<u>Adams v. Inter-Con Sec. System, Inc.</u>,
  242 F.R.D. 530 (N.D. Cal. 2007) ............................................................. 29

<u>Aguirre v. SBC Commc'ns, Inc.</u>,
  2007 WL 772756 (S.D. Tex. Mar. 12, 2007) ............................................ 13

<u>Barfield v. N.Y. City Health & Hospitals Corp.</u>,
  2005 WL 3098730 (S.D.N.Y. Nov. 18, 2005) .......................................... 12

<u>Basco v. Wal-Mart Stores, Inc.</u>,
  2004 WL 1497709 (E.D. La. Jul. 2, 2004) ............................................... 17

<u>Brickey v. Dolgencorp, Inc.</u>,
  2011 WL 643256 (W.D.N.Y. Feb. 23, 2011) ........................................... 15

<u>Brumbelow v. Quality Mills, Inc.</u>,
  462 F.2d 1324 (5th Cir. 1972) ................................................................. 16

<u>Burkhart-Deal v. CitiFinancial, Inc.</u>,
  2010 WL 457127 (W.D. Pa. Feb. 4, 2010)........................................... 14, 29

<u>Castle v. Wells Fargo Finance, Inc.</u>,
  2008 WL 495705 (N.D. Cal. Feb. 20, 2008) ............................................ 15

<u>Colozzi v. St. Joseph's Hospital Health Ctr.</u>,
  595 F. Supp. 2d 200 (N.D.N.Y. 2009) ..................................................... 29

<u>Davis v. Charoen Pokphand (USA), Inc.</u>,
  303 F. Supp. 2d 1272 (M.D. Ala. 2004)............................................... 12, 13

<u>Diaz v. Electrics Boutique of America, Inc.</u>,
  2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ......................................... 15

<u>Eng-Hatcher v. Sprint Nextel Corp.</u>,
  2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) ....................................*passim*

<u>Fei v. WestLB AG</u>,
  2008 WL 7863592 (S.D.N.Y. Apr. 23, 2008) ........................................... 30

<u>Flores v. Lifeway Foods, Inc.</u>,
  289 F. Supp. 2d 1042 (N.D. Ill. 2003)...................................................... 27

<u>Gilbert v. Citigroup, Inc.</u>,
  2009 WL 424320 (N.D Cal. Feb. 18, 2009)........................................... 22, 28

Guan Ming Lin v. Benihana National Corp.,
    755 F. Supp. 2d 504 (S.D.N.Y. 2010) ........................................................ 12

Guillen v. Marshalls of MA, Inc.,
    750 F. Supp. 2d 469 (S.D.N.Y. 2010) ........................................................ 26

Hallissey v. America Online, Inc.,
    2008 WL 465112 (S.D.N.Y. Feb. 19, 2008) .............................................. 28

Hens v. Clientlogic Operating Corp.,
    2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006).......................................... 29

Hinojos v. Home Depot, Inc.,
    2006 WL 3712944 (D. Nev. Dec. 12, 2006).............................................. 16

Hoffman-LaRoche, Inc. v. Sperling,
    493 U.S. 165 (1989) ............................................................................. 11, 12

Joza v. WW JFK, LLC,
    2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ........................ 15, 16, 23, 24

Laroque v. Domino's Pizza, LLC,
    557 F. Supp. 2d 346 (E.D.N.Y. 2008) ...................................................... 26

Levy v. Verizon Inf. Services,
    2007 WL 17447104 (E.D.N.Y. Jun. 11, 2007)........................................... 28

Mechmet v. Four Seasons Hotels, Ltd.,
    825 F.2d 1173 (7th Cir. 1987) .................................................................. 14

Mendoza v. Casa de Cambio Delgado, Inc.,
    2008 WL 938584 (S.D.N.Y. April 7, 2008) .............................................. 27

Morisky v. Public Serv. Electric & Gas Co.,
    111 F. Supp. 2d 493 (D.N.J. 2000)........................................................... 13

Newton v. City of Henderson,
    47 F.3d 746 (5th Cir. 1995) ..................................................................... 16

Pfohl v. Farmers Insurance Grp.,
    2004 WL 554834 (C.D. Cal. Mar. 1, 2004) .............................................. 27

Prizmic v. Armour, Inc.,
    2006 WL 1662614 (E.D.N.Y. Jun. 12, 2006)............................................ 12

Rudd v. T.L. Cannon Corp.,
    2011 WL 831446 (N.D.N.Y. Jan. 4, 2011) ............................................... 29

Ruggles v. Wellpoint,
    591 F. Supp. 2d 150 (N.D.N.Y. 2008) ........................................................ 26

Seever v. Carrols Corp.,
    528 F. Supp. 2d 159 (W.D.N.Y. 2007) ...................................................... 15

Simmons v. T-Mobile USA, Inc.,
    2007 WL 210008 (S.D. Tex. Jan. 24, 2007) .............................................. 14

Singh v. City of New York,
    418 F. Supp. 2d 390 (S.D.N.Y. 2005) ........................................................ 16

Singh v. City of New York,
    524 F.3d 361 (2d Cir. 2005) ................................................................. 16, 17

Torres v. Gristede's Operating Corp.,
    2006 U.S. Dist. LEXIS 74039 (S.D.N.Y. Sept. 28, 2006) ......................... 13

Trinh v. J.P. Morgan Chase & Co.,
    2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) ........................................... 28

West v. Border Foods, Inc.,
    2006 WL 1892527 (D. Minn. Jul. 10, 2006) ............................................. 16

White v. Osmose, Inc.,
    204 F. Supp. 2d 1309 (M.D. Ala. 2002) .................................................... 16

Wombles v. Title Max of Ala., Inc.,
    2005 WL 3312670 (M.D. Ala. Dec. 7, 2005) ............................................ 12

Zivali v. AT&T Mobility, LLC,
    - F. Supp. 2d -, 2011 WL 1815391 (S.D.N.Y. May 12, 2011) ......... 15, 16, 24

## FEDERAL STATUTES and RULES

29 U.S.C. § 207(a) ................................................................................ 16

29 U.S.C. § 251(a)(1), (4), (7) ............................................................. 11

29 U.S.C. § 255(a), ........................................................................... 4, 29

Fed. R. Civ. P. 23 ................................................................................ 30

**MISCELLANEOUS**

DOL Opinion Letter, 1986 DOLWH LEXIS 79 (May 30, 1986) ......................................6

**INTRODUCTION**

Plaintiffs in these two cases are former Personal Bankers ("PBs") of Defendant Citibank, N.A. who claim that they worked overtime without proper compensation, and assert claims under the Fair Labor Standards Act ("FLSA") and several state laws.  Plaintiffs do not allege, and have expressly disavowed, that Citibank required them to work overtime without proper compensation. Instead, Plaintiffs contend that because of the requirements of the job – specifically their sales goals – they took it upon themselves to work overtime, and their individual managers knew or should have known of such work yet failed to pay them for it.  Plaintiffs seek to proceed as a collective action under the FLSA together with all other PBs nationwide, going back three years.  Plaintiffs have fallen woefully short, even under a lenient standard, of demonstrating they are similarly situated to each other, much less to thousands of current and former PBs nationwide.

Plaintiffs make their allegations in the face of Citibank's robust policies and training to ensure that all time worked is recorded and paid, which are enforced under threat of discipline, including termination.  Not only does Citibank pay for all overtime required by law, but its policies provide for the payment of overtime under numerous circumstances not required by law.

Notably, Plaintiffs testified that it was not common duties or similar sales goals that caused them to work overtime, but their own aberrational circumstances, such as the staffing in their branch, the nature of the branch clientele, the languages spoken by them and the branch clientele, the location of the branch, the volume of walk-in traffic at the branch, the age of the branch, their relationship with their manager, and many other factors based on their individual circumstances. Plaintiffs themselves testified that, under different circumstances, it was possible that PBs could meet their sales goals and complete their duties without working overtime.

Nor are the sales goals "similar" for all PBs.  Sales goals for PBs are set individually, based on the PBs salary, the age of the branch, and the experience of the PB.  Just among the Plaintiffs the

sales goals varied at different times by more than 20%, 50%, even more than 240%. And the opportunities for PBs to meet their sales goals varied widely, with some PBs able to earn additional credits based on having insurance and securities licenses, and by being qualified to sell business products. Whereas Plaintiffs claim they had difficulty meeting their sales goals, Opt-In Dara Ho, testified that it was "so easy" to meet her sales goals, and she often doubled or tripled them, earning over $182,000 in incentive compensation and trips to Mexico, Hawaii, and Florida. Numerous other PBs have testified that they regularly met and exceeded their sales goals without working overtime.

The evidence also refutes Plaintiffs' claims of a uniform system of discipline. Plaintiffs allege that PBs were required to be disciplined for missing their sales goals for even one month, and could be terminated for missing three months. Plaintiffs themselves testified, however, that local Branch Managers had discretion to deviate from these supposed standards. Plaintiff Winfield missed his sales goals for the first 20 consecutive months without receiving any discipline for doing so, and Plaintiff Shen missed his sales goals for 12 consecutive months without being terminated.

