Sam S. Shaulson (SS-0460)
sshaulson@morganlewis.com
Thomas A. Linthorst (TL-3345)
tlinthorst@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6718 (Telephone)
(212) 309-6001 (Fax)
Attorneys for Defendant

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIGNA RUIZ, on behalf of herself and all others similarly situated, | : : : |
| Plaintiff, | : **Civ. A. No. 10-cv-5950 (JGK) (THK)** |
| v. | : : |
| Citibank, N.A., | : : |
| Defendant | : |

| | |
|---|---|
| FREDERICK WINFIELD, on behalf of himself and all others similarly situated, | : : : |
| Plaintiff, | : **Civ. A. No. 10-cv-7304 (JGK) (THK)** |
| v. | : : |
| Citibank, N.A., | : : |
| Defendant | : |

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN
<u>FURTHER SUPPORT OF CONDITIONAL CLASS CERTIFICATION</u>**

**TABLE OF CONTENTS**

I.  THE EVIDENCE RESULTING FROM EMAIL SEARCHES CONFIRMS THAT THERE IS NO CLASSWIDE POLICY OR PRACTICE OF FAILING TO PAY PERSONAL BANKERS FOR ALL TIME WORKED ................................................... 1

II. PLAINTIFFS' EVIDENCE THAT MANAGERS ATTEMPTED TO CONTROL THE AMOUNT OF OVERTIME WORKED DOES NOT SUPPORT CERTIFICATION. ................................................................................................. 3

III. THE SUPREME COURT'S WAL-MART DECISION CONFIRMS THAT THERE ARE NO COMMON ISSUES THAT WOULD PERMIT THE ADJUDICATION OF THOUSANDS OF OVERTIME CLAIMS IN THIS CASE ........ 7

IV. PLAINTIFFS HAVE NOT ALLEGED, MUCH LESS DEMONSTRATED, THAT THEY ARE SIMILARLY SITUATED TO A NATIONWIDE CLASS OF PERSONAL BANKERS ................................................................................ 10

V.  CONCLUSION ............................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Creely v. HCR ManorCare, Inc.,
   2011 U.S. Dist LEXIS 77170 (N.D. Ohio July 1, 2011) ...............................................................7

Davis v. J.P. Morgan Chase & Co.,
   587 F.3d 529 (2d Cir. 2009) ......................................................................................................3

Flores v. Lifeway Foods, Inc.,
   289 F. Supp. 2d 1042 (N.D. Ill. 2003)........................................................................................3

Guan Ming Lin v. Benihana Nat'l Corp.,
   755 F. Supp. 2d 504 (S.D.N.Y. 2010) ......................................................................................10

Joza v. WW JFK, LLC,
   2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ............................................................................3

MacGregor v. Farmers Ins. Exchange,
   No. 10-CV-3088, 2011 WL 2981466 (D.S.C. July 22, 2011) ..................................................7, 8

Newton v. City of Henderson,
   47 F.3d 746 (5th Cir. 1995) .......................................................................................................5

Ramos v. Simplex Grinnell LP,
   2011 WL 2471584 (E.D.N.Y. June 21, 2011) ............................................................................7

Seever v. Carrols Corp.,
   528 F. Supp. 2d 159 (W.D.N.Y. 2007) ....................................................................................10

FEDERAL STATUTES

29 C.F.R. § 785.13 ............................................................................................................................3

I. **THE EVIDENCE RESULTING FROM EMAIL SEARCHES CONFIRMS THAT THERE IS NO CLASSWIDE POLICY OR PRACTICE OF FAILING TO PAY PERSONAL BANKERS FOR ALL TIME WORKED.**

Plaintiffs have filed a Supplemental Memorandum purportedly to supplement their Motion for Conditional Class Certification with additional emails recently produced by Defendant Citibank, N.A. ("Citibank"). The evidence from the email searches conducted by Citibank, however, confirms that Plaintiffs' motion should be denied. These emails were the result of over 80 email searches conducted through the emails of over 50 Citibank managers and employees, going back over three years. Specifically, Citibank searched the emails of the Plaintiffs and Opt-In, 35 Branch Managers (including both all their Branch Managers and Branch Managers at ten other branches over a three year period), the Area Managers they reported to (who had responsibility for branches in five states), and the Division Directors they reported to (who at various times had responsibility for almost all of the approximately 1,000 branches operated by Citibank nationwide).[1]  (Supp. Declaration of Thomas A. Linthorst ¶¶ 2-4; Declaration of Michael Perez ¶¶ 10-13.)[2]  If there was a "*sub rosa*" policy or practice at Citibank of failing to pay Personal Bankers ("PBs") for overtime worked, coordinated over almost 1,000 branches for at least the past three years – as alleged by Plaintiffs – these email searches would have found conclusive evidence of such policy or practice.

