Sam S. Shaulson (SS-0460)
sshaulson@morganlewis.com
Thomas A. Linthorst (TL-3345)
tlinthorst@morganlewis.com
Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6718 (Telephone)
(212) 309-6001 (Fax)
Attorneys for Defendant

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DIGNA RUIZ, on behalf of herself and all others similarly situated, | : | |
| | : | |
| | : | |
| Plaintiff, | : | **Civ. A. No. 10-cv-5950 (KPF) (RLE)** |
| | : | |
| v. | : | |
| | : | |
| CITIBANK, N.A., | : | |
| | : | |
| Defendant | : | |

| | | |
|---|---|---|
| FREDERICK WINFIELD, on behalf of himself and all others similarly situated, | : | |
| | : | |
| | : | |
| Plaintiff, | : | **Civ. A. No. 10-cv-7304 (KPF) (RLE)** |
| | : | |
| v. | : | |
| | : | |
| CITIBANK, N.A., | : | |
| | : | |
| Defendant | : | |

# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION TO DECERTIFY COLLECTIVE ACTION

## **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 1

II.   PROCEDURAL HISTORY ....................................................................................... 4

III.  FACTUAL BACKGROUND ..................................................................................... 6

      A.    The Citibank Branch Network And The Personal Banker Position ..................... 6

      B.    Citibank Has Robust Policies And Training To Ensure Proper Payment For
            All Time Worked ................................................................................................... 6

      C.    The Opt-Ins And Their Managers Followed These Lawful Policies ................... 9

IV.   ARGUMENT ............................................................................................................ 10

      A.    Plaintiffs Cannot Meet Their Burden To Demonstrate That The Case
            Should Proceed As A Collective Action ............................................................. 10

      B.    The Elements Of Plaintiffs' Claims And Citibank's Defenses .......................... 12

      C.    Courts Have Routinely Decertified Similar Off-The-Clock Class And
            Collective Actions .............................................................................................. 15

      D.    Opt-Ins' Disparate Factual and Employment Settings Confirm That There Is
            No Common Basis On Which To Adjudicate Their Claims ................................ 17

            1.    The Plaintiffs and Opt-Ins are not similarly situated with respect to
                  whether and to what extent they worked more than 40 hours ................ 18

            2.    The Plaintiffs and Opt-Ins are not similarly situated with respect to
                  whether overtime was requested, approved, recorded, and/or paid ........ 22

            3.    The Plaintiffs and Opt-Ins are not similarly situated with respect to
                  whether or how a manager would know (or should know) that they
                  allegedly worked overtime that they did not record .............................. 26

            4.    Plaintiffs and Opt-Ins are not similarly situated with respect to
                  damages.................................................................................................... 29

      E.    Varying Defenses To Each Opt-In's Claim Mandate Decertification ................ 30

      F.    Fairness and Procedural Considerations Mandate Decertification .................... 32

V.    CONCLUSION......................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Allen v. Bd. of Pub. Educ. for Bibb Cnty.*,
  495 F.3d 1306 (11th Cir. 2007) ......................................................................14

*Basco v. Wal-Mart Stores, Inc.*,
  2004 WL 1497709 (E.D. La. July 2, 2004)........................................................13

*Brickey v. Dolgencorp, Inc.*,
  272 F.R.D. 344 (W.D.N.Y. 2011)....................................................................15

*Briggins v. Elwood TRI, Inc.*,
  882 F. Supp. 2d 1256 (N.D. Ala. 2012)..........................................................16

*Brown v. ScriptPro, LLC*,
  700 F.3d 1222 (10th Cir. Nov. 27, 2012) .......................................................12

*Brumbelow v. Quality Mills, Inc.*,
  462 F.2d 1324 (5th Cir. 1972) ..................................................................12, 14

*Carey v. 24 Hour Fitness USA, Inc.*,
  2012 WL 4857562 (S.D. Tex. Oct. 11, 2012)..................................................15

*Comcast v. Behrend*,
  133 S. Ct. 1426 (2013)....................................................................................30

*Diaz v. Elecs. Boutique of Am., Inc.*,
  2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ................................................15

*Douglas v. First Student, Inc.*,
  888 F. Supp. 2d 929 (E.D. Ark. 2012)............................................................16

*Eng-Hatcher v. Sprint Nextel Corp.*,
  2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009).......................................15, 19, 24

*Espenscheid v. DirectSat USA, LLC*,
  705 F.3d 770 (7th Cir. 2013) (Posner, J.) .......................................................11

*Espinoza v. Cnty. of Fresno*,
  290 F.R.D. 494 (E.D. Cal. 2013) ....................................................................16

*Frye v. Baptist Mem'l Hosp., Inc.*,
  495 F. App'x 669 (6th Cir. 2012) ...................................................................16

*Gardner v. W. Beef Props., Inc.*,
  2013 WL 1629299 (E.D.N.Y. Mar. 25, 2013)..................................................11

*Griffith v. Wells Fargo Bank, N.A.*,
   2012 WL 3985093 (S.D. Tex. Sep. 12, 2012) ....................................................................15

*Hinojos v. Home Depot, Inc.*,
   2006 WL 3712944 (D. Nev. Dec. 1, 2006) ......................................................................13

*Hinterberger v. Catholic Health Sys.*,
   - F.R.D. -, 2014 WL 1278919 (W.D.N.Y. Mar. 27, 2014) ............................................ passim

*Hoffman-LaRoche v. Sperling*,
   493 U.S. 165 (1989)....................................................................................................2, 11

*Johnson v. Big Lots Stores, Inc.*,
   561 F. Supp. 2d 567 (E.D. La. 2008) ...............................................................................34

*Joza v. WW JFK LLC*,
   2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ............................................................ passim

*Kellar v. Summit Seating Inc.*,
   664 F.3d 169 (7th Cir. 2011) ..........................................................................................14

*Knott v. Dollar Tree Stores, Inc.*,
   897 F. Supp. 2d 1230 (N.D. Ala. 2012) ...........................................................................34

*Martin v. Citizens Fin. Grp., Inc.*,
   2013 WL 1234081 (E.D. Pa. Mar. 27, 2013) ........................................................16, 31, 34

*Morangelli v. Chemed Corp.*,
   922 F. Supp. 2d 278 (E.D.N.Y. 2013) .............................................................................15

*Morano v. Intercont'l Capital Grp., Inc.*,
   2012 WL 2952893 (S.D.N.Y. July 17, 2012) ...................................................................16

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010).................................................................................10, 11, 12

*Newton v. City of Henderson*,
   47 F.3d 746 (5th Cir. 1995) ............................................................................13, 14, 27, 28

*Seever v. Carrols Corp.*,
   528 F. Supp. 2d 159 (W.D.N.Y. 2007) ...................................................................12, 13, 29

*Seward v. Int'l Bus. Machine Corp.*,
   2012 WL 860363 (S.D.N.Y. Mar. 9, 2012) ............................................................16, 32, 34

*Singh v. City of New York*,
   418 F. Supp. 2d 390 (S.D.N.Y. 2005), *aff'd*, *Singh*, 524 F.3d 361.........................................13

*Singh v. City of New York*,
　524 F.3d 361 (2d Cir. 2008) (Sotomayor, J.)..........................................................13

*Thompson v. Speedway SuperAmerica LLC*,
　2009 WL 130069 (D. Minn. Jan. 20, 2009)............................................................15

*Viveros v. VPP Grp., LLC*,
　2013 WL 3733388 (W.D. Wis. Jul. 15, 2013).........................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
　131 S. Ct. 2541 (2011)............................................................................................34

*Whineglass v. Smith*,
　2013 WL 2237841 (M.D. Fla. May 21, 2013).....................................14, 16, 31, 33

*White v. Baptist Mem'l Health Care Corp.*,
　699 F.3d 869 (6th Cir. 2012), *cert. denied*, 134 S. Ct. 296 (2013) ...............12, 14, 28

*White v. Osmose, Inc.*,
　204 F. Supp. 2d 1309 (M.D. Ala. 2002) .................................................................13

*Zavala v. Wal Mart Stores Inc.*,
　691 F.3d 527 (3d Cir. 2012)....................................................................................10

*Zivali v. AT&T Mobility LLC*,
　784 F. Supp. 2d 456 (S.D.N.Y. 2011)............................................................. passim

*Zulauf v. Amerisave Mortg. Corp.*,
　911 F. Supp. 2d 1266 (N.D. Ga. 2012) ..................................................................16

STATUTES

29 U.S.C. § 255(a)..........................................................................................................13

Fair Labor Standards Act ("FLSA") ...................................................................... passim

OTHER AUTHORITIES

Fed. R. Civ. P. 23 .............................................................................................1, 11, 12, 30

## I.   <u>INTRODUCTION</u>

Plaintiffs in these two cases are former Personal Bankers ("PBs") of Defendant Citibank, N.A. who claim that they worked overtime without proper compensation, and assert claims under the Fair Labor Standards Act ("FLSA") and several state laws.  Plaintiffs do not allege, and have expressly disavowed, that Citibank required them to work overtime without proper compensation. Linthorst 2011 Decl. ¶ 3 (Dkt. No. 46).  Instead, Plaintiffs contend that because of the requirements of the job – specifically their sales goals – some of them took it upon themselves to work overtime without recording such work in their time records, and their individual managers knew or should have known of such uncompensated work.

On February 9, 2012, Judge Koeltl granted Plaintiffs' motion to conditionally certify this case as a collective action pursuant to the FLSA, finding that Plaintiffs satisfied their "minimal burden" of making a "modest factual showing" that notice should be issued, and considering only Plaintiffs' evidence in ruling on the motion.  Dkt. No. 58, pp. 7, 10.  Following this decision, Plaintiffs sent notice to more than 6,000 current and former PBs.  Linthorst 2014 Decl. ¶ 2.[1]  Only 436 of these individuals (7%) joined the case (and 156 of those are completely time-barred).  *Id.* ¶ 3.  The parties then engaged in almost two years of discovery directed at Plaintiffs' anticipated Motion for Class Certification under Rule 23 and Citibank's Motion for Decertification of the FLSA claims.  Dkt. No. 123; Linthorst 2014 Decl. ¶ 4.