Plaintiffs' claim of a "no overtime" policy is similarly baseless. Citibank has paid over $7.8 million in overtime to PBs since 2008. Every one of the Plaintiffs and Opt-In regularly recorded and was paid overtime – in over half of their paychecks. Plaintiffs themselves conceded that some Branch Managers approved overtime, including specifically to permit PBs to meet their sales goals. Numerous other PBs testified that they were paid for all time worked, and that their managers regularly approved and paid them for overtime, including to meet their sales goals.

Plaintiffs' claims that the non-existent "no overtime" policy came from "Area" or "Regional" managers is based on double hearsay testimony that, even on its face, establishes nothing more than that Area Managers wanted to limit the amount of overtime worked. Not even Plaintiffs' own evidence establishes that any Area Manager or other manager outside their own branches directed or permitted the failure to pay for overtime worked. Finally, Plaintiffs' claim that the financial crisis

2

caused Citibank to fail to pay all PBs for overtime worked is rank speculation and is thoroughly refuted by the millions of dollars of overtime Citibank paid to PBs throughout the financial crisis, even when the law did not require it.

Plaintiffs also submit declarations from four other former PBs who claim that they were not paid for all time worked ("Plaintiff Declarants").  The only thing remarkable about this evidence is how few PBs have come forward to support Plaintiffs' claims.  Months ago, Citibank provided Plaintiffs with the names, addresses, and telephone numbers for <u>every single one of 4,030 current and former PBs</u> employed in the Unites States from August 2007 through 2010, yet only four of them have come forward to support their claims (and none have joined the case).

Plaintiffs have failed to provide any evidence of any classwide unlawful policies or practices, or any common basis on which to determine whether every other PB needed to work overtime (or why, when, or how much), whether their managers approved such overtime, whether they recorded the overtime on their time records, whether the manager knew or should have known of the unpaid overtime, and whether the work at issue is compensable under the FLSA or is non-compensable because it was de minimis or preliminary or postliminary work.  Plaintiffs themselves testified under oath that there is no way to determine whether any PB worked overtime without proper compensation other than to make inquiry of each PB individually.  Numerous courts – including this Court – have denied conditional certification where, as here, plaintiffs have failed to demonstrate any factual nexus that they are all victims of an ***<u>illegal</u>*** ***<u>and</u>*** ***<u>common</u>*** policy.   For all of these reasons, Plaintiffs' Motion for Conditional Collective Certification should be denied.

## I.     STATEMENT OF FACTS

### A.     The Citibank Branch Network And The Personal Banker Position.

Citibank has approximately 1,000 bank branches in thirteen states, plus the District of Columbia.  Putman Decl. ¶ 7.  Each branch is managed by a Branch Manager, and employs

anywhere from one to ten Personal Bankers, depending on the location and size of the branch, and a group of Tellers, who are responsible for tasks such as taking deposits.  Putman Decl. ¶¶ 4, 5.[1] Some branches also have Assistant Branch Managers, and Service Officers.  Service Officers are responsible for handling customer service issues and complaints.  Putman Decl. ¶ 6.  A total of 4,030 Personal Bankers worked at branches nationwide in the period from August 2007 through 2010.[2] During the relevant period, there were at least four different levels of Personal Banker, each with different qualifications and job responsibilities.  Walsh Decl., Ex. 10.  PBs also performed widely different duties depending on their individual circumstances and the circumstances of their branch. Ruiz Dep. 354; Chu Decl. ¶ 7, Fernandez Decl. ¶¶ 3, 8, Gray Decl. ¶¶ 4, 5, Marsico Decl. ¶¶ 4, 5.

**B.      Each PB Had Different Sales Goals And Different Opportunities To Meet Them.**

Although there was a single compensation plan applicable to all PBs at any particular time, the plan changed regularly and established *individual* sales goals for each PB.  Winfield Dep. 113; Ruiz Dep. 103; Walsh Decl. Exs. 8, 11, 12.  Under the incentive compensation plans, a PB had a monthly sales goal (or "hurdle"), and earned sales credits based on a variety of business metrics. Walsh Decl. Ex. 8, pp. 7-15, Ex. 11, pp. 5-11, Ex. 12, pp. 5-11.  PBs were paid a percentage of the amount their sales credits exceeded their goal each month.  Walsh Decl. Ex. 8, p. 6.

For most of the FLSA limitations period (since January 2009), a PB's sales goal was established as a percentage of his or her base salary, and the percentage varied based on the age of the branch.  Walsh Decl., Ex. 11, p. 10, Ex. 12, pp. 10.  The plans also provided for sales goals to be pro rated to 50% for new PBs during their first three months, and 80% for their next three months.

---

[1]  The deposition transcript excerpts and declarations are attached as exhibits, by witness in alphabetical order, to the Linthorst Declaration, except that the Walsh Declaration was previously filed by Plaintiffs.

[2]  Plaintiffs state several times that the class list attached as Ex. 7 to their Motion reflects 3,962 Personal Bankers, but by Citibank's count this list reflects 4,030 Personal Bankers.  Although Citibank produced the list as requested spanning August 2007 through 2010, the maximum statute of limitations under the FLSA claim is three years from the date an individual files a consent to sue with the Court (29 U.S.C. § 255(a)), so the list likely contains some individuals who do not have a timely claim at this point.

Walsh Decl., Ex. 8, p. 20, Ex. 11, p. 19.  Also, PBs who transferred to branches that had been open for less than a year also received a pro rated sales goal.  Walsh Decl., Ex. 8, pp. 20-21, Ex. 11, p. 19.

As a result, no two PBs would have the same sales goals unless they had the same salary, worked at a branch in the same age range, had worked as a PB for longer than 6 months, and had not been transferred to a new branch.  Ruiz Dep. at 115-16.[3]  Salaries among PBs varied widely, based on factors such as past job experience and location.  Steffensen Dep. 38 (starting salary of $38,000); Ruiz Dep. 22-23 (starting salary of $65,000).  None of the Plaintiffs, Opt-In, or Plaintiff Declarants had the same sales goals at any time between 2008 and 2010.  Costa Decl. Ex. 1.

PBs also had wide variations in their opportunities for earning sales credits.  PBs received different sales credits for different products, some of the credits were earned up front, some were earned at a later point, and some would not be earned if the customer did not maintain a certain balance in the account.  Walsh Decl., Ex. 8, p. 7, Ex. 11, p. 5, Ex. 12, pp. 5-6.  A PB, therefore, could make their sales goals selling a lot of small-credit accounts, or fewer large loans, and could lose the chance to earn credits for reasons beyond their control or effort.  Ruiz Dep. 109.

The incentive compensation plans also included credits for selling business products that could only be sold by PBs who had been trained in business products and whose local branch management allowed them to sell business products.  Ruiz Dep. 110-11; Kahn Decl. ¶ 2.  Business products offered significantly more credits than did consumer products, and those PBs eligible to sell business products were afforded an additional set of customers and opportunities to meet their sales goals.  Walsh Decl., Ex. 8, p. 7, Ex. 11, p. 5, Ex. 12, pp. 5-6; Ruiz Dep. 112.

Some PBs were licensed to sell insurance products, which allowed them to earn additional sales credits, and some PBs were licensed to sell securities, and were eligible for additional credits

---

[3]  In 2008, the sales goals were established as a percentage of salary and also had pro rated sales goals for new PBs. Walsh Decl., Ex. 12, p. 10.

for referring customers considering securities products to financial advisors.  Ruiz Dep. 118-19;

Shen Dep. at 299-300; Khan Decl. ¶ 2.  Being eligible to sell business products and sell or refer

insurance and securities customers did not increase a PB's sales goals.  Ruiz Dep. 129; Nakpil Decl.

¶6; Viteri Decl. ¶ 8.

### C.    Citibank Requires Personal Bankers To Record All Time Worked And Pays Time-And-A-Half For All Overtime.

PBs throughout the limitations period were each subject to a series of policies, procedures,

and training that required them to accurately record all of their time worked under penalty of

termination if they failed to abide by those policies.  For example, the Employee Handbook stated:

*Keeping accurate time records*

Falsification of time records is a violation of policy.  Employees who falsify any time record
may be subject to corrective action up to and including termination of employment.

- All time worked is compensable and must be recorded.  If you're a non-exempt and
  overtime-eligible employee, "off-the-clock" work is strictly prohibited.  Managers may
  not request or require "off-the-clock" work.
  . . .
- If you have any concerns about deductions from your pay, overtime pay, or any other
  issue relating to your wages or hours of work, please contact Human Resources.
  Retaliation against any employee for raising a concern is strictly prohibited.

Putman Decl. Ex. B, p. 24; see also Ex. A, p. 27 (handbooks applicable from 2009 to present).

Not only does Citibank require payment of overtime required by law, but it also pays

overtime under circumstances more generous than what the law requires.  For example, Citibank

credits employees with holidays and other approved time off as though they were hours worked,

resulting in overtime payments even where the worker has not actually worked more than 40 hours

in a workweek.  Putman Decl. Ex. A, p. 27, Ex. B, p. 24. [4]

---

[4]  See DOL Opinion Letter, 1986 DOLWH LEXIS 79, *3-4 (May 30, 1986) ("FLSA does not require that vacation
hours be counted in determining the hours that an employee has actually worked for the purpose of determining
overtime pay under the standards discussed above.").