In fact, however, these email searches conclusively establish that there was no such policy or practice. From all of these email searches conducted across the emails of managers with responsibility for the majority of branches in all of the states in which Citibank has branches, Plaintiffs have identified alleged evidence of PBs working overtime without proper compensation in only two branches. The first instance involves PBs at a branch in Richmond Hill, New York. (Pls'

---

[1] Citibank operates approximately 1,000 bank branches in thirteen states, plus the District of Columbia. Putman Decl. ¶ 7 (attached as Exhibit 10 to the Declaration of Thomas A. Linthorst, Docket No. 46).

[2] The declarations and deposition excerpts are attached as exhibits to the Supplemental Declaration of Thomas Linthorst.

Supp. Brief at 5-6.) In June 2009, Branch Manager Diane Bissu-Oumadatt uncovered that certain employees in the branch purportedly had not been paid for overtime hours worked under the prior manager. Declaration of Deborah Henderson ("Henderson Decl.") ¶¶ 4-5. She promptly reported these allegations and vowed that "[t]his [failure to record all time worked] will cease immediately and will not occur in the future." (Supplemental Declaration of Murielle J. Steven Walsh ("Supp. Walsh Decl.") Ex. 15.) Deborah Henderson in Human Resources interviewed each PB involved and asked them to estimate how many hours they had worked without being paid. Henderson Decl. ¶ 7. Citibank paid each of the PBs the highest number of hours estimated by any of them – 300 hours of overtime. Henderson Decl. ¶ 9. Because the prior manager was no longer employed by Citibank, no discipline was possible. Henderson Decl. ¶ 11.

The episode at Richmond Hills refutes the Plaintiffs' claim of a common policy or practice of failing to pay all PBs for all time worked. If there was such a common policy or practice, this Branch Manager would not be reporting this issue to her manager with alarm and resolving that the situation will "cease immediately [as of June 25, 2009] and will not occur in the future," and Citibank would not have investigated and paid these individuals for 300 hours of overtime each – all long before this litigation was commenced.

The only other evidence offered by Plaintiffs that any PB worked off-the-clock involves a single PB in the McPherson Square branch in Washington DC. This PB alleged that in October 2007, his manager told him to alter his time records for three dates to reduce his time by a total of 46 minutes. (Supp. Walsh Decl. Ex. 17.) In the same email, he alleged that his manager also told him to record one hour for lunch even though he had taken two hours for lunch. (Id.). This email provides no support for Plaintiffs' motion. First, the only alleged uncompensated work occurred in September 2007, which is well outside the limitations period in this case even if Plaintiffs were able to establish a three-year statute of limitations under the FLSA. In addition, on the face of the email,

this PB has alleged that he was required to reduce his recorded work time by 46 minutes, and to increase his recorded work time by one hour (by recording only a one-hour lunch when he actually had taken a two-hour lunch), so the net effect was that he was overpaid by 14 minutes.  (Id.).  This allegation by one PB that he was instructed on one occasion almost four years ago to make these reductions and additions to his time sheet does not support sending notice to anyone, much less nationwide notice going back three years.  See Def.'s Brief at 27; Flores v. Lifeway Foods, Inc., 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) (denying conditional certification because declarations only showed that 4% of class were shorted overtime pay, which did not show a common policy or plan).