Citibank now respectfully requests that the Court decertify the FLSA collective action and dismiss the claims of all Opt-Ins.  The standard to maintain certification at this phase of the proceedings is stringent.  At this stage, **<u>it is Plaintiffs' burden</u>** to prove by a preponderance of the evidence that this case should proceed as a collective action.  **It is Plaintiffs' burden** to

---

[1] Unless otherwise designated with a prior docket number, the declarations and deposition excerpts are attached as exhibits in alphabetical order to the Declaration of Thomas Linthorst ("Linthorst 2014 Decl.").

demonstrate that they and all other Opt-Ins are victims of a <u>common</u> and <u>illegal</u> policy or practice. **It is Plaintiffs' burden to prove** that they and all of the Opt-Ins are similarly situated with respect to the claims at issue, and that this case involves "common issues of law and fact arising from the same alleged [unlawful] activity," *Hoffman-LaRoche v. Sperling*, 493 U.S. 165, 170 (1989), such that the issues of liability and damages can be proven based on common evidence and without individual trials for each Opt-In consistent with Due Process. Although these cases have proceeded for three-and-a-half years, with years of discovery, hundreds of thousands of documents produced, and dozens of witnesses deposed, Plaintiffs have utterly failed to demonstrate that the case can proceed as a collective action.

The record evidence conclusively establishes that this case should be decertified. The only evidence common across Plaintiffs and Opt-Ins are Citibank's robust policies requiring that PBs be paid for all time worked, which are enforced with discipline, up to and including termination for failure to do so. Citibank regularly trains both PBs and managers on the policies. Citibank regularly paid overtime to Plaintiffs and Opt-Ins, and Citibank pays millions of dollars in overtime to PBs each year (almost $13M since 2009). Hammond 2014 Decl. ¶ 4. Numerous PBs testified that they were paid for all time worked, and that their managers regularly approved and paid them for overtime, including to meet their sales goals. And, since 2011, there is a reminder to employees on every time record they submit that they must record all time worked and certify that they have done so, and a complaint procedure that is available with the click of a button. These facts directly contradict any claim of a nationwide policy or practice to require PBs to work off-the-clock.

Plaintiffs have never offered a theory, much less any evidence, as to how each of the issues of liability and damages could be determined on a common basis. Indeed, whether each Opt-In needed to work overtime (or why, when, or how much), whether each manager approved such overtime, whether each Opt-In recorded the overtime on each time record, whether each manager

knew or should have known of any unpaid overtime, whether the work at issue is compensable under applicable standards, whether Citibank has any additional defenses to an Opt-In's individual claim, and numerous damages issues (including the precise amount of damages, and issues of willfulness and good faith to each Opt-In) are completely individual inquiries.

The disparate factual settings among the Plaintiffs and Opt-Ins require decertification.  *See, e.g., Zivali v. AT&T Mobility LLC*, 784 F. Supp. 2d 456 (S.D.N.Y. 2011) (decertifying FLSA collective action after examining the disparate factual settings of the plaintiffs and opt-ins).  Sales goals for PBs are set individually, and just among the Plaintiffs and the Opt-Ins the sales goals varied by as much as 353%.  And the opportunities for PBs to meet their sales goals varied widely based on the location of the branch, the staffing in the branch, the nature of the branch clientele, the languages spoken by the PB and the branch clientele, the age of the branch, the PB's relationship with his or her manager, whether the PB was qualified to offer business products, and many other individual circumstances.  Whereas some Plaintiffs claim they had difficulty meeting their sales goals, some Opt-Ins testified that it was "so easy" to meet their sales goals, and they often doubled or tripled them, earning tens of thousands of dollars a year in incentive compensation.  Numerous PBs have testified that they regularly met and exceeded their sales goals without working overtime.

The facts relating to the Plaintiffs' and Opt-Ins' claims for uncompensated overtime vary widely.  When they did work overtime, PBs were required to record and be paid for such time, and the Plaintiffs and Opt-Ins regularly recorded and were paid for overtime.  Although some Plaintiffs and Opt-Ins claim that their managers refused to approve overtime, others admit they were paid for all overtime they recorded, and that their managers approved overtime to be worked and paid every time they requested it.  Some rarely recorded overtime but others were regularly paid overtime in most of their paychecks.  Some claim they told their managers about their alleged off-the-clock work, but others admit they never told their managers about such work and, instead, lied or hid any

3

alleged off-the-clock work from their managers.  Some claim their managers told them to remove overtime from the time records, but others were specifically directed to record all time worked and to record <u>additional overtime</u> that they had failed to record.  Some Opt-Ins even admitted they could not recall ever working unpaid overtime, and numerous PBs have testified that they were paid for all time worked, including all overtime.

The case should be decertified because individual trials would be required to adjudicate the claims of each Opt-In.  No Opt-In could prove his or her claim other than by his or her own testimony, other witnesses with knowledge specific to him or her, and documents that are specific to him or her.  And, consistent with Due Process, Citibank plainly must be permitted to cross-examine and challenge the credibility of each Opt-In that seeks to hold Citibank liable for his or her individual claim, present contrary testimony by the manager and other witnesses, present contrary documentary evidence, and assert any individualized defenses it may have with respect to each Opt-In.  Whatever a trier of fact might determine as to one Opt-In after considering the testimony and evidence specific to that Opt-In necessarily cannot establish any element of liability or damages as to any other Opt-In who worked in a different branch under a different manager and whose individualized evidence would have to be separately considered.

For these reasons, as set forth in more detail below, Citibank respectfully requests that the Court decertify the collective action and dismiss the claims of all Opt-Ins without prejudice.

## II.    <u>PROCEDURAL HISTORY</u>

These cases have been proceeding for over three-and-a-half years.  Plaintiffs have been afforded years of discovery to meet their high burden of proving that this case should proceed as a collective action.  At the outset of the cases, the Court compelled Citibank to produce to Plaintiffs a list of the names, addresses and phone numbers of what was then all 4,030 PBs employed between August 2007 and 2010.  Dkt. No. 22.  The parties then participated in discovery in advance of a

Motion for Conditional Certification.  Citibank produced emails resulting from over 80 searches conducted on the emails of over 50 Citibank managers and employees, going back over three years. Citibank searched the emails of Plaintiffs and Opt-Ins, 35 Branch Managers, the Area Managers they reported to (who cumulatively had responsibility for branches in a total of five states), and the Division Directors they reported to (who at various times had responsibility for almost all of the approximately 1,000 branches operated by Citibank nationwide).[2]  Supp. Linthorst 2011 Decl. ¶¶ 2-4 (Dkt. No. 67); Perez Decl. ¶¶ 10-13 (Dkt. No. 67-2).

Following the Court's ruling on conditional certification, notice was sent to over 6,000 current and former PBs, and 436 returned Consent to Join forms (the "Opt-Ins").  Citibank served written discovery on each of the 296 Opt-Ins with potentially timely claims.  Dkt. No. 123. Plaintiffs requested that the Court preclude Citibank from taking discovery from each Opt-In.  *Id.* Plaintiffs' request was granted and the Court limited discovery to a "sampling" of Opt-Ins.  *Id.* Confined to a "sample," the parties agreed that discovery was to be taken from 30 Opt-Ins – 15 chosen by Plaintiffs and 15 chosen by Citibank.  Linthorst 2014 Decl. ¶ 5.  Over half of those chosen by Citibank to participate in discovery, however, refused to do so, and a request for their dismissal is pending before Judge Ellis.  *Id.* ¶ 6.  Ultimately, despite repeated efforts to replace those Opt-Ins in the discovery pool who refused to participate in discovery, only 23 opt-ins participated in discovery including deposition during this phase.  *Id.* ¶ 7.

For each Opt-In who participated in discovery, the parties exchanged written discovery and Citibank produced emails from the Opt-In and the Opt-Ins' Branch Managers – over 80 additional custodians, including 54 Branch Managers.  *Id.* ¶¶ 8-9.  In all, Citibank has produced over 250,000 pages of documents, including email communications relating to overtime to and from all of the

---

[2]  Citibank operates approximately 1,000 bank branches in thirteen states, plus the District of Columbia.  Putman Decl. ¶ 7 (Dkt. No. 46-10).

Opt-Ins participating in discovery and numerous Citibank managers with responsibilities for different branches across all of Citibank's branch locations.  *Id.* ¶ 10.

In addition, Plaintiffs deposed five corporate representatives regarding a wide variety of topics, including Citibank's overtime and other compensation policies, timekeeping system, computer log records, security cameras and alarm systems, restructurings, and other human resources matters.  *Id.* ¶ 11.  Citibank deposed a total of 29 Plaintiffs and Opt-Ins.  *Id.* ¶ 12.

## III.   FACTUAL BACKGROUND

### A.   The Citibank Branch Network And The Personal Banker Position.

The facts in this case show that that the Plaintiffs' and Opt-Ins' experiences at Citibank varied from branch to branch and from time period to time period.  Citibank has approximately 1,000 bank branches in thirteen states, plus the District of Columbia.  Putman Decl. ¶ 7 (Dkt. No. 46-10).  Each branch is managed by a Branch Manager, and during the relevant time period, each branch has employed anywhere from one to ten Personal Bankers, depending on the location and size of the branch, and a group of Tellers.  *Id.* ¶¶ 4-5.  Some branches also have Assistant Branch Managers and Service Officers.  *Id.* ¶ 6.  Service Officers are responsible for handling customer service issues and complaints, which can free up the PB to spend more time on sales activities.  *Id.*

### B.   Citibank Has Robust Policies And Training To Ensure Proper Payment For All Time Worked.

Throughout the relevant time period, the Plaintiffs and Opt-Ins (and all other Personal Bankers) were subject to policies and training that required them to accurately record all of their time worked, including all of the overtime hours they worked.  First, since 2007, Citibank has utilized the North America Time & Attendance System (NATA) – an online timekeeping system that allows employees to accurately record their start, stop, and lunch times <u>to the minute</u> to ensure that

they are paid for each and every minute of work performed.  Suomela Decl. ¶ 5.[3]

Starting in early 2011, Citibank added the following language to the NATA screen in which employees enter their time:  "**Please confirm below whether your entries are accurate and account for all hours worked, including overtime**."  *Id.* ¶ 11 (emphasis added).   In order for an employee to be able to save or submit their time entries in NATA, one of two radio buttons  - "I Agree" or "I Do Not Agree" with this statement – must be selected.  *Id.* ¶ 12; Suomela Dep. 36.  If an employee selects "I Do Not Agree," the employee is contacted by a representative from Citibank Employee Services to discuss the issue.  Suomela Decl. ¶ 13.[4]

Moreover, the Employee Handbook has made it clear for many years that all overtime hours worked must be recorded and paid and that off-the-clock work is "**strictly prohibited**":

> *Overtime Pay*
> …
>
> If you're non-exempt or overtime-eligible, your manager must provide advance approval for you to work overtime.  However, overtime must be paid regardless of whether or not the time was approved in advance by your manager.[5]
> …
>
> *Recording Work Hours*
>
> If you're non-exempt or overtime-eligible, you must record all time worked on a daily basis or as soon as practical to reflect start and end (in and out) times in addition to absences that occur. … You're responsible for recording hours worked and time away from work accurately. Managers are responsible for ensuring that non-exempt and overtime-eligible employees are reporting time accurately as well as approving timesheets on a timely basis.
> …
>
> *Keeping accurate time records*

---

[3]  *See also* Sanchez Dep. 101, 103 (manager told her to "enter your time to the minute in order to be as accurate as possible"); Adler Dep. 43 (NATA allowed him "to put in the exact time down to the minute").