Citibank's Personal Code of Conduct also prohibits falsification of records, and provides multiple avenues for employees to report complaints or concerns.  Putman Decl. Ex. E, pp. 14, 22. Plaintiffs signed acknowledgement forms that they read and would follow the Handbook and Code of Conduct.  Winfield Dep. 183-84, 203-04 & Exs. 15, 16; Shen Dep. 204-05, 208; Steffensen Dep. 137-39; Ho Dep. 193-94, 196.  Plaintiffs admitted that they knew that they were responsible for accurately entering their own hours worked into the Citibank timekeeping system.  Winfield Dep. 185-86, Ruiz Dep. 155-56, 175; Shen Dep. 206; Steffensen Dep. 142-45.

Citibank also trained PBs and their managers on the timekeeping policies and procedures. One of the training modules reiterated the requirement that overtime-eligible employees must "[r]ecord all time worked on [their] time record" and that "[f]alsification of time records is prohibited and may result in corrective action up to an including termination of employment."  Ruiz Dep. 174-76; Putman Decl. ¶ 11 & Ex. H, p. Citi-Ruiz 2195.  The timekeeping software required PBs to record their actual work times to the minute, and PBs were required to check a box for each day's time approving the time as accurate.  Ruiz Dep. 171, 240.

Citibank paid over $7.8 million dollars in overtime to PBs nationwide from 2008 through the present.  Hammond Decl. ¶ 4.  Every Plaintiff, Opt-In, and Plaintiff Declarant regularly recorded and was paid overtime.  Hammond Decl. ¶¶ 5, 6 (Plaintiffs and Opt-In received overtime compensation in more than half of their total paychecks).

### D.    Plaintiffs' Individual Allegations.

Plaintiff Ruiz:  Ruiz testified that she had trouble meeting her sales goals because she was overwhelmed by service duties because she was the only Spanish-speaking PB in a branch with a significant Spanish-speaking customer base, her sales goals were higher than most other Personal Bankers due to her high salary ($65,000), and she claims her manager discriminated against her because Ruiz is Hispanic (Ruiz has filed a separate discrimination claim).  Ruiz Dep. 35, 76-77, 303-

05, 354-55.  Ruiz testified that no one ever requested her to work overtime, no one told her not to record her work time and, to the contrary, her managers told her to properly record her time, to take her lunch, and to leave the branch on time.  Ruiz Dep. 160-61, 181, 184-86, 222, 344-45, 366.  Ruiz secretly disobeyed the instructions of her managers and worked overtime without recording her time, and tried to fool her managers by changing her time entries each day so that it would look like her time was accurate.  Ruiz Dep. 156, 179-180, 185-187, 192-94, 231, 259-260, 366.  Ruiz never requested permission to work the overtime she claims she worked but did not record.  Ruiz Dep. at 161.  Although her managers allegedly said that there needed to be "special circumstances" for the overtime to be approved, it was within the manager's discretion to approve overtime but Ruiz never requested overtime.  Ruiz Dep. at 161, 233-34.  Ruiz's Branch Manager worked in the basement of the branch, supervised 16-17 other employees, and Ruiz testified it would be "almost impossible" for her managers to know what hours she actually worked.  Ruiz Dep. 164-65, 172, 326.  Ruiz was paid for all overtime she recorded.  Ruiz Dep. 162, 202-206; Hammond Decl. ¶¶ 6-11.

Ruiz explained it best herself:  "I was at fault . . . I was not inputting the proper time in the computer.  Q:  And you knew it was Citi's policy that you should input the proper time? A:  Correct.  Q:  And that as a non-exempt or overtime eligible employee, off-the-clock work was strictly prohibited?  A:  Yes."  Ruiz Dep. at 156:5-18.  Ruiz's employment was terminated for forging the signature of a customer.  Ruiz Dep. 347, 366-67.[5]

Adoram Shen.  Shen attributed his need to work overtime to the fact that his branch did not have a Service Officer, which he claims caused him to spend 60%-70% of his time performing the duties of a Service Officer.  Shen Dep. 113-15, 128.  Plaintiffs' Brief relies upon a single statement

---

[5]  Ruiz points to the fact that her 2005 performance review references that she was one of the first to arrive and last to leave, and her 2006 review references that she gave up her lunch hour.  Pls' Br. 10, 12.  Nothing in these entries indicates that the manager was aware that Ruiz did not record this work time.  Moreover, both of these entries are well outside the FLSA statute of limitations and the manager who wrote those entries ceased supervising Ruiz in 2008 (long before Ruiz's termination in 2010).  Ruiz Dep. 27.

by Shen that the directive from the Area Manager was that they should keep their overtime work to a minimum. Pls' Br. 13-14. Plaintiffs, however, fail to disclose that when Shen was questioned about this statement in his deposition, he recanted his testimony and denied that he had ever had any communications with the Area Manager about overtime, and could not recall having <u>any</u> discussions <u>with anyone</u> about keeping overtime to a minimum. Shen Dep. 233-34. Shen also could not recall whether he ever worked any hours he did not record. Shen Dep. 228. Shen could not recall ever being instructed to work overtime without compensation, or being threatened or disciplined for recording overtime. Shen Dep. 227-28. In fact, Shen actually was directed by his Branch Manager, Andre Quiros, to correct his timesheet to ***add time worked*** so that it was accurate. Quiros Decl. ¶ 3 & Ex. A; Shen Dep. 238. Quiros also asked all the PBs, including Shen, if they had ever worked hours they did not record and they denied this had occurred. Quiros Decl. ¶ 5.

<u>Fredrick Winfield</u>: Winfield was denied employment with Citibank after he failed a drug test, which showed cannabis in his system. Winfield Dep. 25-26. He was hired a year later and made his monthly sales goals for only two months in two years, yet he was never disciplined or terminated for such failures. Winfield Dep. 108, 178. Winfield attributed his difficulty in meeting his sales goals to the fact that he worked at a new branch that did not have an existing customer base, which required him to work outside the branch to try to drum up business. Winfield Dep. 152-54. Winfield gave wildly inconsistent testimony, testifying at one point that it was physically impossible to submit more than 40 hours in a workweek in the timekeeping system, and that he never once was paid overtime, even though he submitted and was paid for overtime in over 42% of his paychecks. Winfield Dep. 221-23; Hammond Decl. ¶ 11. Although Winfield had little success in generating sales for Citibank, he was prolific in generating complaints from female co-workers and customers about his comments and conduct. Winfield was issued a final warning and involuntarily transferred away from a branch for making sexually-suggestive comments and

touching two female co-workers.  Winfield Dep. 72-73 & Ex. 11.  And his employment was
terminated after three female customers informed the Branch Manager that Winfield was flirting
with them and had offered to fund the initial balances if they opened accounts with him.  Winfield
Dep. 284-88; Anwar Decl. ¶¶ 4, 7.  After Winfield was terminated, the Branch Manager received
additional complaints from <u>customers</u> that Winfield made other inappropriate comments to or about
females, and talked about drug abuse and buying and selling cocaine.  Anwar Decl ¶ 9.

    <u>James Steffensen</u>:  Steffensen attributed his difficulty in meeting his sales goals to the fact
that his branch was *overstaffed* with PBs and, at times, he did not even have a desk to work at.
Steffensen Dep. 48, 102-03, 107-09.  Steffensen alleges that on occasion, his manager promised
Steffensen "comp time" in lieu of overtime.  Steffensen Dep. 147-48.  Steffensen left early on
Mondays to participate in his bowling league.  Steffensen Dep. 207.  Steffensen's employment was
terminated for chronic failure to achieve his sales goals.  Steffensen Dep. 129-31.

    <u>Zulma Muniz</u>:  Muniz had trouble meeting her sales goals because there was almost no walk-
in traffic in her branch, and it was a low income area where many clients would open accounts but
not put any money in them.  Muniz Dep. 29-31, 38.  Although Muniz testified she gave up
submitting overtime after being reprimanded by her manager for having done so (Muniz Dep. 48-
49), her time and payroll records reflect that she continued submitting and being paid for overtime
up to and including her final month of work in April 2010.  Hammond Decl. ¶ 8 & Ex. A.[6]  Muniz's
employment was terminated for forging her husband's signature on a check from a closed account
that she attempted to deposit into her overdrawn Citibank account.  Muniz Dep. 166-67, 171-72.

    <u>Dara Ho</u>.  By contrast to the Plaintiffs, Opt-In Dara Ho testified that meeting her sales goals
was "so easy" that she regularly doubled or tripled them, and received over $182,000 in incentive

---

[6]  Muniz filed a similar lawsuit against Washington Mutual alleging that she worked unpaid overtime, and although
Laura Grabavoy was her Assistant Manager for some period at Washington Mutual, Muniz followed Ms. Grabavoy
to Citibank.  Muniz Dep. 13-14, 19, 168.

compensation and reward trips to Mexico, Hawaii, and Florida.  Ho Dep. 82-83, 148, 160-62 & Ex.

11, Costa Decl. Ex. 1.  Ho attributed her claimed need to work overtime to the allegation that her

Branch Manager undermined her work because Ho is Chinese (like Ruiz, Ho filed a separate

discrimination claim), and the fact that Ho chose to handle service issues for her clients while other

PBs referred them to Service Officers.  Ho Dep. 40-42.[7]  Ho was terminated for opening up an

account without receiving proper documentation.  Ho Dep. 298-301.