II.  **PLAINTIFFS' EVIDENCE THAT MANAGERS ATTEMPTED TO CONTROL THE AMOUNT OF OVERTIME WORKED DOES NOT SUPPORT CERTIFICATION.**

Much of Plaintiffs' Supplemental Memorandum is devoted to several communications by managers about managing overtime.  None of these communications reflect that any PB worked overtime without proper compensation, only that these managers were attempting to manage their employees' hours to control the amount of overtime worked.  Not only is it lawful for a Citibank manager to control the amount of overtime worked by employees under his or her supervision, he or she has the obligation to do so under the Department of Labor's regulations.  29 C.F.R. § 785.13 ("[I] the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. . . . Management has the power to enforce the rule and must make every effort to do so.").  See also Joza v. WW JFK, LLC, 2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ("the concern of any well-managed business enterprise to avoid needless overtime" does not reflect a "workplace culture of hostility toward overtime"); Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009) ("The overtime requirements of the FLSA were meant to apply financial pressure to 'spread employment to avoid the extra wage'").

Moreover, as more fully discussed in Defendant's moving brief and the cases cited therein, numerous courts have rejected lawful and reasonable efforts to limit the amount of overtime worked as the basis for certification.  See Def.'s Brief at 13-15.

Further, the emails relied upon by Plaintiffs do not support Plaintiffs' position.  None of the emails came from Division Directors – the highest level of the hierarchy searched – and the majority are from Branch Managers forwarding the same emails from one Area Manager (Syed Rauf) in California.  None of the emails include any direction not to pay any PB for all time worked, most seek merely to require pre-approval before overtime is worked or to "minimize" the amount of overtime worked, and they identify various circumstances in which overtime was appropriate, including where there was a "clear business need," (Ex. 20, CR-8825), when it was "unavoidable," (Ex. 2, CR-11543), and in "emergency situations," (Ex. 2, CR-011541).  The named Plaintiffs and Opt-In themselves testified they were paid for overtime even when it was not pre-approved.  See, e.g., Ruiz Dep. at 161-62, 202-206, 233-34; Ho Dep. 202-07; Steffensen Dep. at 144[3].  Plaintiffs also testified that some Branch Managers regularly approved overtime, including to allow PBs to meet their sales goals.  Steffensen Dep. at 198-99; Winfield Dep. at 188; Ruiz Dep. at 234.

Moreover, the same emails relied on by Plaintiffs also regularly reminded the Branch Managers that all time worked was required to be recorded and paid.  Ironically, the first email Plaintiffs quote is directed to a California employee who was not a Personal Banker, and attaches an email from Area Manager Syed Rauf that expressly directs the Branch Managers as follows:  "**It is your responsibility to ensure your employees record their TIME WORKED accurately on their TIMESHEETS.**"  (Ex. 2, CR-11543) (emphasis added).[4]  Plaintiffs rely on the emails of other

---

[3] These transcript excerpts are attached as Exhibits 4, 5, 9, and 6 respectively to the Declaration of Thomas A. Linthorst (Docket No. 46).

[4] The fact that this individual is not a PB is confirmed by his absence from the list of Personal Bankers produced to Plaintiffs.  (See Exhibit 7 to Plaintiffs' original motion .)

Branch Managers who forwarded this same email from Mr. Rauf, again without quoting the language above. (Pls' Supp. Br. at 6, 7, Ex. 10 at 11325; Ex. 18 at CR 11943-44.)

Plaintiffs also rely on a portion of a similar email from Mr. Rauf's assistant reminding managers to reduce overtime expenses (Pls' Supp. Brief at 4, Ex. 9 at CR 8667-68), but again omit the critical part of the message that confirmed that all time worked must be accurately recorded:

> **IMPORTANT NOTE: It is very important that employees record their TIME WORKED accurately on their TIMESHEETS. On an exception basis, you may need to schedule an Employee over their contracted hours. You may also have instances where OVERTIME is unavoidable. It is your responsibility to ensure that your employees record their TIME WORKED accurately on their TIMESHEETS. Please make certain you communicate the message accurately!**

(Ex. 9 at CR 8668) (emphasis added). Plaintiffs quote the email of another Branch Manager forwarding this same email from Mr. Rauf's assistant, but again do not quote the above provision. (Pls' Supp. Brief at 7, Ex. 20 at CR 8826.)