[4]



Redacted

Linthorst 2014 Decl., Ex. 39 (CITI-RUIZ 174108).

[5]  "Requiring pre-approval for overtime, and disciplining employees for working overtime that has not been authorized, is not unlawful."  *Zivali*, 784 F. Supp. 2d at 462 n.3.

Falsification of time records is a violation of policy.  Employees who falsify any time record may be subject to corrective action up to and including termination of employment.

- All time worked is compensable and must be recorded.  If you're a non-exempt and overtime-eligible employee, **"off-the-clock" work is strictly prohibited.  Managers may not request or require "off-the-clock" work.**

…

If you have concerns about deductions from your pay, overtime pay, or any other issue relating to your wages or hours of work, please contact Human Resources.  Retaliation against any employee for raising a concern is strictly prohibited.

Sorrells Decl. ¶ 5, Ex. C, pp. 24-25 (emphasis added); *see also* Ex. A, pp. 29-30, Ex. B, pp. 27-28 (handbooks applicable from 2009 to present).

Plaintiffs and Opt-Ins admitted that they knew that they were responsible for accurately entering their own hours worked into the NATA system. *See, e.g.*, Ruiz Dep. 155-56, 175; Shen Dep. 206; Steffensen Dep. 142-45; Kenney Dep. 88-89; Kosiba Dep. 168 ("We all know that is Citibank policy to record our time accurate[ly]."). Plaintiffs and Opt-Ins also admitted that they knew that under Citibank policy, they were not permitted to work off-the-clock and that their managers were prohibited from requesting or requiring that they perform work off the clock. *See, e.g.*, Ruiz Dep. 156-157; Valencia Dep. 273; Sanchez Dep. 172.

Furthermore, Citibank regularly trains non-exempt employees and their managers to ensure that these policies are followed. Suomela Decl. ¶¶ 6-9, Exs. A-E (company-wide trainings on timekeeping policies and payment for all time worked in 2007, 2010, and 2012, including explicit instructions that even if an employee works beyond their scheduled work hours without manager approval, they must record and be paid for that time). Citibank has consistently enforced these policies, and when concerns have been raised that an individual manager required employees to work off-the-clock, Citibank investigated the issue and, where an allegation of off-the-clock work was substantiated, the affected employees have been paid for the amounts of unpaid wages. Henderson Decl. ¶¶ 6-11, Ex. A (Dkt. No. 67-1); Schornstein Dep. 183 & Ex. 15; *see also* Sorrells

Decl.¶ 5, Ex. A, pp. 29-30.

C.    **The Opt-Ins And Their Managers Followed These Lawful Policies.**

The record is flooded with evidence that many Opt-Ins and their managers followed these policies.  Every Plaintiff and Opt-In subject to discovery regularly recorded and was paid for overtime.  Hammond 2010 Decl. ¶¶ 4-12 (Dkt. No. 46-13); Hammond 2014 Decl. ¶¶ 6-7.  Numerous emails show that rather than attempting to deprive Opt-Ins of overtime compensation for hours that they worked, many managers made sure that the Opt-Ins recorded and were paid for overtime they worked, even when the Opt-Ins forgot to record the extra time.  *See, e.g.,* Wallace Dep. 180-81 &



Ex. 18 Redacted

; Linthorst 2014 Decl. Ex. 40 (CITI-RUIZ 173393) Redacted

; Quiros Decl. ¶ 3 & Ex. A (Dkt. No. 46-11); Shen Dep. 238 (manager directed Shen to correct his timesheet to add time worked so that it was accurate); *see also* Plazola Decl. ¶ 6 (manager instructed Opt-In Moline to correct timesheet to add time to accurately reflect time she left).

The email evidence further demonstrates that when a particular manager attempted to minimize the amount of overtime <u>worked</u>, he or she did so <u>lawfully</u>.  For example, Redacted

Linthorst 2014 Decl. Ex. 41 (CITI-RUIZ 203488-90); *see also* Carreno Dep. 62-64; 146 (manager scheduled him to work 38 hours per week for a period of time).  Similarly, Redacted

Linthorst 2014 Decl. Ex. 42 (CITI-RUIZ 195057). Redacted

9

**Redacted**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* Ex. 43 (CITI-RUIZ 200831).

These facts – strong policies requiring the recording of all time worked, training of employees and managers that all time worked must be paid, reminders to employees on every time record that they must record all time worked and certify that they have done so, a complaint procedure that is available to employees with the click of a button, regular payment of overtime to Plaintiffs and Opt-Ins, and the payment of millions of dollars of overtime every year to PBs – directly contradict any claim of a classwide policy or practice of requiring off-the-clock work.

## IV.    ARGUMENT

### A.    Plaintiffs Cannot Meet Their Burden To Demonstrate That The Case Should Proceed As A Collective Action.

Unlike a motion for conditional certification, which typically is decided under a "lenient" standard, in considering a motion for decertification, "the Court, now afforded a much fuller record, must apply a more 'stringent standard' of proof in determining whether the plaintiffs are similarly situated for the purposes of the FLSA."  *Zivali*, 784 F. Supp. 2d at 460 (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) ("At the second stage, the district court will, on a fuller record, determine whether the so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."). It is Plaintiffs' burden to establish "by a preponderance of the evidence . . . [that] 'the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs.'"  *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 537 (3d Cir. 2012) (affirming decertification of collective action) (quoting *Myers*, 624 F.3d at 555); *Zivali*, 784 F. Supp. 2d at 460 ("The burden is on the named plaintiff to prove that the other employees are similarly situated.").  If Plaintiffs fail to establish that the Opt-Ins are similarly situated, the class "may be 'de-certified'" and the "opt-in plaintiffs'

10

claims may be dismissed without prejudice."  *Myers*, 624 F.3d at 555.

Like a class action under Rule 23, a collective action serves the purpose of judicial efficiency.  *Sperling*, 493 U.S. at 170 ("The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.").  Collective actions also present Due Process issues which the Rule 23 elements are designed to address.  For example, the Court in this case precluded discovery from most of the Opt-Ins (Dkt. No. 123), and presumably Plaintiffs will likewise seek to proceed at trial on the basis of testimony and evidence from a limited number of Opt-Ins.  As such, Plaintiffs seek to adjudicate the claims of most of the Opt-Ins *in abstencia*, and the Due Process concerns underlying the Rule 23 standards are fully applicable to the FLSA claims in this case – both for the absent Opt-Ins whose claims could be adjudicated against them without their participation or submission of evidence, and for Citibank because Plaintiffs seek to hold it liable to individuals as to whom it may not be permitted to adduce evidence at trial.

Because of the similar concerns at issue in both class and collective actions, "there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) (Posner, J.); *see also Gardner v. W. Beef Props., Inc.*, 2013 WL 1629299, at *6 (E.D.N.Y. Mar. 25, 2013) (citing *Espenscheid*; "[t]he more opt-ins there are in the class, the more the analysis under § 216(b) will mirror the analysis under Rule 23"); *Hinterberger v. Catholic Health Sys.*, - F.R.D. -, 2014 WL 1278919, at *34 (W.D.N.Y. Mar. 27, 2014) (denying class certification and decertifying collective action for same reasons); *Viveros v. VPP Grp., LLC*, 2013 WL 3733388, at *1, *4-6 (W.D. Wis. Jul. 15, 2013) (denying Rule 23 motion and decertifying collective action under same standard).

District courts in this Circuit have applied the following factors in determining whether

plaintiffs have met their burden of establishing that the opt-ins are "similarly situated": 1) the disparate factual and employment settings of the individual plaintiffs; 2) the defenses available to defendants which appear to be individual to each plaintiff; and 3) fairness and procedural considerations counseling for or against collective action treatment. *Zivali*, 784 F. Supp. 2d at 460. Despite the "terminological difference" between these factors and the Rule 23 standards, the relevant focus remains whether the claims of the Plaintiffs and Opt-Ins can be adjudicated with common proof consistent with Due Process.

### B.  The Elements Of Plaintiffs' Claims And Citibank's Defenses.

The certification analysis must be made by reference to the elements of the claims that Plaintiffs must prove and the defenses available to Citibank. *Myers*, 624 F.3d at 549 (to proceed on a class or collective basis, the case must "involve evidence tending to show that the plaintiffs' jobs were similar in ways material to the establishment of the" claim). To establish liability for a claim of off-the-clock work, Plaintiffs must prove, and the Court must determine, the following issues for each Opt-In for each work week that he or she worked:

- Whether each Opt-In worked overtime (or when, or how much);

- Whether the Opt-In recorded that time using the required timekeeping mechanism[6];

- Whether the Opt-In was directed to perform the alleged work[7];

- Whether the Opt-In requested permission to work overtime and whether the request was

---

[6]  *See, e.g., Joza v. WW JFK LLC*, 2010 WL 3619551, at *7 (E.D.N.Y. Sept. 10, 2010) (denying overtime claims in part because employee failed to record her time on time records); *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 170 (W.D.N.Y. 2007) (dismissing off-the-clock claims in part because of "the undisputed fact that plaintiffs never reported this work on their timesheets"); *see also Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1230-31 (10th Cir. Nov. 27, 2012) ("Under these circumstances, where the employee fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation"); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (affirming decertification because "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process."), *cert. denied*, 134 S. Ct. 296 (2013).