## II.   ARGUMENT

### A.   The Court Should Exercise Its Discretion To Deny Collective Action Certification.

Plaintiff's motion is based on a faulty understanding of the statute and its history.  Over 60

years ago, in response to a flood of "representative" litigation, Congress amended the FLSA to *__limit__*

the ability of employees to proceed collectively.  In the Portal-to-Portal Act of 1947, Congress

precluded representative actions and expressly limited FLSA actions to similarly situated individuals

who have filed consents to join the case.  Congress declared in the statute itself that the explosion of

FLSA litigation threatened to "bring about financial ruin of many employers and seriously impair

the capital resources of many others," and that, in the absence of these limitations, "the courts of the

country would be burdened with excessive and needless litigation and champertous practices would

be encouraged."  29 U.S.C. § 251(a)(1), (4), (7).  See also Hoffman-LaRoche, Inc. v. Sperling, 493

U.S. 165, 173 (1989) (noting that the 1947 amendments to the FLSA were enacted for "the purpose

of limiting private FLSA plaintiffs to employees who asserted claims in their own right and freeing

employers of the burden of representative actions.").  The Supreme Court has made clear that a court

should exercise its discretion to send notice only "in appropriate cases."  Hoffman-LaRoche, 493

U.S. at 170.  The Court cautioned that although "[c]ourt intervention in the notice process for case

---

[7]  Ho claims that, on one occasion in March 2005 she was required to change her time sheet and she wrote "without recourse" on the timesheet.  Pl.s' Br. 13.  This alleged incident occurred well outside the FLSA statute of limitations and Ho's manager at the time ceased supervising her as of 2006.  Ho Dep. 58.

11

management purposes" is an appropriate use of the court's power, "the solicitation of claims" is not, and "courts must be scrupulous to respect judicial neutrality." Id. at 174.

The touchstone for conditional certification is judicial efficiency. Hoffman-LaRoche, 493 U.S. at 170 (the purpose of allowing plaintiffs to proceed collectively is to provide the judicial system the benefit of "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [conduct]"). Employees are similarly situated where Plaintiffs can demonstrate ***through competent evidence*** that they are tied together by a factual nexus that they are all victims of an ***illegal and common*** policy, which permits their claims to be adjudicated on a common basis, thereby saving judicial resources. See, e.g., Guan Ming Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, at *3-4 (S.D.N.Y. 2010) (holding that there must be a "factual nexus" with evidence "'sufficient to demonstrate that [current] and potential plaintiffs together were victims of a common policy or plan that violated the law'."); Prizmic v. Armour, Inc., 2006 WL 1662614, at *2 (E.D.N.Y. Jun. 12, 2006) ("A plaintiff must provide actual evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory allegations"); Barfield v. N.Y. City Health & Hosps. Corp., 2005 WL 3098730, at *1 (S.D.N.Y. Nov. 18, 2005) (holding that "anecdotal hearsay" was insufficient to establish purported company-wide unlawful policy or plan). Where the court must adjudicate the claims individually, judicial efficiencies will not result and conditional certification should be denied. Wombles v. Title Max of Ala., Inc., 2005 WL 3312670, at *5-6 (M.D. Ala. Dec. 7, 2005).

Plaintiffs argue that the motion should be governed by a "lenient standard." Pls' Br. 17-18. However, "[t]he rationale for the 'fairly lenient standard' is that at the early stages of litigation, plaintiffs have not had time to conduct discovery and marshal their best evidence. This rationale disappears, however, once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures." Davis v. Charoen Pokphand (USA), Inc., 303 F. Supp. 2d

1272, 1276 (M.D. Ala. 2004); see also Torres v. Gristede's Operating Corp., 2006 U.S. Dist. LEXIS 74039, at *29 (S.D.N.Y. Sept. 28, 2006) (applying heightened scrutiny where motion for conditional certification was filed after discovery had taken place).[8]

In this case, the parties engaged in seven months of discovery targeted at whether conditional certification was appropriate.  Defendant produced thousands of pages of documents relating to overtime and time keeping policies, the job duties of PBs, and incentive compensation documents. Linthorst Decl. ¶ 2.  More than four months ago, Defendant also produced a list of the names, address and phone numbers of **all** 4,030 PBs employed between August 2007 through 2010.  Where, as here, Plaintiffs have had significant discovery, the lenient standard gives way to a "more searching standard of review."  Davis, 303 F. Supp. 2d at 1276.

### B.      Under Circumstances Similar To Those In This Case, Courts Have Denied Conditional Certification.

Regardless of what standard the Court applies, Plaintiffs have not come close to meeting their burden of showing that they and thousands of current and former PBs nationwide are similarly situated because they have not demonstrated that each has been the victim of a ***common*** ***unlawful*** policy or practice.  See Steffensen Dep. 250 ("Q.  Is there any policy or practice that was applicable to all personal bankers during the time you worked at Citibank that you seek to challenge in this case?  A.  No.").  Courts have repeatedly denied conditional certification where, like here, plaintiffs rely on lawful (and sensible) business policies, like a desire to increase sales and limit overtime, as the basis for presuming a common, unlawful policy or practice.  In Eng-Hatcher v. Sprint Nextel Corp., 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009), plaintiff alleged that she and all other Retail Consultants (RCs) were subject to a "national *de facto* policy" of denying RCs compensation for

---

[8]   Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 497-98 (D.N.J. 2000) (applying higher level of scrutiny where discovery was completed well before the motion for conditional certification was filed); Aguirre v. SBC Commc'ns, Inc., 2007 WL 772756, at *9 (S.D. Tex. Mar. 12, 2007) (where discovery had been conducted, "this court does not accept the substance of plaintiffs' affidavits or depositions over that submitted by the defendants, but examines the evidence to determine whether it is appropriate to certify a class").

overtime worked, which was caused because defendants allegedly exercised "strict control" over their labor costs, while rewarding management with lucrative bonuses for exceeding sales targets. Id. at *3.  Judge Jones denied plaintiff's motion for conditional certification, finding that policies "maximizing sales and minimizing overtime" were insufficient to infer that all managers across the country were beholden to a policy to force RCs to work off-the-clock, particularly where, like here, the employer had a written policy requiring payment for all time worked, and sales quotas and overtime practices that, like those in this case, varied widely.  Id. at *4.  See also Simmons v. T-Mobile USA, Inc., 2007 WL 210008, at *5-6, 9 (S.D. Tex. Jan. 24, 2007) (denying certification of FLSA off-the-clock claims because plaintiff's theory that "T-Mobile's fundamentally inconsistent policies – maximizing sales and minimizing overtime – conflict to the [putative class members'] detriment and cause [them] to believe that if they cannot meet their quotas without working overtime, they are required to work uncompensated overtime hours" did not create evidence of any common policy or plan and there were clear written policies prohibiting off-the-clock work); cf. Burkhart-Deal v. CitiFinancial, Inc., 2010 WL 457127, at *5 (W.D. Pa. Feb. 4, 2010) (limiting notice to branches where plaintiff and declarants worked; "[T]he nature of the asserted policy itself does not readily support nationwide certification or notice.  Plaintiff's claim rests on an unwritten, *de facto* requirement that FSRs work unpaid overtime hours, imposed by a combination of infrequent overtime approval, the nature of job responsibilities, and sales and collection targets.").  Indeed, discouraging employees from working overtime is consistent with the purposes of the FLSA, which are designed to encourage employers to avoid having employees work overtime in favor of spreading work. See Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d 1173, 1176 (7th Cir. 1987).

Numerous courts in this Circuit and across the country also have denied conditional certification where the plaintiffs failed to demonstrate any common, unlawful policy or practice because the employer, like Citibank, had implemented written policies requiring the recording and

payment of all time worked and paid significant overtime, and the plaintiffs' allegations amounted to nothing more than that a few rogue managers disobeyed the company's directives.  See, e.g., Brickey v. Dolgencorp, Inc., 2011 WL 643256, at *2-4 (W.D.N.Y. Feb. 23, 2011) (denying conditional certification where stores had policies limiting hours and financially rewarding managers who kept to the limits, holding that such "facially-lawful policies" cannot "form the equivalent of a 'common policy or plan that violate[s] the law" despite plaintiffs allegation that this created incentives for managers to shave time or assign off-the-clock duties); Seever v. Carrols Corp., 528 F. Supp. 2d 159, 174 (W.D.N.Y. 2007) (denying nationwide conditional certification where ten plaintiffs and a number of affiants made off-the-clock allegations as "there is little indication in the record that the FLSA violations alleged by plaintiffs were anything other than unilateral acts by a few 'rogue' managers . . . refusing to compensate their underlings in the manner prescribed by Carrols' written policies"); Diaz v. Elecs. Boutique of Am., Inc., 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005) (denying certification of FLSA claims where "[P]laintiffs simply allege that overtime work must be approved and, thus, [the company] had a policy of not paying for overtime work.  This is insufficient to suggest that all [Assistant Store Managers] . . . were subject to a policy of requiring but not compensating employees for overtime work."); cf. Zivali v. AT&T Mobility, LLC, - F. Supp. 2d -, 2011 WL 1815391, at*2, 4-8 (S.D.N.Y. May 12, 2011) (decertifying FLSA action where company had a written policy prohibiting work off the clock and plaintiffs' off-the-clock claims "involve highly individualized situations," and "the extent to which plaintiffs [worked off-the-clock] varied widely" ); Joza v. WW JFK, LLC, 2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ("the concern of any well-managed business enterprise to avoid needless overtime" does not reflect a "workplace culture of hostility toward overtime.").[9]

---

[9]   See also Castle v. Wells Fargo Fin., Inc., 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008) (denying conditional certification and notice where the official written policy at Wells Fargo was to pay overtime to non-exempt employees because although all declarants claimed they were pressured by their managers not to record overtime

C.      **Plaintiffs And The Putative Class Of PBs Are Not Similarly Situated.**

To prove liability, Plaintiffs must demonstrate, and the Court will be required to examine,

the following individualized issues for each PB for each work week that he or she worked:

- Whether each PB worked over 40 hours in a given week.  See 29 U.S.C. § 207(a)(i).