Plaintiffs also cite to a portion of a memo from Jean Desjardin-Raposa, a Branch Manager in New York, stating that "If you have OT that is not approved, you will not be paid for it." (Ex. 19 at 7651.) The rest of the paragraph makes clear, however, that they would not be paid overtime because they were required to inform the manager of the extra work so that their remaining hours for the week could be limited, resulting in 40 hours or less for the week so that no overtime would be due. (Ex. 19 at 7651.)[5] Moreover, Plaintiffs again fail to quote the portion of the memo that appears just two sentences earlier, which explains: "**Falsifying timesheets can lead to termination. Make sure you are entering the correct times that you come in, break for lunch, and leave for the day.**" Id. (emphasis added); see also Declaration of Jean Desjardin-Raposa, at ¶¶ 3-8 (stating that all PBs were paid for all time worked regardless of preapproval).

---

[5] A policy requiring pre-approval of overtime is completely lawful. See Newton v. City of Henderson, 47 F.3d 746, 747, 749 (5th Cir. 1995) (reversing judgment for plaintiff where plaintiff was told to obtain preapproval for overtime, but instead worked unauthorized overtime and turned in timesheets that did not include overtime).

The evidence also is undisputed that Citibank paid significant amounts of overtime to PBs during the past three years ($7.8 million), and regularly paid overtime to the Plaintiffs and Opt-In (in over half of their paychecks). (See Def.'s Brief at 7.)[6]

With respect to the other half of the alleged "conflicting mandates" – the purported need to work overtime to meet sales goals and complete other duties – Plaintiffs offer a sole email from one Branch Manager who stated that "[t]he staff never gets out exactly at 5:30 every night." (Ex. 14, CR-7925.) Plaintiffs omit from their quote the portions of this email that make clear that this manager and others were scheduling employees for less than 40 hours but paying them for 40 hours even when they worked less than that amount. (Ex. 14, CR-7925-26.) The Branch Manager was simply agreeing to schedule the employees for 40 hours and making clear that they "could go into overtime any week…." (Id.). This communication is not directed at PB duties at all (it references all non-exempt employees), and simply reflects another example of Citibank overpaying employees.

Beyond this solitary email, Plaintiffs attempt to support their argument by regurgitating their arguments that there were common duties, a common need to work overtime to meet sales goals, and a common system of discipline. (Pls' Supp. Br. at 2.) These arguments are baseless for the same reasons articulated in Citibank's Opposition brief, including the facts that (i) the sales goals varied widely (by up to 240% even just among the Plaintiffs), (ii) Plaintiffs and other PBs performed a wide variety of job duties depending on their individual circumstances, (iii) local managers had discretion in deciding when to discipline a PB for failure to meet sales goals, (iv) Plaintiffs' need to work overtime was due to aberrational circumstances unique to them, (v) Plaintiffs themselves

---

[6] Plaintiffs also cite to several emails referring to a 2007 fourth-quarter initiative in parts of California to reduce overtime expenses, which purports to compare hours worked at certain California branches against model budgeted hours (Pls' Supp. Brief at pp. 3-4 and 4. n.4 (discussing Ex. 3), and p. 4 n.4 (discussing Exhibit 8)), and to another 2007 email asking managers to control overtime, at p. 4 n.5 (citing Exhibit 11). These emails are of little relevance because even if the FLSA's three-year statute of limitations period for *willful* violations applied, putative class members would not have claims dating back to 2007. Moreover, even if these emails were relevant to any conduct during the class period, they are just additional examples of lawful attempts to control overtime by certain managers.

testified that other PBs could meet their sales goals and complete all of their duties without working overtime depending on their individual circumstances, and (vi) numerous other PBs testified that they did not need to work overtime and were paid for all time worked.  (Def.'s Opp. Br. at 18, 20.)

Plaintiffs claim that these emails show that "Personal Bankers were working overtime, but not being paid for all of it" (Pls' Supp. Br. at 7) but the emails say no such thing and, instead, contain stern directives to the Branch Managers to make sure that all time worked was recorded and paid.  These emails, therefore, confirm that there is no nationwide policy or practice of failing to pay PBs for all time worked, and Plaintiffs' motion should be denied.

### III. THE SUPREME COURT'S WAL-MART DECISION CONFIRMS THAT THERE ARE NO COMMON ISSUES THAT WOULD PERMIT THE ADJUDICATION OF THOUSANDS OF OVERTIME CLAIMS IN THIS CASE.

Citibank respectfully refers the Court to its Notice of Supplemental Authority (Dkt. No. 57) for why Wal-Mart supports the denial of Plaintiffs' motion.