[7]  *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) (affirming dismissal of off-the-clock claim where plaintiff was not directed to perform work off-the-clock, though she was directed to complete duties).

approved or denied[8];

- Whether and to what extent the Opt-In was paid overtime[9];

- Whether the alleged uncompensated work was compensable under the applicable standards[10];

- Whether the manager had actual or constructive knowledge of the alleged uncompensated work[11];

- Whether the Opt-In can prove damages by proving, in each workweek that he or she worked more than 40 hours without compensation, "specific facts establishing when, and for how long, she performed the off-the-clock tasks for which she now seeks compensation."[12]

Assuming any Opt-In could meet his or her burden of proving each of the above elements, the following additional issues of damages and defenses would have to be proven:

- Whether the Opt-In can prove that any unlawful failure to pay overtime to him or her was willful (and thereby obtain a third year to the statute of limitations, 29 U.S.C. § 255(a));

- Whether Citibank can demonstrate that any unlawful failure to pay overtime to any Opt-In was based on a good faith belief that it was in compliance with the law (and thereby defeat a claim for

---

[8]  *Newton v. City of Henderson*, 47 F.3d 746, 747, 749 (5th Cir. 1995) (reversing judgment for plaintiff where plaintiff was told not to work unauthorized overtime, but did so and turned in timesheets that did not include overtime).

[9]  *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002) ("Because [the employer] did in fact pay some overtime, it is likely that any particular [off-the-clock] claim will require specific, individualized proof as to any hours that [employer] refused to pay.").

[10]  *Singh v. City of New York*, 524 F.3d 361, 364, 367 (2d Cir. 2008) (Sotomayor, J.) (affirming summary judgment for defendant because work time was "de minimis as a matter of law and thus not compensable under the FLSA" and recognizing that preliminary and postliminary activities are not compensable); *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *8 (E.D. La. July 2, 2004) (denying certification where individualized defenses included whether activities were preliminary or postliminary).

[11]  *Singh v. City of New York*, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005) (fact finder must determine "how much of that time was spent with the employer's actual or constructive knowledge"), *aff'd*, *Singh*, 524 F.3d 361; *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006) (denying conditional certification where individualized inquiry would be required into whether each supervisor knew about the off-the-clock work).

[12]  *Joza*, 2010 WL 3619551, at *7 (quoting *Seever*, 528 F. Supp. 2d at 169-70).

liquidated damages)[13]; and

- Whether Citibank has an additional defense such as the statute of limitations or a release.

The element of employer knowledge of off-the-clock work itself has a number of subsidiary elements, including (a) whether and to what extent the employee recorded and was paid for overtime (*White*, 699 F.3d at 874; *Joza*, 2010 WL 3619551, at *1); (b) whether any manager asked the employee to work any of the allegedly unpaid overtime hours (*Joza*, 2010 WL 3619551, at *3); (c) whether any manager instructed or encouraged the employee to falsely report the time (*Brumbelow*, 462 F.2d at 1327; *Joza*, 2010 WL 3619551, at *2); (d) whether the employee complained about the off-the-clock work (*Joza*, 2010 WL 3619551, at *1, *3; *Newton*, 47 F.3d at 749); and (e) whether the employee took steps to prevent the manager from learning about the overtime (*Joza*, 2010 WL 3619551, at *3; *Newton*, 47 F.3d at 749); *see also, e.g., Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1323 (11th Cir. 2007) (affirming summary judgment against plaintiff where "no one told her to work off the clock and she did not inform anyone of her overtime work," and she could not identify how her employer should have known that she was working without compensation); *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) ("[T]he FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about.").

Plaintiffs are unable to offer any classwide proof that would establish any of these elements, much less all of them, for all of the Opt-Ins.  Rather, discovery has revealed that there are factual differences between Plaintiffs and Opt-Ins that are material to these elements, requiring an individualized inquiry as to each of these elements for each Opt-In.

---

[13] *Whineglass v. Smith*, 2013 WL 2237841, at *9 (M.D. Fla. May 21, 2013) (decertifying FLSA collective because the defenses of willfulness and good faith could be determined only with respect to each individual plaintiff).

### C.    Courts Have Routinely Decertified Similar Off-The-Clock Class And Collective Actions.

As one New York district court recently observed:  "Off-the-clock cases can present challenges for class-wide determination that often preclude certification."  *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 306 (E.D.N.Y. 2013).  New York district courts have repeatedly decertified off-the-clock collective actions where, as here, the defendant's companywide policies are lawful and the Opt-Ins' allegations that the policies <u>sometimes</u> were not followed are highly individualized and manager-specific.[14]  For example, in *Hinterberger*, 2014 WL 1278919, at *30, 34, the court decertified an off-the-clock collective action where the employer's official policies complied with the FLSA, plaintiffs provided varying testimony that they <u>sometimes</u> performed work during unpaid lunch breaks, they <u>sometimes</u> did not record the work but other times recorded and were paid overtime compensation for the work, and <u>some</u> of their managers would not know about the work.  The court held that the case was not appropriate for class or collective action treatment because "the question of [the employer's] liability will come down to whether, on a department specific basis, a particular supervisor did not follow [the employer's] [lawful] directive

---

[14]  Indeed, courts routinely refuse to even conditionally certify off-the-clock collective actions due to the individualized evidence required to prove an off-the-clock claim.  *See, e.g., Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383, at *4 (S.D.N.Y. Nov. 13, 2009) (denying conditional certification of nationwide action because alleged policy of "maximizing sales and minimizing overtime" was insufficient to infer that all managers forced employees to work off-the-clock); *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 347-48 (W.D.N.Y. 2011) (denying conditional certification because policy budgeting hours of work was not "a 'common policy or plan that violate[s] the law'"); *Diaz v. Elecs. Boutique of Am., Inc.*, 2005 WL 2654270, at *4-5 (W.D.N.Y. Oct. 17, 2005) (holding that the "[Plaintiff]'s allegations … that he worked "off-the-clock without compensation and that his timesheets were altered to delete overtime hours worked are too individualized to warrant collective action treatment."); *Griffith v. Wells Fargo Bank, N.A.*, 2012 WL 3985093, at *2-5 (S.D. Tex. Sept. 12, 2012) (where employees made individual choices to inaccurately report work time based on "office-specific experiences relating to the actions of office or division supervisors[,]" action should not proceed on a collective basis); *Carey v. 24 Hour Fitness USA, Inc.*, 2012 WL 4857562, *2 (S.D. Tex. Oct. 11, 2012) (denying conditional certification because "[w]hether a Club Manager would be willing to violate the … written company policy against 'off-the-clock' work … requires an inquiry into the motivation and ethics of each Club Manager."); *Thompson v. Speedway SuperAmerica LLC*, 2009 WL 130069, at *12 (D. Minn. Jan. 20, 2009) (collective action not appropriate where "different individual store managers allegedly instructed the plaintiffs not to report hours … [the] alleged violations [we]re contrary to the Defendants' official written policy … and "the Plaintiffs allege[d] that they sometimes performed [work] … while "off the clock," but on an irregular basis ... because the showings made do not demonstrate such a homogeneity in alleged FLSA violations"; thus, it was inappropriate to "subject[] [the] employer to the weighty burdens of a collective action").

… discouraged the reporting of mealtime work, or knew the work was performed but did not audit and correct time cards as required." *Id.*

*Hinterberger* follows numerous other New York district court decisions decertifying off-the-clock collective actions. *See Morano v. Intercont'l Capital Grp., Inc.*, 2012 WL 2952893, at *6-9 (S.D.N.Y. July 17, 2012) (decertifying off-the-clock collective action where the opt-ins reported to different managers who may or may not have demanded that they work unpaid overtime hours, and some opt-ins turned in timesheets reflecting overtime work while others did not, which would involve different questions of law and fact); *Seward v. Int'l Bus. Machine Corp.*, 2012 WL 860363, at *1 (S.D.N.Y. Mar. 9, 2012) (decertifying off-the-clock collective action because plaintiff failed to establish "the existence of a sufficiently uniform and pervasive policy requiring off-the-clock work, given the many differences in specific job duties, team functions and structures, managerial expectations, and individual experiences and understandings among the plaintiffs[,]" and "potential defenses were highly fact specific and w[ould] likely depend on the testimony of individual plaintiffs and managers") (internal quotations omitted); *Zivali*, 784 F. Supp. 2d at 468 (decertifying off-the-clock collective action).[15]

---

[15] Other courts also have regularly decertified off-the-clock cases similar to this one. *See, e.g., Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 672 (6th Cir. 2012) (affirming order decertifying off-the-clock collective action because the claims relied on employees' unique experiences); *Whineglass*, 2013 WL 2237841, at *5 (decertifying off-the-clock collective action because "discovery show[ed] there [we]re distinct circumstances surrounding each plaintiff's overtime claim," including the reasons they worked off the clock, there was no common decision, policy or plan to violate the FLSA, and individualized defenses existed); *Martin v. Citizens Fin. Grp., Inc.*, 2013 WL 1234081, at *5 (E.D. Pa. Mar. 27, 2013) (decertifying off-the-clock collective action where evidence showed that decisions complained of were "made independently, by either separate branch or regional managers, and were in direct conflict with Defendants' written policy of complying with [the FLSA]"); *Espinoza v. Cnty. of Fresno*, 290 F.R.D. 494, 496 (E.D. Cal. 2013) (decertifying off-the-clock collective action where plaintiffs' claims "ar[o]se out of disparate factual and employment settings[,] … rebutting them will require individual defenses, and the interests of judicial efficiency will be frustrated if these claims proceed on a collective basis"); *Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256, 1268-69 (N.D. Ala. 2012) (decertifying collective action where company regularly measured plaintiffs' on-the-job productivity, but whether this created an indirect incentive to work off-the-clock varied considerably); *Zulauf v. Amerisave Mortg. Corp.*, 911 F. Supp. 2d 1266, 1271 (N.D. Ga. 2012) (decertifying off-the-clock collective action where plaintiffs produced no evidence showing a unified "company-wide 'policy-to-violate-the-policy'" of forcing employees to underreport their time); *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 934 (E.D. Ark. 2012)

(Footnote Continued)

*Zivali* is virtually indistinguishable from this case.  The plaintiffs and opt-ins claimed that, contrary to AT&T's express policies requiring payment for all time worked, they worked off-the-clock during lunch breaks, when they opened and closed the store, and when they participated in company-related activities outside of the store.  The court decertified the collective action because "the evidence point[ed] to an extremely wide range of company practices in the context of varied factual and employment settings[,] … the defenses available to [AT&T] appear[ed] to be highly individual to each plaintiff[,] … and … fairness and procedural considerations counsel[ed] in favor of decertifying the class."  784 F. Supp. 2d at 464.  The plaintiffs' and opt-ins' testimony varied regarding whether they performed each of the alleged categories of off-the-clock work and "the knowledge of each individual manager varie[d] widely."  *Id.* at 466-67.  The court concluded:

> The testimony of the plaintiffs is not representative and cannot fairly be extrapolated to the 4,100 individuals who have opted into this action. … Resolution of the many fact-specific issues in this case would essentially require 4,100 mini-trials in which each individual plaintiff could present evidence that he or she in fact failed to receive proper overtime compensation – evidence that would then be subject to cross-examination and similar challenge by the defendant.  Such a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective action.