- Whether each PB requested permission to work overtime and whether the request was approved or denied each time.  Newton v. City of Henderson, 47 F.3d 746, 747, 749 (5th Cir. 1995) (reversing judgment for plaintiff where plaintiff was told not to work unauthorized overtime, but did so and turned in timesheets that did not include overtime).

- Whether each PB recorded all of his or her time worked and, if not, why not.  Joza, 2010 WL 3619551 (denying overtime claims in part because employee failed to record her time on time records).

- Whether the PB was directed to perform such work.  Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972) (affirming dismissal of off-the-clock claim where plaintiff was not directed to perform work off-the-clock, though she was directed to complete duties).

- Whether and to what extent any overtime was unpaid.  White v. Osmose, Inc., 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002) ("Because [the employer] did in fact pay some overtime, it is likely that any particular [off-the-clock] claim will require specific, individualized proof as to any hours that [employer] refused to pay.").

- Whether the Branch Manager knew or should have known that the PB was working time that was not recorded.  Singh v. City of New York, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005) (fact finder must determine "how much of that time was spent with the employers actual or constructive knowledge"); Hinojos v. Home Depot, Inc., 2006 WL 3712944, at *3 (D. Nev. Dec. 12, 2006) (employees not similarly situated where off-the-clock allegations required individualized inquiry into whether each supervisor knew about the off-the-clock work).

- Whether the amount of time unrecorded was *de minimis* so as not to be compensable. See, e.g., Singh v. City of New York, 524 F.3d 361, 364 (2d Cir. 2005) (Sotomayor, J.) (affirming summary judgment for defendant because work time was "de minimis as a matter of law and thus not compensable under the FLSA."); Zivali, 2011 WL 1815391, at *7 (holding that

---

hours, what they were told was not uniform, and resolution of claims "would require individualized determinations, and would necessitate testimony from individual employees and their supervisors about the schedules actually worked and whether managers were aware of the overtime hours worked"); Hinojos, 2006 WL 3712944, at *1-3 (where plaintiffs alleged they worked off-the-clock and had their time shaved by managers, but most employees received overtime, and the official written policy prohibited off-the-clock work, the mere fact that multiple plaintiffs worked off-the-clock did not show an improper common policy justifying conditional certification of FLSA claims); West v. Border Foods, Inc., 2006 WL 1892527, at *6-9 (D. Minn. Jul. 10, 2006) (holding that allegations that individual restaurant managers deprived six plaintiffs of proper compensation for overtime, and that there may have been pressure to meet budgets by encouraging off-the-clock work, did not warrant certification of FLSA claims, especially in light of official written policy requiring proper payment for all overtime hours).

class of over 4,000 employees who plaintiffs claimed worked off-the-clock were not
similarly situated, in part because the *de minimus* doctrine defense would require a highly
individualized inquiry that would "vary widely according to the particular situation of each
individual plaintiff").

- Whether the work performed was preliminary or postliminary so as not to be compensable.
  See, e.g., Singh, 524 F.3d at 367 (recognizing that preliminary and postliminary activities are
  not compensable); Basco v. Wal-Mart Stores, Inc., 2004 WL 1497709, at *8 (E.D. La. Jul. 2,
  2004) (denying certification where individualized defenses included whether activities where
  preliminary or postliminary).

Plaintiffs have not demonstrated that they are similarly situated to each other, much less that

they are similarly situated to thousands of current and former PBs nationwide.  Plaintiffs do not

allege, and have expressly disavowed, that Citibank required them to work overtime without proper

compensation.  Linthorst Decl. ¶ 3.  Instead, Plaintiffs contend that because of the requirements of

the job – specifically their sales goals – they took it upon themselves to work overtime, and their

managers knew or should have known of such work yet failed to pay them for it.  Plaintiffs have

provided no evidence that all other PBs took it upon themselves to work overtime, or that all other

managers knew or should have known of such work and failed to pay the PBs for the work.[10]

Plaintiffs themselves have admitted that there is no basis on which to determine whether any other

PB worked overtime without proper compensation other than to inquire of each PB individually.

Steffensen Dep. 194; Ruiz Dep. 272; Winfield Dep. 201-02.

Plaintiffs contend that their "stories are consistent" (Pls' Br. 7), but the evidence

conclusively demonstrates otherwise.  At the outset of these cases, Plaintiffs' "stories" could not

have been more different.  Whereas Ruiz claimed that she worked "off-the-clock" because her sales

goals were so high (Ruiz Comp. ¶ 25), the Winfield Complaint alleged that Plaintiffs and all other

PBs at Citibank were misclassified as exempt from overtime.  Winfield Compl. ¶¶ 12-16.  In

response to Citibank's Motion to Dismiss, the Winfield Plaintiffs conceded that this central factual

---

[10]   It is not surprising that this particular group of individuals violated Citi's policy and failed to record all time
       worked because four of the six Plaintiffs and Opt-In were terminated for violations of other company policies.
       Supra, pp. 7-11.  There is no basis on which to conclude, however, that other PBs did the same.

allegation was completely erroneous, and the Court ordered them to amend while noting that it was "troubling that the complaint could have been based on such a fundamental misconception of the facts."  Docket No. 29 at 1.  Plaintiffs' testimony further confirms that their "stories" are unique and provide no basis on which to conclude that they are similar to the experiences of all PBs nationwide.

> 1.    **Plaintiffs and the putative class are not similarly situated with respect to whether and to what extent they worked overtime.**

Plaintiffs themselves testified that it was possible that PBs could meet their sales goals and complete their duties in 40 hours or less, depending on the individual.  Winfield Dep. at 196-97 ("Q. Was it possible for a personal banker, during your employment at Citibank, to meet their sales goals and perform all of their duties in 40 hours or less?  A.  Depended on the individual banker."); Ruiz Dep. at 92-93 ("A.  … [I]t depends on the circumstances. …  The clients, their needs, and even the ability of the employee … to be able to uncover the needs the client has"); Muniz Dep. at 74 ("if you had a really good branch it didn't matter if you work so many hours or less hours"); Steffensen Dep. at 124-25; Shen Dep. at 177.  And numerous PBs testified that they regularly meet and exceed their sales goals, and complete all other duties, without working overtime.  Viteri Decl. ¶ 11; Tacchi Decl. ¶ 3; Cabrera Decl. ¶ 7; Zamudio Decl. at ¶ 4; Fernandez Decl. at ¶ 7; Bautista Decl. at ¶ 3; Nakpil Decl. at ¶ 7.  Plaintiffs and many other PBs have testified that they achieved their sales goals even in months when they were on a leave of absence or vacation for part of the month.  Ruiz Dep. 141-42, 145 (made her sales goals in a month despite being on leave for seven work days); Braverman Decl. ¶ 3 (exceeds sales goals even in months where she takes vacations).

Plaintiffs each testified that their purported need to work unpaid overtime was caused by aberrational job circumstances.  Ruiz was overwhelmed by the service duties imposed upon her because she was the only Spanish-speaking PB in a branch with a significant Spanish-speaking customer base.  Ruiz Dep. 52, 56, 77, 83, 196.  Shen's branch lacked a Service Officer, which caused him to spend 60%-70% of his time performing the duties of a Service Officer.  Shen Dep.

113-15, 128.  Winfield's branch was new, which meant that it lacked walk-in customers that other branches enjoyed and he had to spend significant time outside the branch.  Winfield Dep. 152-54. Steffensen's branch had too many Personal Bankers, which diluted his sales opportunities and sometimes left him without even a desk at which to work.  Steffensen Dep. 48, 102-03, 107-09. Muniz's branch was in a bad location and did not get much walk-in traffic, and was in a low income area with a less affluent customer base than other branches.  Muniz Dep. 70, 74.

The fact that at any particular time, the PBs worked under a common incentive compensation plan provides no basis on which to determine whether any PB worked overtime at all, much less whether such overtime was compensated.  The sales goals varied widely based on the salary of the PB, the age of the branch, and whether the PB or the branch were new.  The variations in sales goals even just among the Plaintiffs, Opt-In, and Plaintiff Declarants amounted to differences at different times of 20%, 50% - even over 240% in their sales goals.[11]  In fact, the Ruiz Complaint specifically alleges that only PBs with high salaries had sales goals that were so high that they required the PBs to work overtime.  Ruiz Complaint ¶ 25 ("[M]ore experienced and more senior Personal Bankers were assigned higher sales goals which were routinely so high that they could not reasonably be achieved in forty hours of work per week.").  See Eng-Hatcher, 2009 WL 7311383, at *3 (denying conditional certification where "sales quotas vary widely" and there were many variables as to whether any given manager felt incentivized to violate the official company policy).