Plaintiffs cite to two cases, neither of which involved off-the-clock claims similar to those in this case, to support their argument that Wal-Mart is inapposite.  See Ramos v. Simplex Grinnell LP, 2011 WL 2471584, at *3-4 (E.D.N.Y. June 21, 2011) (plaintiffs alleged they were not paid the prevailing wage rate for public works projects and defendant admitted that prevailing wages could only be paid through manual overrides of their payroll system); Creely v. HCR ManorCare, Inc., 2011 U.S. Dist. LEXIS 77170, at *4-5 (N.D. Ohio July 1, 2011) (company-wide policy of automatically deducting 30-minute meal-breaks from timecards violated Plaintiffs' statutory rights).

In a case not cited by Plaintiffs, however, MacGregor v. Farmers Ins. Exchange, No. 10-CV-3088, 2011 WL 2981466, at *3-4 (D.S.C. July 22, 2011), the court found the analysis in Wal-Mart "illuminating" and denied conditional certification under the FLSA:

> Plaintiffs characterize defendant's alleged "fail[ure] to fully compensate similarly situated employees overtime at a rate of time-and-a-half" as a "common policy or plan that violated the law ." Pls.' Mot. 10.  **This is not a policy or plan, but rather**

> **a result, which plaintiffs claim is caused by a conglomeration of defendant's policies and practices.** Namely, plaintiffs allege that: 1) defendant required PCRs to obtain pre-approval for overtime from supervisors; 2) these supervisors frequently refused to pre-approve overtime; 3) defendant's manner of assigning work by territories made it difficult for PCRs to accurately predict overtime in order to receive approval and occasionally made it impossible for PCRs to complete the work within 40 hours; 4) supervisors forced plaintiffs to adjust their timecards to decrease the amount of overtime hours on their time cards; and 5) supervisors frequently refused to upwardly adjust the pre-approved hours when plaintiffs worked overtime. . . .
>
> Plaintiffs admit that [Defendant] FIE "prohibited employees from working 'off the clock.'" Pls.' Mot. 4.  Plaintiffs' allegations suggest that had the supervisors approved requested overtime, either before or after it was worked, FIE would have appropriately compensated PCRs for overtime hours.  Thus, each supervisor's actions are essential to establishing any violation of the law.  Requiring supervisor approval for work hours . . . and FIE's method of assigning work do not violate the FLSA without more.

Id. at *3 (emphasis added).  The court concluded that one of the lessons of Wal-Mart was: "if there is not a uniform practice but rather decentralized and independent action by supervisors that is contrary to the company's established policies, individual factual inquiries are likely to predominate and judicial economy will be hindered rather than promoted by certification of a collective action." Id.  Accordingly, the court denied the motion for conditional certification because the case would involve "inquiries into independent supervisor decisions regarding each individual PCR's requested, approved, and refused hours." Id. at *4.

Moreover, records of computer logins/logouts are not common evidence providing classwide answers to liability or damages for PBs in this case.  First, the login/logout records for each PB are individual to each PB, and any adjudication of claims that requires the review of individualized records for each PB is necessarily individualized.  Even as to each individual, those records would not obviate the need for further individualized inquiries.  For example, even if a PB logged in before the time indicated on his or her time sheet, there could be any number of explanations for why that does not indicate an accurate work start time for compensation purposes under the FLSA (for example, if the individual logged into the computer and then went to eat breakfast).  Also, if a PB's

first login was <u>after</u> the start time indicated on the time sheet, an individualized inquiry would be required to determine if he or she performed compensable work prior to the login, as several Plaintiffs claim they did. Ruiz Dep. at 224-25; Shen Dep. at 281-82; Steffensen Dep. at 229-30.

Those records would also not show whether the PB was working constantly between the time of the login and logout, and PBs often did not login or out for unpaid meal breaks, so an individualized inquiry would need to be undertaken for each PB in each workday as to his or her activities between the login and logout and the length of unpaid meal breaks. Those records also would not show whether a PB worked after logging out of the computer, as some Plaintiffs claim they did, or what time they stopped working when they failed to log out at the end of the day. Shen Dep. at 285-88 (stating that he sometimes forgot to sign out of the computer at the end of the day, and other times he would log out of the computer and keep working); Muniz Dep. at 130-31 (stating that she logged off the computer and then performed certain work activities).