*Id.* at 468-69 (quotations and citations omitted).[16]  As shown below, in this case, the varying evidence regarding the elements of liability and damages also point conclusively to decertification.

**D.    Opt-Ins' Disparate Factual and Employment Settings Confirm That There Is No Common Basis On Which To Adjudicate Their Claims.**

As noted, in determining decertification, courts have considered the varying factual and employment settings experienced by the plaintiffs and the opt-ins as they pertain to the elements of

---

(decertifying collective action due to necessary individual inquiries into whether any class members worked off-the-clock during any week, and, if so, how many hours).

[16]  Citibank's timekeeping system is even stronger than that at issue in *Zivali*.  According to *Zivali*, only managers had the ability to record hours worked off-site.  *Zivali*, 784 F. Supp. 2d at 461.  Citibank's timekeeping system gives employees the unfettered ability to record all hours worked to the minute (Suomela Decl. ¶ 5).

the claim that the plaintiffs must establish.  Similarities that are superficial or irrelevant do not make plaintiffs similarly situated with respect to the claims at issue.  Here, there are significant differences in the factual and employment settings even just among the Plaintiffs and Opt-Ins who participated in discovery that warrant decertification.

>**1.    The Plaintiffs and Opt-Ins are not similarly situated with respect to whether and to what extent they worked more than 40 hours.**

There is no common basis on which to adjudicate whether and to what extent all of the Plaintiffs and Opt-Ins worked more than 40 hours in each workweek.  There was no classwide requirement to work overtime.  Plaintiffs themselves testified that it was possible that PBs could complete their duties in 40 hours or less, depending on the individual.  Winfield Dep. 196-97 ("Q. Was it possible for a personal banker, during your employment at Citibank, to meet their sales goals and perform all of their duties in 40 hours or less?  A. ***Depended on the individual banker***.") (emphasis added); Muniz Dep. 74 ("if you had a really good branch it didn't matter if you work so many hours or less hours").  And numerous PBs testified that they regularly met and exceeded their sales goals, and completed all other duties, without working overtime.  Viteri Decl. ¶ 11; Tacchi Decl. ¶ 3; Cabrera Decl. ¶ 7; Zamudio Decl. at ¶ 4; Fernandez Decl. at ¶ 7; Bautista Decl. at ¶ 3 (Dkt. Nos. 46-39, 46-37, 46-22, 46-40, 46-25, 46-20).

Those Plaintiffs who testified to their purported need to work overtime pointed to aberrational job circumstances as the cause.  Ruiz was overwhelmed by the service duties imposed upon her because she was the only Spanish-speaking PB in a branch with a significant Spanish-speaking customer base.  Ruiz Dep. 52, 56, 77, 83, 196.  Shen's branch lacked a Service Officer, which caused him to spend 60%-70% of his time performing the duties of a Service Officer.  Shen Dep. 113-15, 128.  Winfield met his sales goal and completed his job duties without working overtime until his manager left and he had to assume duties for "running the [financial] center."

Winfield Dep. 197-98.  Steffensen's branch had too many PBs, which diluted his sales opportunities and sometimes left him without even a desk at which to work.  Steffensen Dep. 48, 102-03, 107-09.  Muniz's branch was in a bad location that did not get much walk-in traffic, and was in a low income area with a less affluent customer base than other branches.  Muniz Dep. 70, 74.

Nor did the PB's sales goals create any uniform need to work overtime.[17]  The sales goals varied widely based on factors that changed year-to-year, such as the salary of the PB, the age of the branch, and the length of employment by the PB.  Sorrells Decl. ¶ 9 Ex. F at 10, 19, *see also* Exs. G-J.  Ruiz, for example, negotiated a salary of $65,000 and claims that "since I was one of the highest, if not the highest [salary], I have the most goals to accomplish, which was almost impossible for me to satisfy unless I work extra hours[.]"  Ruiz Dep. 22-23, 35.  Peragine, by contrast, was offered a $30,000 salary because he was "fresh out of college," and he routinely exceeded sales goals.  Peragine Dep. 22, 124-25.  The sales goals varied at different times among the Plaintiffs and Opt-Ins by as much as 28%, 55%, 123%, even 353%.[18]  In fact, the *Ruiz* Complaint specifically alleges that only PBs with high salaries had sales goals that were so high that they required the PBs to work overtime.  Ruiz Complaint ¶ 25 ("[M]ore experienced and more senior Personal Bankers were assigned higher sales goals which were routinely so high that they could not reasonably be achieved in forty hours of work per week.").  *See Eng-Hatcher*, 2009 WL 7311383, at

---

[17]  PBs are eligible for incentive compensation under incentive compensation plans that change regularly.  Sorrells Decl. ¶ 8, Exs. F-J.  Under the plans, Plaintiffs and Opt-Ins had sales goals that varied from plan to plan and from individual to individual based on the individual's salary, the age of the branch, and whether the PB was a new-hire.  *Id.* Ex. F, pp. 10, 19.  The Plaintiffs and Opt-Ins received different sales credits for different products, some of which were earned up front, some were earned at a later point, and some would not be earned if the customer did not maintain a certain balance in the account.  *Id.* Ex. F, pp. 5-7, Ex. G, p. 7-10, *see also* Exs. H-J.  If the Plaintiff or Opt-In exceeded the sales goal in any given month, he or she earned incentive compensation based on the amount he or she exceeded the sales goal.  *Id.* Ex. F, p. 4, *see also* Exs. G-J.

[18]  For example, in January 2009, Opt-In Ash's sales goal was $█████ and Ruiz's sales goal was $█████, over 55% higher.  Costa 2011 Decl., Ex. 1 (Dkt. No. 46-12).  In March 2010, Opt-In Sanchez's sales goal was $█████ and Opt-In Ho's sales goal was $█████, over 123% higher.  *Id.*; Costa 2014 Decl, Ex. A.  In June 2011, Opt-In Lewis' sales goal was $█████, while Opt-In Drews' sales goal was $█████, over 353% higher.  Costa 2014 Decl, Ex. A.  In January 2012, Opt-In Massey's goal was $█████, and Opt-In Williams' goal was $█████, over 28% higher.  *Id.*

19

*3 (denying <u>conditional</u> FLSA certification where sales "quotas vary widely" and there were many variables as to whether any given manager felt incentivized to violate the official company policy).

In contrast to claims by Ruiz and others that they struggled to meet their sales goals, Opt-In Ho testified that it was "so easy" to meet her sales goals and she often doubled or tripled them, earning rewards trips to Mexico, Hawaii, and Florida.  Ho Dep. 82-83, 148, 160-62 & Ex. 11; *see also* Pikulin Dep. 54-56 (regularly met sales goals and often doubled and tripled them); Peragine Dep. 124-25 (it was "easy" to meet sales goals and often doubled and tripled them).  The amount of incentive compensation earned by the Opt-Ins by virtue of exceeding their sales goals varied substantially.  Whereas Opt-In Massey never received any incentive compensation during his Citibank employment and Opt-In Jeudy earned only $[Redacted] in incentive compensation during his year and a half of employment, Opt-In Valencia earned average annual incentive compensation of over $[Redacted] during his three years of employment, Opt-In Peragine earned an average of over $[Redacted] per year in incentive compensation during 2009 and 2010, and Opt-In Ho made over $[Redacted] in incentive compensation during her employment.  Costa 2011 Decl., Ex. 1 (Dkt. No. 46-12); Costa 2014 Decl. Ex. A; Peragine Dep. 106-07 & Ex. 11; Valencia Dep. 254 & Ex. 17.

Many other Opt-Ins admitted that they did not need to work more than 40 hours to meet their sales goals, that they felt no pressure to work more than 40 hours in order to meet their goals, and that the number of hours they worked did not affect whether they met their sales goals. Williams Dep. 83-84 (did not feel that she needed to work more than 40 hours to meet her sales goal); Drews Dep. 81 (did not need to work more than 40 hours to meet her sales goal); Lindsey Dep. 85 (did not feel pressure to work more than 40 hours to make her numbers); Pikulin Dep. 68-69 (sales performance not tied to hours worked).  Moreover, Plaintiffs and Opt-Ins testified that they achieved their sales goals even in months when they were on a leave of absence or vacation for part of the month.  Ruiz Dep. 141-42, 145 (made her sales goals in a month despite being on leave

for seven work days); Williams Dep. 76-77 (made her sales goals during her entire three month medical leave of absence despite not working at all); Adler Dep. 99-101 (met his sales goals during two months when he had taken two week vacations); Drews Dep. 82-83 (had one of her best months when she took two holidays and three vacation days off); Pikulin Dep. 71-72 (far exceeded hurdle in September 2010 despite taking a two-week vacation that month).

As the Plaintiffs and the Opt-Ins testified, whether they could meet their sales goals depended on a variety of factors unrelated to the number of hours worked, including:

- The location of the branch, affluence of the branch clientele, amount of foot traffic, and how many competitor branches were nearby[19];

- Whether the branch was a new branch or one with an established customer base[20];

- Whether the PB could speak a foreign language used by a significant portion of the branch's customer base, and whether there were others at the branch who could do so as well[21];

- Whether the PB could sell business accounts and had insurance and securities licenses that allowed him or her to receive additional credits[22];

- Whether the PB took on additional duties, such as notary, auditing, or management duties[23];

- Whether the branch had a Service Officer and, if so, whether or not the PB chose to send service issues to the Service Officer or resolve them him or herself[24];

---

[19] Williams Dep. 76-77 (able to meet sales goal within 40 hours because worked in affluent area and earned significant credits from high balance accounts – indeed, balances allowed her to meet hurdle during three months she was on medical leave of absence); Wallace Dep. 59-61 (difficult to meet sales goal because branch located in low-income area, and often lost credits due to "chargebacks" on accounts with low/no balance); Massey Dep. 255-56 (hard to meet sales goal due to low foot traffic); Kosiba Dep. 86-87 (same); Ash Dep. 174 (same); Winfield Dep. 153-154 (hard to meet sales goal and had to work longer hours because worked in a new branch with no established business).

[20] Winfield Dep. 152-54, 173; Steffensen Dep. 66-67.