Moreover, the opportunities for achieving the sales goals varied widely based on whether the PBs had insurance and securities licenses, and whether they were eligible to sell business products to business clients, which had much higher credit values than commercial products.  Whereas some of the Plaintiffs had difficulty meeting their sales goals, Opt-In Ho testified that it was "so easy" to

---

[11]   For example, in January 2008, Plaintiff Muniz's sales goal was $5,985 while Plaintiff Ruiz's sales goal was $20,420 – over 240% more.  In January 2009, Declarant Ash's sales goal was $12,400 and Plaintiff Ruiz's sales goal was $19,250 – over 55% higher.  In March 2010, Plaintiff Muniz's sales goal was $12,616, and Opt-In Ho's sales goal was $15,161 – over 20% higher.  See Costa Decl. Ex. 1.

19

meet her goals, and numerous other PBs have testified that they regularly exceeded their sales goals without working overtime.  Ho Dep. 148; Viteri Decl. ¶ 5, 11; Nakpil Decl.¶ 7; Bautista Decl. ¶ 3; Lagmay Decl. ¶ 5; Kahn Decl. ¶ 6; Zamudio Decl. ¶ 4; Ouyang Decl. ¶ 4; Tacchi Decl. ¶ 3; Fenandez Decl. ¶ 7.  Opt-In Ho made more in incentive compensation in 2008 ($20,072) than any other Plaintiff, particularly Plaintiffs Shen ($3,825) and Muniz ($4,636).  Costa Decl. ¶ 4, Ex. 1.  Moreover, some PBs made almost $100,000 or more per year in incentive compensation alone – far more than any of the Plaintiffs made in salary and incentive compensation.  Costa Decl. ¶ 5.

As the Plaintiffs' themselves testified, whether a PB could meet his or her sales goals depended on a variety of factors unrelated to the number of hours worked, including:

- Whether the branch was a new branch or one with an established customer base (Winfield Dep. 152-54, 173; Steffensen Dep. 66-67);

- Whether the PB could speak a foreign language used by a significant portion of the branch's customer base, and whether there were others at the branch who could do so as well (Winfield Dep. 150-51; Ruiz Dep. 46, 77; Ho Dep. 37-38; Steffensen Dep. 53-54, 93-94; Barajas Decl. ¶ 10; Braverman Decl. ¶ 4);

- Whether the PB took on additional duties, such as notary, auditing, or management duties (Steffensen Dep. 95, 115-117);

- The PB's personality, effort, sales ability, and time management skills (Winfield Dep. 159-60; Ruiz Dep. at 76; Shen Dep. 179-80; Barajas Decl. ¶ 10);

- Whether the PB could sell business accounts and had insurance and securities licenses that allowed him or her to receive the additional sales credits (Winfield Dep. 161; Ho Dep. 151-52; Shen Dep. at 299-300; Khan Decl. ¶ 2);

- Whether the branch had a Service Officer and, if so, whether or not the PB chose to send service issues to the Service Officer or resolve them him or herself (Shen Dep. 112-14; Ho Dep 40-42; Ouyang Decl. ¶ 6);

- Whether the Tellers and Service Officers liked the PB and referred customers to him or her (Ho Dep. 166-67; Winfield Dep. 163; Fernandez Decl. ¶ 5);

- Whether the Branch Manager or other branch employees allegedly undermined the PB due to discrimination (Ho Dep. 20-21, 167-68 & Ex. 13; Ruiz Dep. 54-58 & Ex. 3);

The location of the branch and amount of foot traffic, and how many competitor branches were nearby (Winfield Dep. 166-67, 173, Muniz Dep. 38, 40, 62-63, 70; Steffensen Dep. 60, Nakpil Decl. ¶¶ 2-3; Braverman Decl. ¶ 4);

- The nature of the branch's clientele, including the affluence and banking experience of the customers (Ruiz Dep. 77; Muniz Dep. 38, 40, 62-63, 70);

- The branch staffing, how large the staff was, and whether it was understaffed or overstaffed (Winfield Dep. 167-68; Ruiz Dep. 46; Steffensen Dep. 107, Gray Decl. ¶ 2);

- The economic climate and time of year (Winfield Dep. 171; Muniz Dep. 63; Steffensen Dep. 109; Lagmay Decl. ¶ 6); and

- Luck and events over which PBs had no control (Welsh Decl. Exs. 11-15, Muniz Dep. 40-41; Steffensen Dep. 76-77, 124).

Nor was there a common system of discipline applicable to PBs for failing to meet their sales goals. Pls' Br. 9. The Ruiz Complaint alleges a uniform system of discipline under which failure to meet sales goals for one month would result in a verbal notice, two consecutive months would result in a written warning, and three or more consecutive months could result in termination. Ruiz Complaint ¶ 23. As Plaintiffs' own experiences demonstrate, however, local Branch Managers had discretion as to whether or not to discipline a PB for failing to meet his or her sales goals. For example, Plaintiff Winfield missed his monthly sales goals for the first *20 consecutive months* of his employment without receiving any verbal or written warning, or any discipline. Winfield Dep. 108, 173-175, 178-79 & Ex. 14, Costa Decl. Ex. 1, and Citi-Winfield 1300-01. Similarly, Plaintiff Shen did not meet his sales for stretches of *12 consecutive months*, and *6 consecutive months* without being terminated because his manager recognized he contributed in other ways, and exercised his discretion not to terminate Shen despite his poor sales performance. Shen Dep. at 172-75. Other PBs have testified that they too were not disciplined or terminated for failing to meet their sales goals despite the "uniform" disciplinary standards. Fernandez Decl. ¶ 6; Cabrera Decl. ¶ 6; Barajas Decl. ¶ 9; Nakpil Decl. at ¶ 4; Lagmay Decl. at ¶ 5. Plaintiffs have not identified any common

basis on which the Court could conclude that every other PB needed to work overtime, or why, or when, or how much.[12]

**2.      Plaintiffs and the putative class are not similarly situated with respect to <u>whether overtime was requested, approved, recorded, and/or paid.</u>**

<u>Whether Overtime Was Requested</u>:  Some PBs are required to request overtime before working it and some are paid overtime even if they do not request it in advance.  <u>See, e.g.</u>, Ho Dep. 202-07; Steffensen Dep. 144; Hammond Decl. ¶ 7; Bautista Decl. ¶ 4, Braverman Decl. ¶ 7.

<u>Whether Overtime Was Approved</u>:  Although some Plaintiffs claim their managers would not approve overtime, or would not approve overtime for certain reasons, other Plaintiffs testified that some Branch Managers regularly approved overtime, including to allow PBs to meet their sales goals.  Steffensen Dep. 198-99; Winfield Dep. 188; Ruiz Dep. 234.  Many PBs have testified that every time they needed to work overtime to complete their job duties, their managers approved and they were paid for that time.  Barajas Decl. ¶ 4; Corona Decl. ¶ 8, Marsico Decl. ¶ 8, Nakpil Decl. ¶ 10, Rosenberg Decl. ¶¶ 7, 8, Zito Decl. ¶ 5.

<u>Whether Overtime Was Recorded</u>:  Plaintiffs claim they did not record some or all of the overtime they seek in this case, but many other PBs have testified that they have recorded all time worked.  <u>See, e.g.</u>, Barajas Decl. ¶ 6, Bautista Decl. ¶¶ 6-8, Braverman Decl. ¶ 6, Cabrera Decl. ¶ 8, Chu Decl. ¶¶ 9, 10, Corona Decl. ¶ 9, Fernandez Decl. ¶ 9, Gray Decl. ¶ 7, Guan Decl. ¶¶ 4, 5.

<u>Whether Overtime Was Paid</u>:  Despite references throughout their brief to a "no overtime" policy (Pls' Br. 2, 10), or a policy that PBs time records must be limited to 40 hours per week (Pls' Br. 11-12), every one of the Plaintiffs, Opt-In, and Plaintiff Declarants regularly recorded and was paid overtime.  Hammond Decl. ¶ 5.  In fact, Plaintiffs and Opt-In recorded and were paid for overtime in over half of their paychecks.  Hammond Decl. ¶ 6.

---

[12]    Plaintiffs cite <u>Gilbert v. Citigroup, Inc.</u>, 2009 WL 424320 (N.D Cal. Feb. 18, 2009) for the proposition that a uniform compensation policy can support certification (Pl.s' Br. 21), but <u>Gilbert</u> was a misclassification case. Here, it is undisputed that PBs were eligible to receive overtime.

22

The overtime experiences even just for the Plaintiffs, Opt-In, and Plaintiff Declarants varied widely.  Declarant Wilson was paid overtime in 6% of her paychecks, while Declarant Handy was paid overtime in 78% percent of her checks.  Hammond Decl. ¶ 12.  Some PBs made much more overtime than Plaintiffs – more than $25,000 in overtime from 2008 to 2010.  Zito Decl. ¶ 5.  Overall, since 2008, Citibank paid over $7.8 million in overtime to PBs.  Hammond Decl. ¶ 4.