Thus, Plaintiffs' own testimony demonstrates that determining their hours worked would not be a "simple calculation" of the time on the login/logout records (Pls' Supp. Br. at 10) but that those records would instead spawn literally <u>millions</u> individualized inquiries into why the login <u>and</u> logout time for <u>each</u> of thousands of PBs, on <u>each</u> work day going back three years, may have been before or after the start and stop time the PB recorded on his or her time sheet, what the PB was doing before, after, and between those times, whether the PB's activities were compensable work under the FLSA, whether they recorded the overtime on their time records, whether they were paid for the work, and whether their manager knew or should have known of the work.

Plaintiffs themselves admitted that there is no way to determine whether any other PB worked overtime without proper compensation other than to inquire of each PB individually. Steffensen Dep. 194; Ruiz Dep. 272; Winfield Dep. 201-02. This is fatal to their motion.

IV.  **PLAINTIFFS HAVE NOT ALLEGED, MUCH LESS DEMONSTRATED, THAT THEY ARE SIMILARLY SITUATED TO A NATIONWIDE CLASS OF PERSONAL BANKERS**.

The evidence submitted by Plaintiffs is so deficient that they do not even argue that they are similarly situated to the class of thousands to which they seek to send notice – all PBs nationwide going back three years – under any standard, lenient or otherwise. Rather, Plaintiffs claim that a nationwide class of thousands can be certified where Plaintiffs have shown only that "some" undefined group of PBs of an unspecified number are similarly situated. (Pls' Supp. Brief at 2.) This is not the law. Courts have uniformly denied conditional certification unless the plaintiffs show evidence of a common illegal policy providing a factual nexus across the entire putative class. See, e.g., Guan Ming Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, 509 (S.D.N.Y. 2010) (holding that there must be a "factual nexus" with evidence "'sufficient to demonstrate that [current] and potential plaintiffs *together were victims of a common policy or plan that violated the law*'.") (emphasis added); Seever v. Carrols Corp., 528 F. Supp. 2d 159, 174 (W.D.N.Y. 2007) (denying nationwide conditional certification despite off-the-clock allegations by ten plaintiffs and a number of affiants); Def.'s Brief at 12-13.

In addition, after over five months of active discovery that was devoted to conditional certification issues, after being provided with a class list and contact information for over 4,000 PBs, and after 80 email searches through emails of over 50 individuals, including managers with responsibility for hundreds of branches nationwide, Plaintiffs' reliance on a "lenient" standard applicable to cases where plaintiffs file their motion for conditional certification at the outset of discovery is completely misplaced. (See Def.'s Brief at 13.)

V.  **CONCLUSION**

For all the foregoing reasons, Citibank respectfully requests that the Court deny Plaintiffs' Motion for Conditional Collective Certification and Court Authorized Notice in its entirety.

| | |
|---|---|
| Dated: August 19, 2011 | Respectfully submitted,<br><br>MORGAN, LEWIS & BOCKIUS LLP<br><br>  s/Sam S. Shaulson  <br>Sam S. Shaulson  (SS 0460)<br>Thomas A. Linthorst (TL-3345)<br>101 Park Avenue<br>New York, NY  10178<br>212.309.6718<br>212.309.6001 (fax)<br>sshaulson@morganlewis.com<br>tlinthorst@morganlewis.com<br><br>Attorneys for Defendant Citibank, N.A. |

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above, Memorandum of Law in Opposition to Plaintiffs' Supplemental Memorandum in Further Support of Conditional Class Certification and the foregoing Supplemental Declaration of Thomas A. Linthorst and attached Exhibits in support, were served via ECF on this 19th day of August, 2011 as listed below:

>Marc I. Gross
>Shaheen Rushd
>Murielle J. Steven Walsh
>Jeremy A. Lieberman
>POMARANTZ HAUDEK GROSSMAN & GROSS, LLP
>100 Park Avenue – 26th Floor
>New York, New York  10017
>
>D. Maimon Kirschenbaum
>JOSEPH HERZFELD HESTER & KIRSCHENBAUM, LLP
>757 Third Avenue – 25th Floor
>New York, New York  10017