[21] Steffensen Dep. 52-54 (large Hispanic population and inability to speak Spanish made it difficult to meet goal); Adler Dep. 105-06 (same); Kenney Dep. 165 (inability to speak Chinese made it more difficult to meet goal); Sanchez Dep. 49 (ability to speak Spanish helped her to meet goal); Ho Dep. 37-38 (same); Moline Dep. 69-70 (same).

[22] Shen Dep. 167 (ability to sell business products made it easier to meet goal); Wallace (inability to sell business products made it more difficult to meet goal); Jeudy Dep. 49-50 (insurance license made it easier to meet goal).

[23] Steffensen Dep. 95, 115-117 (management and notary duties made it more difficult to meet sales goal).

[24] Peragine Dep. 42 (having service officer at branch helped him to meet sales goals); Drews Dep. 78-79 (same); Shen Dep. 112-114 (after Service Officer position eliminated, spent up to 70% of time servicing customers, making it "impossible" to achieve his sales goals); Ruiz Dep. 76-77 (same due to lack of Spanish-speaking Service Officer).

- Whether the branch had too many or too few other PBs[25];

- The PB's personality, effort, sales ability, and time management skills[26];

- Whether the PB had prior banking or sales experience[27];

- Whether the Tellers and Service Officers liked the PB and referred customers to him or her[28];

- Whether the Branch Manager or other branch employees allegedly undermined the PB due to discrimination or unfair treatment[29];

- The economic climate and time of year[30]; and

- Luck and events over which PBs had no control[31]

Given the wide variety in job duties, sales goals, and circumstances that impacted a PB's ability to meet his or her sales goals that are unrelated to hours worked, there is no common basis on which to determine whether and to what extent each Plaintiff and Opt-In may have worked overtime in each workweek.

> **2.    The Plaintiffs and Opt-Ins are not similarly situated with respect to whether overtime was requested, approved, recorded, and/or paid.**

There is no common basis on which to determine whether each Plaintiff or Opt-In requested to work overtime before working it, received approval to work overtime, worked

---

[25] Pikulin 59-60 (when fewer PBs worked at the branch it was easier to meet goal); Steffensen Dep. 48, 102-103, 107-109 (struggled to meet goals because branch overstaffed with PBs); Jeudy Dep. 62 (easier to meet goals when other PB on leave); Moline Dep. 47-49, 91-92, 170 (number of PBs and/or BBs negatively affected ability to meet goals).

[26] Peragine Dep. 84-85, 124-25 (claims he worked more than 40 hours because he "was an overachiever" and wanted to earn significantly greater than his salary); Winfield Dep. 159-60; Ruiz Dep. 76; Shen Dep. 179-80; Drews Dep. 76.

[27] Jeudy Dep. 11-12, 43 (prior role as small business banker helped him sell business products and to make goal); Foley Dep. 128-29 (would have been easier to meet goal if she had prior experience in mortgages or investments).

[28] Adler Dep. 95 (quality of teller referrals impacted ability to meet sales goals); Jeudy Dep. 61 (most tellers referred business to him and this helped him to meet goals); Ho Dep. 166-67; Winfield Dep. 163.

[29] Ho Dep. 20-21, 167-68, 188 & Ex. 13(discussing filing of action alleging discrimination by manager and this alleged discrimination made it harder to reach sales goal); Ruiz Dep. 54-58 & Ex. 3 (same); Jeudy Dep. 62-63; Ash Dep. 162-65; Moline Dep. 72-73.

[30] Winfield Dep. 171; Muniz Dep. 63; Steffensen Dep. 109.

[31] Muniz Dep. 40-41; Steffensen Dep. 76-77, 124; Pikulin Dep. 56; Peragine Dep. 78.

overtime without approval, recorded the overtime they worked, and/or was paid for the overtime

they worked or recorded – facts that are material to each Plaintiff's and Opt-In's claim for

overtime – and their testimony on these issues varied widely.

Whether Overtime Was Requested:  Some Plaintiffs and Opt-Ins were required to request

overtime before working it and some were not.  *See, e.g.*, Ho Dep. 202-07; Steffensen Dep. 144.

Some Plaintiffs and Opt-Ins requested permission to work overtime before working it and some did

not.  Kenney Dep. 83; Carreno Dep. 158.

Whether Overtime Was Approved:  Local managers had authority to approve overtime to be

worked.  Winfield Dep. 249 (his branch manager would not pay overtime, but when he worked at

another branch, that manager was willing to pay overtime because overtime was left to the

manager's discretion); Wong Decl. ¶ 4 (had authority to approve overtime and "authorized overtime

to be worked when I thought there was a business need for overtime"); Nguyen Decl. ¶ 3; Hearon

Decl. ¶ 7 ("I could approve as much overtime to be worked as I thought was warranted").  Whether

overtime was approved, or under which circumstances, varied by manager.  Winfield Dep. 249;

Sanchez Dep. 101, 108, 111-14, 154-58 (allegedly did not record all time worked to avoid making

branch manager angry, but recorded all time worked when assistant branch manager was in charge

because she was "fair").  Although some Plaintiffs claim their managers would not approve

overtime, or would not approve overtime for certain reasons, other Plaintiffs and Opt-Ins testified

that some Branch Managers regularly approved overtime, including to allow PBs to meet their sales

goals or to finish helping a customer at the end of the day.  Ruiz Dep. 234 (different managers

approved overtime for different reasons); Carreno Dep. 164-65 (manager approved overtime for

generating business at after hours, off-site bank at work events); Moline Dep. 134-135 (one

manager paid overtime for staying late with a customer; other manager sometimes did not);

Peragine Dep. 100-101 (manager approved overtime for staying late with customer); Jeudy Dep.

121-22 (OT under two hours generally was acceptable); Steffensen Dep. 169, 198-99 (manager

approved overtime to meet sales goals); Winfield Dep. 188.  Some Plaintiffs and Opt-Ins testified

that their manager never refused to approve overtime that was requested.  Ruiz Dep. 162; Adler Dep.

44-45.  Many PBs testified that every time they needed to work overtime to complete their job

duties, their managers approved and they were paid for that time.  Barajas Decl. ¶ 4; Corona Decl.

¶ 8, Marsico Decl. ¶ 8, Nakpil Decl. ¶ 10, Rosenberg Decl. ¶¶ 7, 8, Zito Decl. ¶ 5 (Dkt. Nos. 46-19,

46-24, 46-31, 46-32, 46-34, 46-41).  *Eng-Hatcher*, 2009 WL 7311383, at *4 (denying conditional

certification in part where store managers had discretion over whether overtime is approved).

        <u>Whether Overtime Was Recorded</u>.  Although some Plaintiffs and Opt-Ins may claim that

they were prohibited by their manager from recording any overtime, the Plaintiffs and Opt-Ins that

participated in discovery regularly recorded and were paid overtime.  Hammond 2014 Decl. ¶ 7.

The frequency with which the Plaintiffs and Opt-Ins recorded overtime, and the amounts of

overtime they were paid, varied widely.  Whereas Opt-In Carreno was paid overtime in 8% of his

paychecks during the relevant period, many other Opt-Ins were paid overtime in the vast majority of

their pay periods, such as Kosiba (99%), Pikulin (97%), Dabrowski (94%), Moline (85%), and Foley

(83%).  *Id.* ¶¶ 10, 11, 15, 20, 24, and 27.  Although some Plaintiffs and Opt-Ins recorded and were

paid for small amounts of overtime, others recorded and were paid significant amounts.  Pikulin Dep.

51-52 (paid over $█████ in overtime compensation for over 200 hours of overtime in one year);

Sanchez Dep. 97-98 & Ex. 12 (paid over $█████ in overtime compensation in her 10 months of

employment).  The regular payment of significant overtime to Plaintiffs and Opt-Ins belies any claim

of a "no overtime" policy.

        In addition, the reasons that Plaintiffs and Opt-Ins allegedly did not record all time worked

also varied widely.  Sanchez Dep. 101, 108, 111-14, 154-58 (chose the amount of overtime hours

she would record each week "depending on how [her manager] felt that week … Did she wake up

in a good mood?"); Ash Dep. 33, 119-20 (claims he worked off-the-clock on his own initiative after learning branch was under-performing to generate more business for the branch); Peragine Dep. 110-114 (chose to work off-the-clock to earn more incentive compensation).

Moreover, some Opt-Ins over-reported their time, and recorded and were paid for overtime that they had not worked.  Ash Dep. 151-57 & Ex. 28; Mularchyk Decl. ¶ 6; *see also* Wong Decl. ¶ 3 (Peragine inaccurately recorded more time than he worked); Plazola Decl. ¶ 7 (Moline, same).

Whether Overtime Was Paid:  The Plaintiffs and Opt-Ins' experiences with being paid for overtime they recorded also varied in important ways.  Although a few Plaintiffs and Opt-Ins may claim that their managers modified their time entries or that their managers required them to change their time entries on one or more occasions (Muniz Dep. 49; Massey Dep. 257), most Plaintiffs and Opt-Ins admitted that they were paid for all of the overtime hours they recorded. *See, e.g.*, Ruiz Dep. 162 (paid for all overtime hours she recorded); Drews Dep. 150 (same); Schornstein Dep. 162-63 (same), Adler Dep. 45 (same); Kenney Dep. 81-82 (same), Moline Dep. 106 (same); Peragine Dep. 112-13 (same); Shen Dep. 146; Steffensen Dep. 156-57; Muniz Dep. 48-49; Williams Dep. 141-42 (manager never changed time entries); Carreno Dep. 194 (same).  *See Joza*, 2010 WL 3619551, at *10 (rejecting overtime claim in part where "Joza concedes that she was paid every penny of overtime she claimed on overtime slips.").

Whether the Plaintiff or Opt-In Ever Worked Off-The-Clock.

**Incredibly, some Opt-Ins testified that they did not know, or do not recall, whether they ever worked off-the-clock.**  Pikulin Dep. 97-98 (could not recall whether he ever worked uncompensated overtime hours); Kosiba Dep. 151 (could not recall an instance when she worked extra time that she did not record in the timekeeping system); Shen Dep. 228 (does not remember if he ever performed any work and did not record his overtime).  These Opt-Ins plainly cannot meet their burden of proof.  *Hinterberger*, 2014 WL 1278919, at *14.