Moreover, each of the Plaintiffs' allegations of wrongdoing are different.  Ruiz allegedly took it upon herself to work extra overtime without recording it, and Ruiz, Shen, Steffensen, and Muniz all testified they were paid for all time they recorded.  Ruiz Dep. 162; Shen Dep. 146; Steffensen Dep. 156-57; Muniz Dep. 48-49; see also Joza, 2010 WL 3619551, at *10 (rejecting overtime claim in part where "Joza concedes that she was paid every penny of overtime she claimed on overtime slips.").  Only Ho and Muniz allege that they were directed to change their time records to remove overtime.  Ho Dep. 124-25; Muniz Dep. 51.  Only Winfield and Muniz allege that their managers changed the overtime they recorded.  Winfield Dep. 215-16; Muniz Dep. 51.  And only Steffensen alleges that he was provided "comp time" in lieu of overtime.  Steffensen Dep. 148.

Plaintiffs have not identified any common basis on which to determine whether, when, how much, and under what circumstances overtime was requested, approved, recorded, and/or paid, or that their individual experiences were the same as each other, and all other PBs.  Eng-Hatcher, 2009 WL 7311383, at *4 (denying conditional certification in part where store managers had discretion over whether overtime is approved).

> **3.**     **Plaintiffs and the putative class are not similarly situated with respect to whether or how a manager would know (or should know) that a PB worked overtime that they did not record.**

Another critical element of the Plaintiffs' claims for overtime is whether the employer knew or had reason to know of the alleged overtime.  Once again, Plaintiffs are not similarly situated to each other, much less to all other PBs nationwide.  For example, Plaintiff Steffensen claims that he

alerted his manager when he had reached 40 hours for the week and, on occasion, was approved to work overtime.  Steffensen Dep. 174-77.  Plaintiff Ruiz, by contrast, never sought permission to work the unpaid overtime she did, disobeyed her manager's directives to take lunch or leave work on time, and took active steps to hide her alleged unpaid overtime.  Ruiz Dep. 156, 179-180, 185-187, 192-94, 231, 259-260, 343, 366.  Despite testifying that it would be "almost impossible" for her managers to know what hours she actually worked (Ruiz Dep. 164-65), Ruiz claims managers could have made use of security video to monitor her hours worked.  Ruiz Dep. 180.  But this is the type of evidence that has been found to be insufficient to put an employer on notice of overtime worked.  Joza, 2010 WL 3619551, at *10 (rejecting argument that employer was on notice of unpaid overtime because "managers periodically passed by her cubicle and should have noticed that she was there during the usual lunch period and outside of her assigned shift hours").  In any event, some managers have a clear view of the PBs' desks, but some do not because they work in the basement (Ruiz Dep. 326), their views are obstructed (Steffensen Dep. 49), or they work in a different branch entirely (Shen Dep. 91).  Plaintiffs have not provided any common basis on which to determine whether managers for each PB knew (or should have known) of any alleged unpaid overtime.  Zivali, 2011 WL 1815391, at *7 (decertifying FLSA collective action in part because of individualized issues where "plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work").

### D.   Plaintiffs Have Failed To Demonstrate That Their Disparate Experiences Were Part Of A Class-Wide Policy And Practice.

In an effort to elevate their disparate, individual experiences to a common practice, Plaintiffs claim that the alleged "no overtime" policy came from the Area Managers (which they sometimes refer to as "Regional" Managers).  All of this supposed evidence consists of double hearsay and is subject to Citibank' motion to strike.  Even if the evidence is considered, however, it establishes at most that Area Managers wanted to limit the amount of overtime worked, there is zero evidence that

24

any Area Manager directed a Branch Manager not to <u>pay</u> for any overtime already worked. Steffensen Dep. 171-72; Muniz Dep. 52-53; Winfield Dep. 189.  Moreover, the claimed directives from Area Managers are demonstrably false.  Winfield claims he was told it "comes from regional …You can't go over 40 hours . . . Simple as that."  Winfield Dep. 189.  Obviously, it was not as "simple as that" because Winfield was paid overtime in 42% of his paychecks.  Hammond Decl. ¶ 11.

Similarly, Plaintiffs' claim that the financial crisis caused Citibank to fail to pay all PBs for overtime worked is rank speculation unsupported by any evidence, and is plainly inconsistent with the undisputed evidence that Citibank paid millions of dollars of overtime to PBs throughout the financial crisis – even when the law did not require it.  Hammond Decl. ¶ 4.

Moreover, the four declarations Plaintiffs submitted with their motion are woefully insufficient to demonstrate a common, nationwide practice of failing to pay overtime to PBs.  What is notable about the four declarations submitted by Plaintiffs is how few PBs have supported the Plaintiffs' claims.  Plaintiffs were provided months ago with the names, addresses, and telephone numbers for 4,030 PBs – all PBs who worked in every branch in the United States from August 2007 through 2010.  From this population, only four have come forward to support Plaintiffs' claims.  Defendant has not had an opportunity to depose these individuals, but the declarations from these four individuals are nearly identical, boilerplate allegations.  Notably, one of the Plaintiff Declarants has no timely claim for overtime, and one was terminated for excessive tardiness.  Hardy Decl. ¶ 2 (ceased being a PB in 2007); Mohseni Decl. ¶ 6.  The claims in these few declarations have been refuted by 23 PBs from across the country – including from New York, California, Illinois, and Florida, who have testified that they do not feel any pressure to work off the clock, do not need to do so to complete their work or save their jobs, and have been paid for all time worked. See Linthost Decl., Exs. 16-38.

Plaintiffs attempt to conceal the insufficiency of their evidence by arguing that they have submitted evidence from states that include 78% of PBs.  Pls' Br. 6, 23.  Each Plaintiff and Declarant testified only to their own experiences in their own branches, and Plaintiffs have not submitted <u>any</u> evidence from the hundreds of other branches in those same states.  Plaintiffs' argument that because they have submitted evidence about their own experience in one branch they somehow have submitted evidence for every branch in the entire state is disingenuous.[13]

Plaintiffs Ruiz, Winfield, Muniz, and Shen each conceded that they do not know whether any other PBs worked overtime without proper compensation.  Ruiz Dep. 150-51; Winfield Dep. 255; Muniz Dep. 52-53; Shen Dep. 246.  With respect to the few other PBs from their own or nearby branches that Ho, Steffensen, and Wilson claim also worked overtime without compensation, these claims are based on hearsay statements of co-workers which is subject to Citibank's motion to strike, and none of these PBs have submitted evidence to support Plaintiffs' claims even though Plaintiffs have their contact information.  <u>See</u> <u>Eng-Hatcher</u>, 2009 WL 7311383, at *5 ("Identifying potential class members may be a sufficient showing when the potential class is made up of individuals 'who worked in the same location, during the same general period, under essentially the same management,' <u>see</u> <u>Laroque v. Domino's Pizza, LLC</u>, 557 F. Supp. 2d 346, 353 (E.D.N.Y. 2008), but fails to meet the modest factual showing required by the courts when plaintiff attempts to impute her own limited experience to a nationwide class."); <u>Guillen v. Marshalls of MA, Inc.</u>, 750 F. Supp. 2d 469, 477 (S.D.N.Y. 2010) (denying conditional certification of nationwide collective action because plaintiff presented "extremely thin" evidence from only himself and four other New York employees at 9 of the 820 stores); <u>see also</u> <u>Mendoza v. Casa de Cambio Delgado, Inc.</u>, 2008 WL 938584, at *1-

---

[13] Plaintiffs suggest that the fact that they have Plaintiffs and declarants from 6 states makes this case like <u>Ruggles v. Wellpoint</u>, 591 F. Supp. 2d 150, 155 (N.D.N.Y. 2008), where the court approved certification based on various evidence including ten declarations from 7 of 14 states where defendant had call centers.  <u>Ruggles</u>, however, was a misclassification case where plaintiffs claimed all nurses were misclassified as exempt.  <u>Id.</u> at 155.  There is no similar allegation of an undisputed nationwide policy that Plaintiffs challenge here.

3 (S.D.N.Y. April 7, 2008) (denying conditional certification in off-the-clock case where affidavits of 11 plaintiffs and 1 non-plaintiff stated that they were not paid for all overtime hours worked, but there was a varying amount of overtime paid to the employees each week).

Not only were Plaintiffs provided with the contact list of over 4,000 PBs, but they also issued a press release with the filing of the <u>Ruiz</u> case, which was published by many media sites, and Plaintiffs' counsel also posted an Internet newsletter inviting individuals to contact Plaintiffs' counsel about Citibank.  Linthorst Decl. ¶¶ 4, 5.  The fact that only one individual has opted into this case (Dara Ho) and only four individuals submitted declarations in support of Plaintiffs (none of whom have joined the case) is reason alone to deny conditional certification in this case.  See <u>Pfohl v. Farmers Ins. Grp.</u>, 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004) (holding that 13 opt-ins out of a putative class of "hundreds" were insufficient to justify a collective action); <u>Flores v. Lifeway Foods, Inc.</u>, 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) (denying conditional certification and notice because the declarations only showed that 4% of class (2 out of 50 employees) were shorted overtime pay and this was not sufficient to show a common policy or plan).