25

Numerous PBs testified that they were paid for all time worked, including overtime. Barajas Decl. ¶ 6, Braverman Decl. ¶ 6, Fernandez Decl. ¶ 7, Gray Decl. ¶ 6, Guan Decl. ¶ 5 (Dkt. Nos. 46-16, 46-18, 46-25-27). Other Plaintiffs and Opt-Ins testified that they were paid for all time worked at some branches but not others, or under some managers but not others, thus belying any claim of a common or classwide policy or practice. Williams Dep. 150-51, 160-61; 178-79 (made a "personal choice" to work off-the-clock during a limited period until current manager joined the branch and instructed her not to work off-the-clock); Burgos Dep. 183-84 (paid for all time worked from 2008 to 2013 after receiving instruction to record all time); Ash Dep. 33; 119-20 (no off-the-clock until after he transferred to a new branch; after transfer, he chose to work off the clock before and after his shifts in order to generate more business for the branch); Drago Dep. 15, 57 (accurately recorded and was paid for all time worked from the time he was hired in February 2009 through mid-2011; claims that he worked off-the-clock during last six months of employment after he transferred to new branch and manager allegedly pressured him to "manage his time to 40 hours"); Hurler Dep. 144 (only his third manager would not allow him to record overtime); Winfield Dep. 249 (one manager would not pay overtime but another manager paid overtime because overtime was left to the manager's discretion); Jeudy Dep. 121-22 (first manager allegedly did not permit him to record overtime, but second manager permitted him to record up to two hours of overtime per week).

Plaintiffs have not identified any common basis on which to determine whether, when, how much, and under what circumstances overtime was requested, approved, recorded, and/or paid, or that their individual experiences were the same as each other, and all other Plaintiffs and Opt-Ins.

      **3.**      **The Plaintiffs and Opt-Ins are not similarly situated with respect to whether or how a manager would know (or should know) that they allegedly worked overtime that they did not record.**

Plaintiffs also must prove that their manager knew or should have known of the alleged

uncompensated overtime.  *Hinterberger*, 2014 WL 1278919, at *14.  Once again, Plaintiffs and Opt-Ins are not similarly situated to each other, and there is no common proof that would establish this element for all Plaintiffs and Opt-Ins.

Some Opt-Ins admitted that they could not identify a single individual with any knowledge that they performed off-the-clock work.  *See, e.g.*, Williams Dep. 177; Linthorst 2014 Decl. Ex. 36 at Response 1 ("Q.  Is there anyone that you'd like to identify now who has knowledge that you performed work off the clock?  A.  No.  I have no information for that."); Kosiba Dep. 229-30; Linthorst 2014 Decl. Ex. 17 at Response 1.

Some Plaintiffs and Opt-Ins disobeyed their managers' instructions not to work more than 40 hours and took affirmative steps to hide their extra work time from their managers and lie about working extra time.  Nessler Dep. 145-46, 255-57 (overtly lied to manager to cover up off-the-clock work); Quiros Decl. ¶ 5 (Dkt. No. 46-11) (Quiros asked all the PBs, including Shen, if they had ever worked hours they did not record and they denied this had occurred); Peragine Dep. 110-114 (worked overtime after his manager "made it very clear … that they did not want us working overtime" in order to earn more incentive compensation); Drews Dep. 127-28 (manager told her not to <u>work</u> more than 40 hours but she did so anyway); Carreno Dep. 257-258 (same); Ash Dep. 125 (same).  *See Newton*, 47 F.3d at 749 (rejecting overtime claim in part where plaintiff contravened manager's directive not to work overtime).  For example, Plaintiff Ruiz never requested permission to work the overtime she claims she did not record, was paid for all overtime she recorded, secretly disobeyed the instructions of her managers and worked overtime without recording her time, tried to fool her managers by changing her time entries each day so that it would look like her time was accurate, and admitted that managers worked in the basement of the branch and it would be "almost impossible" for them to know what hours she actually worked.  See Ruiz Dep. 156, 179-180, 185-187, 192-94, 230-31, 259-260, 366.  *Joza*, 2010 WL 3619551, at

*3 (rejecting overtime claim despite an alleged "culture of hostility to overtime" where plaintiff did not record the alleged overtime, was not asked by her manager to work the time, did not inform her manager of the time, and did not raise a complaint of uncompensated time).

Some Opt-Ins admitted that their managers never asked them to perform work off-the-clock and never told them to not record hours all the hours worked.  Ruiz Dep. 160, 222 (managers never told her to work more than 40 hours or not to record the time she worked); Kosiba Dep 158-59, 169-70 ("no manager would have said" not to record time accurately); Lewis Dep. 95 (manager never told him not to record hours he worked).  *Joza*, 2010 WL 3619551, at *3.

Some Opt-Ins admitted that they never told their manager that they had worked any time without proper compensation, or utilized a complaint procedure.  Kosiba Dep 158-59, 169-70 (does not recall telling any manager that she was working time that she was not recording); Carreno Dep. 159-60 (never told managers he was working time that he was not entering); Williams Dep. 123 (never complained to her managers that she missed lunches); *see Joza*, 2010 WL 3619551 at *1, *3 (no FLSA liability where plaintiff "never reported, formally or informally," the overtime hours claimed); *Newton*, 47 F.3d at 749 (same).

Some Opt-Ins claim that their manager knew of their off-the-clock work because they could see them at their desk.  But this is the type of evidence that has been found to be insufficient to put an employer on notice of <u>uncompensated</u> overtime worked.  *Hinterberger*, 2014 WL 1278919, at *14 ("'The relevant knowledge is not 'I know the employee was working,' but 'I know the employee was working and not reporting his time.''") (quoting *White,* 699 F.3d at 875 ); *Joza*, 2010 WL 3619551, at *10 (rejecting argument that employer was on notice of unpaid overtime because "managers periodically passed by her cubicle and should have noticed that she was there during the usual lunch period and outside of her assigned shift hours").  In any event, some Opt-Ins admitted that their managers often were absent from the branch and would not have knowledge of

their alleged off the clock work.  *See, e.g.*, Shen Dep. 91 (manager worked in different branch); Jeudy Dep. 96-97 (manager "always" left early and would not know when he stopped working each day); Pikulin Dep. 35 (some BMs took advantage of managerial position and were regularly absent); Ash Dep. 49-51.  Moreover, some Opt-Ins testified that their off-the-clock work consisted of time they were outside the branch, such as when they asked local businesses about their banking needs while shopping there on weekends or at lunch.  Ash Dep. 128-29.  *See, e.g., Hinterberger*, 2014 WL 1278919, at *20-21 (decertifying off-the-clock collective action where some plaintiffs acknowledged that their supervisors generally were not present during their off-the-clock work).

Even among the Opt-Ins who claim their managers knew that they worked off-the-clock, these managers have denied any such knowledge, and individualized inquiries will be necessary to resolve these disputes.  *See* Polykova Decl. ¶ 7; Greenhill Decl. ¶ 6;  Botu Decl. ¶ 7; Maldanado-Tirado Decl. ¶ 5, Hearon Decl. ¶ 9; Nguyen Decl. ¶ 7; Shaw Decl. ¶¶ 4-5; Wong Decl. ¶ 7.

Plaintiffs have not provided any common basis on which to determine whether managers for each Plaintiff and Opt-In knew or should have known of any alleged unpaid overtime.  *Zivali*, 2011 WL 1815391, at *7 (decertifying FLSA collective action in part because of individualized issues where "plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work").

### 4.     Plaintiffs and Opt-Ins are not similarly situated with respect to damages.

Where an employee's time records are inaccurate "solely due to the [employee]'s deliberate failure to accurately report the time she worked," that employee must "provide specific facts establishing when, and for how long, she performed the off-the-clock tasks for which she now seeks compensation."  *Joza*, 2010 WL 3619551, at *7 (quoting *Seever*, 528 F. Supp. 2d at 169-70 (granting summary judgment on off-the-clock claim where "time record 'deficiencies'

alleged by the employee[s] [we]re admittedly and voluntarily self-created.")).  Not a single

Plaintiff or Opt-In has done this.  To the contrary, every Plaintiff and Opt-In who participated in

discovery objected and refused to calculate their own damages on the grounds that doing so would

be "unduly burdensome."  Linthorst 2014 Decl. ¶ 13 & Exs. 1-37.  Not only is there no common or

classwide basis to determine damages for all Plaintiffs and Opt-Ins, but Plaintiffs and Opt-Ins have

found it impossible even to calculate their own individual damages.  *See Comcast v. Behrend*, 133

S. Ct. 1426, 1432-33 (2013) (reversing district court's grant of Rule 23 class certification in part

because "respondents' [damages] model falls far short of establishing that damages are capable of

measurement on a classwide basis" and "[q]uestions of individual damage calculations will

inevitably overwhelm questions common to the class").

### E.    Varying Defenses To Each Opt-In's Claim Mandate Decertification.

The Plaintiffs' and Opt-Ins' claims are subject to numerous individualized defenses, which

also weighs strongly in favor of decertification.  First, some Opt-Ins' claims are barred, in whole or

in part, by defenses of release, waiver, and/or estoppel.  For example, a complaint was made about

working off-the-clock at Opt-in Schornstein's branch, and as a result of the investigation of the

entire branch, Opt-in Schornstein was paid almost $Redacted for over 300 hours of overtime, which

she acknowledged in writing was "in full satisfaction of all the overtime compensation owed to me

for this Period [from January 1, 2008 until March 31, 2010] and I do not have any other claims

against Citibank for overtime compensation."  Schornstein Dep. 183, 186 & Ex. 15 (admitted she

was not owed any additional payments of overtime for the period in question).