Finally, Plaintiffs attempt to argue that Citibank conceded that certification is appropriate even if they submit evidence from a small fraction of putative class members, based on Citibank's argument that it was not necessary to search the emails of every Branch Manager nationwide to find evidence of a uniform, nationwide policy of not paying overtime contained in emails.  Pls' Br. 22-23.  It is true that if any common policy to deny overtime to PBs was rolled out in email, such directive should be found in the email of all Branch Managers and it is unnecessary to search all (or even most) of their email.  The contrary is true as well – if the Court looks anywhere and does not see evidence of the allegedly unlawful policy or practice, it obviously is not uniform across all branches.  The flaw in Plaintiffs' argument, however, is that they have not provided evidence from even a <u>single</u> branch of a common, uniform national policy – only their own testimony about their

27

own aberrational experiences with no evidence to support their conclusion that all other PBs at all other branches nationwide had the same experiences.  In fact, Plaintiffs do not even claim to have such evidence, but expressly request the Court to "***infer*** the existence of a common wrongful overtime practice affecting all Citibank Personal Bankers" based on their disparate and individualized experiences, and argue that "***[p]resumably***, branch managers would give the same 'no overtime' directives to other Personal Bankers" beyond the named Plaintiffs.  Pls' Br. 15, 22 (emphasis added).  This sort of speculation cannot be basis for sending notice to a nationwide class, particularly where there is undisputed evidence that Plaintiffs themselves were not subject to any "no overtime" policy or practice.  See Trinh v. J.P. Morgan Chase & Co., 2008 WL 1860161, at *4 (S.D. Cal. Apr. 22, 2008) (holding that plaintiffs' speculative beliefs that practices were the same nationwide were insufficient to show that loan officers nationwide are similarly situated).

### E.    The Cases Cited By Plaintiffs Are Readily Distinguishable.

The cases cited by Plaintiffs are readily distinguishable from this case.  See, e.g., Hallissey v. America Online, Inc., 2008 WL 465112, at *1-2 (S.D.N.Y. Feb. 19, 2008) (certifying collective action in misclassification case where named plaintiff sought to bring action on behalf of all "community leader[s]" for AOL, all of whom were classified as volunteers and not employees, and who therefore never received overtime pay); Levy v. Verizon Info. Servs., 2007 WL 17447104, at *1, 5 (E.D.N.Y. Jun. 11, 2007) (certifying collective action for Telephone Sales Representatives ("TSRs") in New York, New Jersey and Pennsylvania where Verizon had "no system by which TSRs can record the hours they worked" and 16 of the TSR declarations submitted by *defendants* actually stated that the TSRs were not paid for unapproved overtime that they worked); Gilbert, 2009 WL 424320, at *3 (stating that certification was appropriate because BBOs were all exempt and paid the same way nationwide prior to reclassification and "neither side contests that BBOs

throughout the country were transferred to new positions around the middle of 2007");[14] Adams v.
Inter-Con Sec. Sys., Inc., 242 F.R.D. 530, 537-38 (N.D. Cal. 2007) (granting certification where
Plaintiffs alleged uniform illegal policies – specifically that employees were required to attend
uncompensated orientation sessions and pre-shift briefings, 383 employees had already opted-in to
the action, the defendant had not provide any evidence to rebut the allegations, and the illegal
policies at issue were "described in employee handbooks and job applications"). There is no similar
evidence in this case of a single uniform illegal policy that would be subject to common proof.[15]

### F.    The Notice Requested By Plaintiff Is Inappropriate.

If the Court were to order notice which, for the reasons set forth above, Citibank respectfully
maintains would not be appropriate, the Court should order the parties to meet and confer to devise a
fair and accurate notice agreeable to the parties. See, e.g., Colozzi v. St. Joseph's Hosp. Health Ctr.,
595 F. Supp. 2d 200, 211 (N.D.N.Y. 2009) (rejecting plaintiff's proposed notice and directing the
parties to negotiate the content of an acceptable notice). Due to space constraints, Citibank will not
detail all of the ways in which Plaintiffs' proposed notice is improper, but they include:

- Plaintiffs' notice is directed at all PBs nationwide since August 6, 2007 (three years prior to
  the filing of the Ruiz Complaint) even though Plaintiffs concede that "[u]nder the FLSA, the
  clock continues to run on the statute of limitations for each potential class member's claims
  until he or she files a 'Consent to Join' for with the Court . . . ." Pls' Br. 3; see also 29
  U.S.C. § 255(a). Therefore, notice should only go to individuals who worked as a PB at any
  time three years prior to the date of the notice.

---

[14]    While some of the bankers in Gilbert alleged that they were also not compensated for time worked in their new
positions after reclassification, this does not appear to be the basis for the court's certification decision.

[15]    Even if, contrary to the overwhelming evidence discussed above, the Court concludes that Plaintiffs have shown some
uniformity of experiences amongst themselves, they have failed to demonstrate any nationwide violations and
any notice should be limited to those branches where the Plaintiffs submitted competent evidence that a violation
may have occurred. See, e.g., Rudd v. T.L. Cannon Corp., 2011 WL 831446, at *9-10 (N.D.N.Y. Jan. 4, 2011)
(in off-the-clock case, limiting notice to location where the affiants worked); Hens v. Clientlogic Operating
Corp., 2006 WL 2795620, at *4-5 (W.D.N.Y. Sept. 26, 2006) (where Plaintiffs filed over 60 declarations in
support of their allegations of nationwide policy of requiring call center employees to perform preparatory pre-
shift and closing post-shift tasks for which they were not compensated, limiting notice to facilities in the four
cities where plaintiffs or declarants worked); Burkhart-Deal, 2010 WL 457127, at *5 (limiting notice to branches
where plaintiff and individuals who submitted declarations in support of certification worked).

- Plaintiffs seek to send notice to the putative class members for the New York state labor law claims, which has a six year statute of limitations period going back to 2004, even though they have only sought conditional certification of FLSA claims *and have not yet moved the court to certify a New York state law class pursuant to Fed. R. Civ. P. 23*. This is improper, as is the notice's discussion of the various other state law and ERISA class claims **not** at issue in their motion. <u>See, e.g.</u>, <u>Fei v. WestLB AG</u>, 2008 WL 7863592, at *3 (S.D.N.Y. Apr. 23, 2008) (holding that "[s]ince [plaintiff's] motion to compel proceeds on the premise that he wants to notify potential plaintiffs of their opt-in rights under Section 216(b) of the FLSA" plaintiffs were not entitled to a list of New York employees going back six years).

If the Court orders notice of any kind, Citibank respectfully requests that the Court direct the parties to submit a mutually agreeable notice within 30 days of the Court's order. If the parties cannot agree, they should submit their separate proposals for the Court's decision.[16]

## III.   <u>CONCLUSION</u>

As the 1947 amendments to the FLSA reflect, and as the Supreme Court has acknowledged, the FLSA attempts to strike a balance between protecting workers while not unduly stirring up claims and subjecting employers to excessive litigation. To reflexively certify a nationwide collective action of thousands of current and former PBs, inviting them to file claims that would not otherwise be filed, simply because a tiny number of disgruntled former employees (all but one of whom were involuntarily terminated) make individual claims, provides no incentive for employers to undertake the efforts Citibank has undertaken to ensure that its PBs are paid for all time worked.

For all the foregoing reasons, Citibank respectfully requests that the Court deny Plaintiff's Motion for Conditional Collective Certification and Court Authorized Notice in its entirety.

---

[16]   Plaintiffs repeatedly refer to the fact that Citibank has not yet produced emails. Pls' Br. 5. As set forth in the correspondence to the Court on the email issues, the reason why Citibank has not produced emails to date is because Plaintiffs have been unwilling to agree to a reasonable scope for such production. The parties negotiated the appropriate number of custodians for over three months and Plaintiffs never made any proposal below 1,000 custodians. Linthorst Decl. ¶ 6. The Court's order relating to the custodian group for the email searches resulted in just over 50 custodians, but now Plaintiffs are being equally unreasonable with the scope of the search terms to be conducted. <u>Id.</u> If Plaintiffs had been able to agree to a focused set of searches likely to result in a reasonable production, they would have had emails months ago.

Dated: June 3, 2011                          Respectfully submitted,


                                             MORGAN, LEWIS & BOCKIUS LLP
                                               s/Sam S. Shaulson
                                             _____
                                             Sam S. Shaulson  (SS 0460)
                                             101 Park Avenue
                                             New York, NY  10178
                                             212.309.6000; 212.309.6001 (fax)
                                             sshaulson@morganlewis.com
                                             Attorneys for Defendant Citibank, N.A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing support, were served via ECF on

this 3rd day of June, 2011 as listed below:

> Marc I. Gross
> Shaheen Rushd
> Murielle J. Steven Walsh
> Jeremy A. Lieberman
> POMARANTZ HAUDEK GROSSMAN & GROSS, LLP
> 100 Park Avenue – 26th Floor
> New York, New York  10017
>
> D. Maimon Kirschenbaum
> JOSEPH HERZFELD HESTER & KIRSCHENBAUM, LLP
> 757 Third Avenue – 25th Floor
> New York, New York  10017