Moreover, the differences in the Plaintiffs' and Opt-Ins' allegations and evidence described

above are based simply on their own testimony.  In defending their claims, Citibank will dispute

their allegations with testimony from managers and others that the Plaintiffs and Opt-Ins were

instructed to record all time worked, they were never told not to record all time worked, and the

30

manager had no knowledge of the alleged uncompensated overtime.  Polykova Decl. ¶¶ 3-4, 7;
Greenhill Decl. ¶¶ 2, 5-6; Botu Decl. ¶¶ 3, 5, 7; Maldanado-Tirado Decl. ¶¶ 2-5; Hearon Decl.
¶¶ 6, 9; Nguyen Decl. ¶¶ 2, 6-7; Shaw Decl. ¶¶ 6, 8-9; Alicea Decl. ¶¶ 3, 7.  Similarly, although the
claims of many of the Plaintiffs and Opt-Ins are deficient as a matter of law based on their own
testimony, Citibank must be given the opportunity to cross-examine and challenge the credibility
of each Plaintiff and Opt-In who seeks to adjudicate liability against it.  Jeudy Dep. 177-79
(admitting interrogatory response indicating that he discussed off-the-clock work with manager
was not true); Kosiba Dep. 197-200 (used Ethics Hotline and DRP to complain about BM's
behavior but did not complain about off-the-clock work); Jeudy Dep. 76-77 (called Human
Resources to complain about allegedly unfair termination but did not complain about off-the-clock
work).  Regardless of how a trier of fact might resolve a credibility dispute between a particular
Plaintiff or Opt-In and his or her manager, it would not have any bearing on any other Plaintiff or
Opt-In.  Each claim is disputed, and each dispute would need to be litigated individually.  Under
these circumstances, decertification is appropriate.  *See, e.g., Martin*, 2013 WL 1234081, at *6-7
("In order to resolve the question of liability, a fact-finder would need to determine whether the
employer or the manager was being truthful … [and] this question with regard to one manager and
one employee would not accomplish the task for any of the others[.] . . . [These] individualized
defenses destroy the efficiency sought to be gained through a collective action.").

Other defenses also weigh in favor of decertification.  For example, Citibank is entitled to
dispute whether any of the claimed off-the-clock work by any Plaintiff or Opt-In is compensable
under applicable standards.  Specifically, under the Portal-to-Portal Act, work performed before or
after a scheduled shift is not compensable unless the work was integral and indispensable to the
employee's principal job duties, which is a task ill-suited to collective treatment.  *See Whineglass*,
2013 WL 2237841, at *9-10 (potential portal-to-portal defense to some opt-ins' claims weighed in

favor of decertification).  In addition, Citibank is entitled to argue that each Plaintiff's and Opt-In's

alleged off-the-clock work is *de minimis* and thus not compensable.  *Zivali*, 784 F. Supp. 2d at 468

(*de minimis* defense was individualized defense weighing in favor of decertification); *Seward*,

2012 WL 860363, at *2 (decertifying collective action because "defenses were highly fact specific

and w[ould] likely depend on the testimony of individual plaintiffs and managers").  Citibank also

has statute of limitations defenses to numerous Opt-Ins.  Burgos Dep. 183-84; Linthorst 2014 Decl.

¶ 3.  Accordingly, Citibank's individualized defenses also weigh in favor of decertification.

### F.    Fairness and Procedural Considerations Mandate Decertification.

Adjudicating these claims in one proceeding would be inefficient and manifestly unfair to

Citibank and the Opt-Ins, which further warrants decertification.  As demonstrated above,

adjudicating this case will necessarily require highly individualized mini-trials for each Plaintiff

and Opt-In to determine whether and to what extent he or she worked overtime, whether the

overtime work was requested, approved, recorded, and/or paid, whether the Plaintiff's or Opt-In's

manager had knowledge of the allegedly uncompensated work, whether the work was

compensable under applicable standards, whether Citibank has any other defense to the claim

(such as a release), and the amount of damages for any Plaintiff or Opt-In who can meet his or her

burden of proof on the foregoing elements.

Significantly, each Plaintiff and Opt-In who participated in discovery identified under oath

the witnesses he or she thought have knowledge of his or her claim.  Together, the 37 Plaintiffs

and Opt-Ins who provided responses to Citibank's interrogatories identified 177 different

witnesses, and all of the witnesses each Plaintiff and Opt-In identified are exclusive to him or her

except one – a Branch Manager who was identified by three of the Opt-Ins and who managed

those Opt-Ins during varying periods of time.  Linthorst 2014 Decl. ¶¶ 13-14, Exs. 1-37.

Extrapolating this number of witnesses across all of the current Opt-Ins would mean that there

would be over 2,000 witnesses, before accounting for the testimony of the Plaintiffs and Opt-Ins themselves, and the witnesses relied upon by Citibank.

Where there are substantial factual variations between the Plaintiffs and Opt-Ins and it would be impossible to generalize their claims, "considerations of procedure and fairness weigh heavily in favor of granting decertification." *See, e.g., Zivali*, 784 F. Supp. 2d at 459; *Whineglass*, 2013 WL 2237841, at *10 ("judicial economy is not served in this circumstance because each plaintiff's claim raises distinct factual and legal issues which would essentially evolve into … distinct trials. The need for such individualized inquiries contravenes the basic theory of judicial economy upon which the certification of collective actions is based.").

Allowing these mini-trials to occur in one proceeding would be highly prejudicial to all parties.  As one court recently observed:

> [T]rying four different claims in one trial unnecessarily complicates the case. Moreover, it also increases the possibility of prejudice to the defendants if the circumstances of one plaintiff's claim are erroneously attributed to others.  For example, [plaintiff] alleges that [his manager] … directed him "to adjust any hours to show no overtime was worked"; however, that statement is irrelevant to [other opt-ins'] claims because … [the other opt-ins] stated that they never told [the manager] how many overtime hours they worked. … In sum, any efficiency gained through bringing this action collectively would be outweighed by the substantial likelihood of distinct trials, and the risk of confusion and prejudice.

*Whineglass*, 2013 WL 2237841, at *10-11 (citations omitted) (decertifying off-the-clock collective action).

The same is true here.  It would be highly prejudicial to Citibank for the fact-finder to consider Opt-In Ho's testimony that her manager repeatedly removed overtime hours from her timesheet (Ho Dep. 407-08) when considering the claims of Plaintiff Ruiz, who worked in a different branch and reported to a different manager and who admits that she was paid for all time she recorded and actively hid her allegedly uncompensated overtime from her manager (Ruiz Dep. 194), or Opt-In Pikulin, who could not recall whether he ever worked any uncompensated hours.

Pikulin Dep. 97-98.  Conversely, it would be highly prejudicial to Ho to adjudicate her claim on

the basis of Ruiz's or Pikulin's admissions.  *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567,

574 (E.D. La. 2008) ("[T]he more dissimilar plaintiffs are and the more individuated [defendant's]

defenses are, the greater doubts there are about the fairness of a ruling on the merits – for either

side – that is reached on the basis of purportedly representative evidence.").

There is no way, consistent with Due Process, to adjudicate the claims of all Plaintiffs and

Opt-Ins based on a sample of Plaintiffs and Opt-Ins.  Whether any of the hundreds of other Opt-In

who were not subject to discovery would testify similar to Ho or Ruiz or Pikulin, or provide

completely different testimony, and whether Citibank would have a defense to such individual,

could only be determined by taking testimony and evidence from such Opt-Ins and affording

Citibank the opportunity to contest their claims and present defenses specific to them.  Under these

circumstances, decertification is warranted.  *See Zivali*, 784 F. Supp. 2d at 459 ("the Court harbors

considerable doubt that any fair determination could be achieved on the basis of representative

evidence"); *Seward*, 2012 WL 860363, at *1 (representative evidence not appropriate in case with

as many variations as this one); *Martin*, 2013 WL 1234081, at *7 (the "representative sampling"

procedure "would prejudice the parties" given the individualized nature of the claims at issue.);

*Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1241 (N.D. Ala. 2012) (decertifying

collective action because "an abundance of evidence concerning [the opt-in plaintiffs']

differences[,]" and the "efficiency gained by holding one trial as opposed to many cannot be

obtained at the expense of [the defendant's] due process rights"); *Johnson*, 561 F. Supp. 2d at 587

(decertifying collective action because the "efficiency gains" of the FLSA collective action

"cannot come at the expense of a defendant's ability to prove a statutory defense without raising

serious concerns about due process"); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

2554 (2011) (Supreme Court rejected the district court's plan of adjudicating the claims of a "sample

set of the class members" and then extrapolating liability to the larger class on a percentage basis ("Trial by Formula"); "a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims").

## V.   CONCLUSION

Plaintiffs cannot satisfy their burden to prove by a preponderance of the evidence that this case should proceed as a collective action because there are material differences in the claims of the Plaintiffs and Opt-Ins.  Opt-Ins that cannot recall whether they ever worked any uncompensated overtime (Pikulin, Kosiba, Shen) are not similarly situated to those who claim they can.  Opt-Ins who defy their manager's instruction to stop working and lie to their manager or hide their alleged off-the-clock work (Ruiz, Nessler) are not similarly situated to others who claim that their managers directed them to work off-the-clock.  Opt-Ins whose managers allegedly told them to remove overtime from their time records are not similarly situated to Opt-Ins whose manager gave the opposite instruction – to record *more* overtime (Wallace, Karmally).  Opt-Ins who over-reported their time and claimed overtime that they did not work (Ash, Peragine) are not similarly situated to Opt-Ins who did not do that.  Opt-Ins who regularly recorded and were paid overtime in almost every pay period (Kosiba, Pikulin, Dabrowski), are not similarly situated to Opt-Ins who rarely recorded overtime.  Opt-Ins who claim they needed overtime to meet their sales goals are not similarly situated to Opt-Ins who testified it was "so easy" to meet the goals (Ho, Pikulin).

The record evidence conclusively demonstrates that this case cannot proceed as a collective action.  Adjudicating these disparate claims as a series of mini-trials in one proceeding would be inefficient and fundamentally unfair to both Citibank and the Opt-Ins.  For all of the foregoing reasons, Citibank respectfully requests that the Court grant its Motion for Decertification, and dismiss the claims of all Opt-Ins without prejudice.

Dated: April 30, 2014                    MORGAN, LEWIS & BOCKIUS LLP


                                         /s/ Thomas A. Linthorst
                                         Sam S. Shaulson  (SS 0460)
                                         Thomas A. Linthorst (TL 3345)
                                         101 Park Avenue
                                         New York, NY  10178
                                         212.309.6000
                                         212.309.6001 (fax)
                                         sshaulson@morganlewis.com
                                         tlinthorst@morganlewis.com

                                         Attorneys for Defendant Citibank, N.A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing Notice of Motion to Decertify

Collective Action and Memorandum of Law in Support were served via ECF, on this 30th day of

April, 2014 as listed below:

Gregory M. Egleston, Esq.

GAINEY MCKENNA & EGLESTON

440 Park Avenue South, 5th Floor

New York, NY  10016


Murielle J. Steven Walsh, Esq.

Star M. Tyner, Esq.

POMERANTZ GROSSMAN HUFFORD

   DAHLSTROM & GROSS LLP

600 Third Avenue, 20th Floor

New York, NY  10016


Timothy J. MacFall, Esq.

RIGRODSKY & LONG, P.A.

825 East Gate Boulevard, Suite 300

Garden City, NY  11530


/s/ Thomas A. Linthorst