Sam S. Shaulson (SS-0460)
sshaulson@morganlewis.com
Thomas A. Linthorst (TL-3345)
tlinthorst@morganlewis.com
Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6718 (Telephone)
(212) 309-6001 (Fax)
Attorneys for Defendant

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DIGNA RUIZ, on behalf of herself and all others similarly situated, | : : : | |
| Plaintiff, | : | **Civ. A. No. 10-cv-5950 (KPF) (RLE)** |
| v. | : : | |
| CITIBANK, N.A., | : : | |
| Defendant | : | |
| FREDERICK WINFIELD, on behalf of himself and all others similarly situated, | : : : | |
| Plaintiff, | : | **Civ. A. No. 10-cv-7304 (KPF) (RLE)** |
| v. | : : | |
| CITIBANK, N.A., | : : | |
| Defendant | : | |

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND .............................................................................. 4

    A.    Citibank Has Robust Policies And Training To Ensure Proper Payment For All Time Worked. ........................................................................ 4

III.  ARGUMENT ...................................................................................................... 5

    A.    The Court Must Perform A Rigorous Analysis To Determine If Plaintiffs Have Met Their Burden To Prove Each Element Of Rule 23 For Each Class. ........ 5

    B.    The District Of Columbia's Opt-In Requirement Precludes Any Rule 23 Class. ............................................................................................................ 6

    C.    None Of The Classes Proposed By Plaintiffs Meet The Commonality And Typicality Requirements. ........................................................................... 6

          1.    The Issues Of Liability And Damages Each PB Must Prove. ..................... 7

          2.    Plaintiffs Offer No Common Proof To Adjudicate The Issues Of Liability And Damages As To All PBs. .......................................................... 9

          3.    The Factors That Plaintiffs Claim Resulted In Off-The-Clock Work By Some PBs Either Are Non-Existent Or Individualized. ....................... 13

               a.    Neither PB Sales Goals Nor Job Responsibilities Required Uncompensated Overtime. ......................................................... 13

               b.    Plaintiffs' Claim Of A "National 'No Overtime' Directive" Is An Unsupported Fiction. ...................................................... 16

               c.    Plaintiffs' Claim That PB Layoffs Created Pressure For Uncompensated Overtime Is Baseless. ........................................ 17

               d.    Plaintiffs Exaggerate Citibank's Focus On Controlling PB Overtime. ......................................................................................... 17

          4.    Citibank Investigated And Remediated Allegations Of Off-the-Clock Work. ............................................................................................................. 22

          5.    Computer Audit Logs And Alarm Records Do Not Show Actual Time Worked. ............................................................................................... 24

          6.    Plaintiffs' Cases Are Distinguishable and Do Not Support A Finding of Commonality In This Case. ....................................................................... 28

    D.    Ruiz, Winfield, And Muniz Are Not Adequate Class Representatives. ................. 29

    E.    Plaintiffs Have Failed To Prove That Common Issues Will Predominate Over Individual Issues Under Rule 23(b)(3). ......................................... 30

IV.   CONCLUSION ................................................................................................. 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Alix v. Wal-Mart Stores, Inc.,*
   868 N.Y.S.2d 372 (3d Dep't 2008) .......................................................................35

*Alix v. Wal-Mart Stores, Inc.,*
   838 N.Y.S.2d 885 (N.Y. Sup. Ct. 2007) .............................................................13

*Anderson v. Mt. Clemens Pottery,*
   328 U.S. 680 (1946) .....................................................................................33, 34

*Babineau v. Fed. Ex. Corp.,*
   576 F.3d 1183 (11th Cir. 2009) ...........................................................................13

*Basco v. Wal-Mart Stores, Inc.,*
   2004 WL 1497709 (E.D. La. July 2, 2004) ..........................................................8

*Boelk v. AT&T Teleholdings, Inc.,*
   2013 WL 3777251 (W.D. Wis. July 19, 2013) ..................................................27

*Brickey v. Dolgencorp, Inc.,*
   272 F.R.D. 344 (W.D.N.Y. 2011) .......................................................................12

*Brown v. ScriptPro, LLC,*
   700 F.3d 1222 (10th Cir. Nov. 27, 2012) .............................................................7

*Brumbelow v. Quality Mills, Inc.,*
   462 F.2d 1324 (5th Cir. 1972) ..............................................................................8

*Burkhart-Deal v. CitiFinancial Inc.,*
   2010 WL 457122 (W.D. Pa. Feb. 4, 2010) ...............................................3, 31, 35

*Butler v. Sears & Roebuck & Co.,*
   727 F.3d 796 (7th Cir. 2013) ..............................................................................34

*Camilotes v. Resurrection Health Care Corp.,*
   286 F.R.D. 339 (N.D. Ill. 2012) .........................................................................35

*Cohen v. Beneficial Indus. Loan Corp.,*
   337 U.S. 541 (1949) .............................................................................................29

*Comcast Corp. v. Behrend,*
   133 S. Ct. 1426 (2013) ................................................................................. passim

*Davis v. J.P. Morgan Chase & Co.,*
   587 F.3d 529 (2d Cir. 2009) .................................................................19, 28, 29

*Dinkel v. MedStar Health, Inc.*,
   880 F. Supp. 2d 49 (D.D.C. 2012) ..........................................................................9

*Driscoll v. George Washington Univ.*,
   -- F. Supp. 2d --, 2012 WL 3900716 (D.D.C. Sept. 10, 2012) ...................................6

*Eng-Hatcher v. Sprint Nextel Corp.*,
   2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) .................................................12, 29

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) ................................................................................35

*Espinoza v. 953 Assocs., LLC*,
   280 F.R.D. 113 (S.D.N.Y. 2011) ...........................................................................28

*Fernandez v. Wells Fargo Bank, N.A.*,
   2013 WL 4540521 (S.D.N.Y. Aug. 28, 2013) .............................................. passim

*Gen. Tel. Co. v. Falcon*,
   457 U.S. 147 (1982) ...............................................................................................6

*Ginsburg v. Comcast Cable Commc'ns Mgmt, LLC*,
   2013 WL 1661483 (W.D. Wash. Apr. 17, 2013).....................................................13

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*,
   -- F.R.D. --, 2014 WL 1452048 (E.D.N.Y. Apr. 15, 2014)......................................20

*Gordon v. Kaleida Health*,
   -- F.R.D. --, 2014 WL 1279170 (W.D.N.Y. Mar. 27, 2014) ....................................12

*Hertz v. Woodbury Cnty.*,
   566 F.3d 775 (8th Cir. 2009) ................................................................................26

*Hinojos v. Home Depot, Inc.*,
   2006 WL 3712944 (D. Nev. Dec. 1, 2006).......................................................27, 29

*Hinterberger v. Catholic Health Sys.*,
   2014 WL 1278919 (W.D.N.Y. Mar. 27, 2014)...................................................12, 26

*In re Bank of Am. Wage & Hour Emp. Lit.*,
   286 F.R.D. 572 (D. Kan. 2012) ...........................................................................3, 25

*In re Cmty. Bank of N. Va.*,
   622 F.3d 275 (3d Cir. 2010) ..................................................................................30

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) .................................................................................34

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   722 F.3d 838 (6th Cir. 2013) ................................................................34

*Jacks v. Directsat USA, LLC*,
   2012 WL 2374444 (N.D. Ill. June 19, 2012) ........................................28

*Jimenez v. Allstate Ins. Co.*,
   2012 WL 1366052 (C.D. Cal. Apr. 18, 2012) ......................................28

*Joza v. WW JFK LLC*,
   2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ............................... passim

*Kline v. Wolf*,
   702 F.2d 400 (2d Cir. 1983) .................................................................29

*Koike v. Starbucks Corp.*,
   378 F. App'x 659 (9th Cir. 2010) .........................................................13

*La Fleur v. Dollar Tree Stores, Inc.*,
   2014 WL 934379 (E.D. Va. Mar. 7, 2014) ...........................................31

*Leyva v. Medline Indus., Inc.*,
   716 F.3d 510 (9th Cir. 2013) ...............................................................34

*Morangelli v. Chemed Corp.*,
   922 F. Supp. 2d 278 (E.D.N.Y. 2013) .................................................27

*Morris v. Affinity Health Plan, Inc.*,
   859 F. Supp. 2d 611 (S.D.N.Y. 2012)..................................................28

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010) ...................................................................6

*Newton v. City of Henderson*,
   47 F.3d 746 (5th Cir. 1995) ........................................................8, 21, 26

*Pryor v. Aerotek Scientific, LLC*,
   278 F.R.D. 516 (C.D. Cal. 2011) .........................................................25

*RBS Citizens, N.A. v. Ross*,
   133 S. Ct. 1722 (2013)..........................................................................31

*Reich v. S. N.E. Telecommc'ns Corp.*,
   121 F.3d 58 (2d Cir. 1997)....................................................................31

*Romero v. H.B. Auto. Grp., Inc.*,
   2012 WL 1514810 (S.D.N.Y. May 1, 2012)..............................7, 12, 31

*Seever v. Carrols Corp.*,
    528 F. Supp. 2d 159 (W.D.N.Y. 2007) .......................................................................... passim

*Singh v. City of New York*,
    418 F. Supp. 2d 390 (S.D.N.Y. 2005).................................................................................9

*Singh v. City of New York*,
    524 F.3d 361 (2d Cir. 2008) ...............................................................................................9

*Smith v. Family Video Movie Club, Inc.*,
    2013 WL 1628176 (N.D. Ill. Apr. 15, 2013) ...................................................................13

*Spencer v. No Parking Today, Inc.*,
    2013 WL 1040052 (S.D.N.Y. Mar. 15, 2013) ....................................................................9

*Vang v. Kohler Co.*,
    488 F. App'x 146 (7th Cir. 2012) ....................................................................................13

*Velez v. Majik Cleaning Servs., Inc.*,
    2005 WL 106895 (S.D.N.Y. Jan. 19, 2005) ....................................................................28

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)...........................................................................................6, 7, 9

*Whineglass v. Smith*,
    2013 WL 2237841 (M.D. Fla. May 21, 2013) ...................................................................9

*White v. Baptist Mem'l Health Care Corp.*,
    699 F.3d 869 (6th Cir. 2012) .......................................................................................7, 26

*White v. Osmose, Inc.*,
    204 F. Supp. 2d 1309 (M.D. Ala. 2002) .............................................................................8

*Whitlock v. FSL Mgmt.*,
    2012 WL 3274973 (W.D. Ky. Aug. 10, 2012) .................................................................28

*Williams-Green v. J. Alexander's Rests., Inc.*,
    277 F.R.D. 374 (N.D. Ill. 2011).........................................................................................9

*Youngblood v. Family Dollar Stores, Inc.*,
    2011 WL 4597555 (S.D.N.Y. Oct. 4, 2011) ...................................................................28

*Zivali v. AT&T Mobility LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011)..........................................................................8, 25

**RULES**

Fed. R. Civ. P. 23 ................................................................................................ passim

Fed. R. Civ. P. 30(b)(6) ..................................................................................................27

**REGULATIONS**

29 C.F.R. § 785.13 .........................................................................................................18

D.C. Code § 32-1012(b) ...................................................................................................6

**OTHER AUTHORITIES**

DOL Opinion Letter, 1986 DOLWH LEXIS 79 (May 30, 1986) .....................................22

## I.    INTRODUCTION

Plaintiffs seek to certify three classes of Personal Bankers ("PBs") employed by Defendant Citibank, N.A. in New York ("NY"), Illinois ("IL"), and the District of Columbia ("DC").  To certify the NY class in this case would mean that the overtime claims of over 2,100 individuals in NY spanning almost 10 years would be adjudicated by Plaintiff Ruiz and the facts and circumstances that pertain to her.  Similarly, the overtime claims of the classes in IL (388 individuals) and DC (108 individuals) spanning almost seven years would be adjudicated solely by Plaintiffs Muniz (IL) and Winfield (DC).  A class can only be certified where the class representative's claim is so homogeneous with the claims of the absent class members that the adjudication of the representative's claim necessarily will adjudicate the class members' claims and bind both the class members and defendant consistent with Due Process.  This extraordinary departure from litigation between named parties is only permitted where the Court finds, after a "rigorous" analysis, that plaintiffs have proven by a preponderance of admissible evidence that each element of Rule 23 is satisfied.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Because Plaintiffs in this case have utterly failed to meet their burden, their motion should be denied.

Plaintiffs do not contend that Citibank had any classwide policy to require PBs to work off-the-clock.  Rather, they contend that Citibank's *lawful* policies or practices of requiring PBs to meet individual sales goals and perform other duties, as well as its purported desire to limit the amount of overtime *worked*, "effectively" resulted in *some* PBs working off-the-clock.  They do not, however, allege that the *classes* they seek to certify worked off-the-clock *as a class*.  Instead, they allege only that "*numerous* PBs worked unpaid overtime" (Pls' Br. 2) (emphasis added), but they do not articulate how many or which class members are among the "numerous," and offer no basis on which to adjudicate the issues of liability and damages by proof common to the classes.

The only common evidence between Plaintiffs and the classes they seek to represent are Citibank's robust policies requiring just the opposite of what Plaintiffs allege, that PBs record and be paid for all time worked.  Citibank regularly trains both PBs and managers on these policies, which are enforced with discipline, up to and including termination.  Citibank pays millions of dollars in overtime to PBs each year (almost $13M since 2009).  Numerous putative class members testified that they were paid for all time worked, and that their managers regularly approved and paid them for overtime.  Each Plaintiff or PB, therefore, must establish that he and/or his manager violated Citibank's policies by working off-the-clock.  Plaintiffs have never offered a theory, much less any evidence, as to how each of the issues of liability and damages could be determined on a classwide basis.  Indeed, whether each PB needed to work overtime (or why, when, or how much), whether each manager approved such overtime, whether each PB recorded the overtime on each time record, whether each manager knew or should have known of any unpaid overtime, whether the work at issue was compensable under applicable standards, whether Citibank has any additional defenses to a PB's individual claim, and numerous damages issues (including the precise amount of damages, and issues of willfulness and good faith to each Opt-In) are completely individual inquiries.  Whatever a trier of fact determines with respect to one PB would establish absolutely nothing about any other PB, who worked in different branches under different managers.

Each of the purported circumstances that allegedly caused off-the-clock work by some PBs either is non-existent, or individualized.  For example, sales goals for PBs are set individually -- just among the Plaintiffs and the discovery Opt-Ins the sales goals varied by as much as 353%.  And the opportunities for PBs to meet their sales goals varied widely based on the location of the branch, the staffing in the branch, the nature of the branch clientele, the languages spoken by the PB and the branch clientele, the age of the branch, the PB's relationship with his or her manager, whether the PB was qualified to offer business products, and many other individual circumstances.  Some putative

class members testified that it was "so easy" to meet their sales goals, and some testified that they regularly met and exceeded their sales goals without working any overtime at all.

Likewise, Plaintiffs' repeated and unsupported claim of a "no overtime" policy and "national 'no overtime' directive" is flatly refuted by the facts that (1) Citibank pays millions of dollars in overtime to PBs each year; (2) many class members testified that they were paid for all time worked, including overtime; and (3) each of the Plaintiffs and Opt-Ins who participated in discovery in this case was paid overtime. Plaintiffs apparently see no disconnect in offering conclusory testimony of a "no overtime" policy from PBs who were paid significant overtime in the vast majority of their pay periods (*see, e.g.*, Kosiba (99%), Pikulin (97%), Foley (83%), and Ruiz (63%)).

Plaintiffs' claims of extraordinary efforts to reduce or minimize overtime are greatly exaggerated. At most, they reflect efforts to manage the amount of overtime *worked*, which is both completely lawful and consistent with the purposes of the Fair Labor Standards Act ("FLSA"). Moreover, Plaintiffs support their sweeping statements about purported classwide practices with the anecdotal testimony of one individual PB, or an email from a local manager – often outside of NY, IL, or DC. And overtime payments to PBs have *not* been reduced or minimized. Last year alone, Citibank paid over $4 million in overtime to PBs – *an 80% increase over 2012*. Hammond 2014 Decl. ¶ 4 (Dkt. No. 180-48).

Courts have consistently denied class certification of off-the-clock claims of financial services branch workers under circumstances similar to this case – where the employer has published policies requiring the payment of all time worked, and the determination of whether any particular class member worked off-the-clock contrary to those policies would require an individualized inquiry. *See, e.g., Fernandez v. Wells Fargo Bank, N.A.*, 2013 WL 4540521, at *7 (S.D.N.Y. Aug. 28, 2013); *In re Bank of Am. Wage & Hour Emp. Lit.*, 286 F.R.D. 572, 585-86, 588 (D. Kan. 2012); *Burkhart-Deal v. CitiFinancial Inc.*, 2010 WL 457122, at*4-5 (W.D. Pa. Feb. 4, 2010).

3

Because Plaintiffs have failed their burden to establish that each element of Rule 23 has been satisfied as to each class they seek to certify, Plaintiffs' motion should be denied in its entirety.

## II.   FACTUAL BACKGROUND

### A.   Citibank Has Robust Policies And Training To Ensure Proper Payment For All Time Worked.

At all relevant times, PBs were subject to policies and training that required them to accurately record all of their time worked, including overtime.  Since 2007, Citibank has utilized the North America Time & Attendance System (NATA) – an online timekeeping system that allows employees to accurately record their start, stop, and lunch times to the minute.  Suomela Decl. ¶ 5 (Dkt. No. 180-57).  Starting in early 2011, Citibank added the following language to the NATA screen in which employees enter their time:  "**Please confirm below whether your entries are accurate and account for all hours worked, including overtime**."  *Id.* ¶ 11 (emphasis added).  In order for an employee to be able to save or submit their time entries in NATA, one of two radio buttons – "I Agree" or "I Do Not Agree" with this statement – must be selected.  *Id.* ¶ 12; Suomela Dep. 36.  If an employee selects "I Do Not Agree," the employee is contacted by a representative from Citibank Employee Services to discuss the issue.  *Id.* ¶ 13.[1]

Moreover, the Employee Handbook provides that all overtime hours worked must be recorded and paid and that off-the-clock work is "**strictly prohibited.**" Sorrells Decl. ¶ 5 (Dkt. No. 180-56), Ex. C, pp. 24-25 (emphasis added).  Furthermore, the Handbooks provide that if employees have "any concerns about … timesheets or … pay, including overtime pay" they should contact Human Resources or use one of the other listed complaint avenues, they will be "promptly reimbursed" for any errors, and retaliation for raising such a complaint is "strictly prohibited."  *Id.* ¶ 5, Ex. A. p. 30, Ex. B.  p.28.  Citibank regularly trains non-exempt employees and their managers

---

[1]                                                     Redacted

    Redacted          Linthorst 2014 Decl. Ex. 39 (Dkt. No. 180-39).

to ensure that these policies are followed.  Suomela Decl. ¶¶ 6-9 (Dkt. No. 180-57), Exs. A-E

(company-wide trainings on timekeeping policies and payment for all time worked).  Plaintiffs and

putative class members admitted that they knew that they were responsible for accurately entering

their own hours worked into NATA, that they were not permitted to work off-the-clock, and that

their managers were prohibited from requesting or requiring that they perform work off the clock.

*See, e.g.*, Ruiz Dep. 155-57, 175; Valencia Dep. (NY) 273.

   The record is replete with evidence that PBs and their managers followed these policies.

Every Plaintiff and discovery Opt-In regularly recorded and was paid for overtime.  Hammond 2011

Decl. ¶¶ 4-12 (Dkt. No. 46-13); Hammond 2014 Decl. ¶¶ 6-7 (Dkt. No. 180-48).  And as noted

above, Citibank paid almost $13 million dollars in overtime to PBs since 2009, and many PBs were

paid overtime in the vast majority of their pay periods, and received thousands of dollars in overtime

pay.  Hammond 2014 Decl. ¶¶ 4, 10, 11, 15, 20, 24, and 27 (Dkt. No. 180-48);  Pikulin Dep. (NY)

51-52 (paid over $▮▮▮ in overtime in one year); Sanchez Dep. 97-98 & Ex. 12 (Dkt. No. 180-80)

(paid over $▮▮▮ in overtime in 10 months of employment).  Moreover, numerous PBs in NY, DC

and IL testified that they always recorded and were paid for all the overtime they worked.[2]

   These facts directly contradict any claim of a classwide policy or practice of requiring off-

the-clock work.

## III.   ARGUMENT

### A.   The Court Must Perform A Rigorous Analysis To Determine If Plaintiffs Have Met Their Burden To Prove Each Element Of Rule 23 For Each Class.

   A class action is "an exception to the usual rule that litigation is conducted by and on behalf

of the individual named parties only."  *Comcast*, 133 S. Ct. at 1432 (quotation omitted).  "Rule 23

---

[2]  Viteri Decl. (NY) ¶¶ 12-13 (Dkt. No. 46-36); Chu Decl. (NY) ¶¶ 9-10 (Dkt. No. 46-20); Khan Decl. (NY) ¶¶ 6, 9 (Dkt. No. 46-26); Mahlab Decl. (NY) ¶ 6; Tercero Decl. (NY) ¶ 11; Cardenas Decl. (NY) ¶ 4; Lagmay Decl. (IL) ¶¶ 3, 8 (Dkt. No. 46-27); Barraza Decl. (IL) ¶ 3; Brock Decl. (IL) ¶ 4; Herrell Decl. (DC) ¶ 2.  *See also* Barajas Decl. ¶ 6, Braverman Decl. ¶ 6, Fernandez Decl. ¶ 7, Gray Decl. ¶ 6, Guan Decl. ¶ 5 (Dkt. Nos. 46-16, 46-18, 46-25-27).

does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule ...."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  To ensure that the class representative truly may stand in the shoes of the absent class members so that the adjudication of the claims of the named plaintiff can be binding both on the absent class members and the defendant consistent with Due Process, the court may certify only after conducting a "rigorous analysis" that the requirements of Rule 23 are met.  *Comcast*, 133 S. Ct. at 1432; *Wal-Mart*, 131 S. Ct. at 2551.  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim."  *Wal-Mart*, 131 S. Ct. at 2551.  "[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable."  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982).  "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met."  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).

**B.      The District Of Columbia's Opt-In Requirement Precludes Any Rule 23 Class.**

Initially, no Rule 23 class can be certified as to the District of Columbia because the District's overtime statute requires that an individual file a consent to join before his or her claim may be adjudicated.  D.C. Code § 32-1012(b) ("No employee shall be a party plaintiff to any action … unless the employee gives written consent to become a party and the written consent is filed in the court"); *see Driscoll v. George Washington Univ.*, -- F. Supp. 2d --, 2012 WL 3900716, at *7 (D.D.C. Sept. 10, 2012) (ruling that overtime claims under the DC Minimum Wage Act cannot be brought under Rule 23 because "the DCMWA's opt-in mechanism confers substantive rights such that application of Rule 23 in these circumstances would violate the Rules Enabling Act").

**C.      None Of The Classes Proposed By Plaintiffs Meet The Commonality And Typicality Requirements.**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class" while Rule 23(a)(3) requires that the claims "of the representative parties are typical of the claims ... of the

6

class."  "The commonality and typicality requirements tend to merge" and are often addressed together.  *Wal-Mart*, 131 S. Ct. at 2551 n. 5.  Commonality "does not mean merely that [class members] have all suffered a violation of the same provision of law."  *Id.* at 2551.  Rather, to satisfy commonality, a common question must be "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Plaintiffs' purported "common questions," such as "whether Defendant had a pattern or practice of failing to compensate class members for all overtime hours" (Pls' Br. 21), miss the mark. "What matters to class certification … is not the raising of common 'questions' – even in droves – but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551 (quotation omitted); *Romero v. H.B. Auto. Grp., Inc.*, 2012 WL 1514810, at *18 (S.D.N.Y. May 1, 2012) ("After *Dukes,* though, the fact that Plaintiff came up with a list of common questions is no longer sufficient.").

### 1.    The Issues Of Liability And Damages Each PB Must Prove.

Notably, Plaintiffs do not even identify the issues of liability and damages that they will need to prove for each class member for each work week that he or she worked, or identify any common evidence that could prove any of those elements for all putative class members.  The issues of liability that Plaintiffs must prove and the Court must determine include: (i) whether each PB worked overtime (or when, or how much); (ii) whether the PB recorded that time using the required timekeeping mechanism[3]; (iii) whether the PB was directed to perform the alleged work[4]; (iv)

---

[3]  *See, e.g., Joza v. WW JFK LLC*, 2010 WL 3619551, at *7 (E.D.N.Y. Sept. 10, 2010) (denying overtime claims in part because employee failed to record her time on time records); *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 170 (W.D.N.Y. 2007) (dismissing off-the-clock claims in part because of "the undisputed fact that plaintiffs never reported this work on their timesheets"); *see also Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1230-31 (10th Cir. Nov. 27, 2012) ("Under these circumstances, where the employee fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation"); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (affirming decertification because "[u]nder the FLSA, if an employer establishes a

whether the PB requested permission to work overtime and whether the request was approved or denied[5]; (v) whether and to what extent the PB was paid overtime[6]; (vi) whether the alleged uncompensated work was compensable under the applicable standards[7]; and (vii) whether the manager had actual or constructive knowledge of the alleged uncompensated work.[8]

If a PB were able to establish all of these elements, then the PB must prove damages by offering, in each workweek that he or she worked more than 40 hours without compensation, "specific facts establishing when, and for how long, she performed the off-the-clock tasks for which she now seeks compensation."[9]   Assuming any PB could meet his or her burden of proving each of the above elements, the following additional issues of damages and defenses would have to be proven:  (i) whether any unlawful failure to pay overtime to the PB was willful, (ii) whether any unlawful failure to pay overtime to any PB was based on a good faith belief that it was in compliance with the law (which would defeat a claim for liquidated damages)[10]; and (iii) whether Citibank has

reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process.").

[4]  *Joza*, 2010 WL 3619551, at *3 (overtime claim rejected in part because plaintiff "acknowledged that she had not been asked by any manager to work any of those overtime hours"); *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) (affirming dismissal of off-the-clock claim where plaintiff was not directed to perform work off-the-clock, though she was directed to complete duties).

[5]  *Newton v. City of Henderson*, 47 F.3d 746, 747, 749 (5th Cir. 1995) (reversing judgment for plaintiff where plaintiff was told not to work unauthorized overtime, but did so and turned in timesheets that did not include overtime).

[6]  *Joza*, 2010 WL 3619551, at *3 (overtime claim rejected in part because plaintiff had submitted overtime on her time records, "all of which were paid"); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002) ("Because [the employer] did in fact pay some overtime, it is likely that any particular [off-the-clock] claim will require specific, individualized proof as to any hours that [employer] refused to pay.").

[7]  *Singh v. City of New York*, 524 F.3d 361, 364, 367 (2d Cir. 2008) (Sotomayor, J.) (affirming summary judgment for defendant because work time was "de minimis as a matter of law and thus not compensable under the FLSA" and recognizing that preliminary and postliminary activities are not compensable); *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *8 (E.D. La. July 2, 2004) (denying certification where individualized defenses included whether activities were preliminary or postliminary).

[8]  *Singh v. City of New York*, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005) (fact finder must determine "how much of that time was spent with the employer's actual or constructive knowledge"); *Zivali v. AT&T Mobility LLC*, 784 F. Supp. 2d 456, 467-68 (S.D.N.Y. 2011) (decertifying FLSA collective action in part because of individualized determination as to whether each individual manager had knowledge of alleged off-the-clock work).

[9]  *Joza*, 2010 WL 3619551, at *7 (quoting *Seever*, 528 F. Supp. 2d at 170).

[10]  *Whineglass v. Smith*, 2013 WL 2237841, at *9 (M.D. Fla. May 21, 2013) (decertifying FLSA collective because the defenses of willfulness and good faith could be determined only with respect to each individual plaintiff).

an additional defense such as the statute of limitations or a release.[11]

Plaintiffs have to prove all of these elements in the face of Citibank's robust policies requiring payment for all time worked, which are reinforced with robust training and enforcement. In other words, each PB would have to show that he or she, and/or his or her manager, violated those policies. Under such circumstances, Plaintiffs must establish "significant proof" that Citibank "operated under a general policy" of requiring off-the-clock work. *Wal-Mart*, 131 S. Ct. at 2554.

### 2. Plaintiffs Offer No Common Proof To Adjudicate The Issues Of Liability And Damages As To All PBs.

The putative class representatives (Ruiz (NY), Muniz (IL), and Winfield (DC)) can only prove the elements of liability and damages by their own testimony and documents specific to themselves. Each of them has responded to Citibank's interrogatories and identified under oath the witnesses he or she thought have knowledge of his or her claim, but each identified different witnesses, local managers and co-workers. Linthorst 2014 Decl. ¶¶ 13-14 & Exs. 1-37 (Dkt. No. 180). Ruiz, for example, testified under oath that: she knew it was Citibank's policy that she was required to record and be paid for all time worked, and that she was prohibited from working off-the-clock (Ruiz Dep. 155-56); she never sought approval to work the overtime she now claims (*id.* at 161); she never recorded the overtime she now claims on her time records (*id.* at 156 ("I was at fault"; "I was not inputting the proper time in the computer")); she was never told to work overtime (*id.* at 222); she was never told not to record any time that she worked (*id.* at 260); she never told her managers that she had worked the overtime she now claims (*id.* at 259); she was paid for all overtime she recorded (*id.* at 162); her manager told her repeatedly to stop working but she secretly disobeyed those instructions (*id.* at 179-181, 185-187, 259-60, 366); she actively hid her overtime by changing her time entries so that it would look like actual times worked (*id.* at 192-94); her managers

---

[11]   The elements to prove an off-the-clock claim under DC, IL and NY law all track the FLSA.  *See Dinkel v. MedStar Health, Inc.*, 880 F. Supp. 2d 49, 52 (D.D.C. 2012); *Williams-Green v. J. Alexander's Rests., Inc.*, 277 F.R.D. 374, 379 (N.D. Ill. 2011); *Spencer v. No Parking Today, Inc.*, 2013 WL 1040052, at *3 (S.D.N.Y. Mar. 15, 2013).

worked in the basement of the branch and it would be "almost impossible" for them to know what hours she actually worked (*id.* at 164, 366).

Putting aside that these admissions by Ruiz are fatal to her claim and Citibank will be filing a motion for summary judgment after the Court's ruling on class certification[12] the question on this motion is whether the overtime claims of over 2,100 other PBs in New York spanning almost a 10 year period – who worked in different branches and under different managers – can be adjudicated based on Ruiz's own testimony about herself and her own managers consistent with Due Process. Plainly they cannot. A putative class member such as Dara Ho, who testified in conclusory terms that her manager repeatedly removed overtime hours from her timesheet (Ho Dep. (NY) 407-08), could not be bound by the adjudication of Ruiz's claim when the facts underlying the claim of each individual are materially different. Similarly, Citibank could not be bound to every absent PB without the opportunity to seek admissions that the PB did not work any uncompensated overtime, or the manager did not know of such alleged uncompensated overtime, similar to admissions by Ruiz, Pikulin, and others.

The claims of the Plaintiffs and putative class members differ materially with respect to the issues of liability and damages. Many putative class members testified that they did not need to work overtime to meet their sales goals or complete their job duties,[13] they have never been told or

---

[12] *Joza*, 2010 WL 3619551, at *3 (entering judgment for defendant on off-the-clock overtime claim where plaintiff did not record the overtime she claimed on her timesheet, she was not asked by her manager to work the overtime, she did not inform her manager that she worked the overtime, and she did not complain of uncompensated work); *Seever*, 528 F. Supp. 2d at 171 (dismissing claims of off-the-clock work where plaintiffs never reported the overtime on their timesheets and plaintiffs were unable to provide "specific facts establishing when, and for how long, they performed the off-the-clock tasks").

[13] Viteri Decl. (NY) ¶ 11 (Dkt. No. 46-36); Chu Decl. (NY) ¶ 6 (Dkt. No. 46-20); Mahlab Decl. (NY) ¶ 7; Brock Decl. (IL) ¶ 6; Cardenas Decl. (IL) ¶ 3.

10

pressured to work off-the-clock and, to the contrary, their managers instructed them to record all time worked,[14] and they recorded and were paid for all time worked.[15]

Even among the Plaintiffs and Opt-Ins who participated in discovery, testimony revealed material differences with respect to the elements of liability and damages. Some testified that they could not recall whether they ever worked any uncompensated overtime (Pikulin Dep. (NY) 97-98, Kosiba Dep. 151, Shen Dep. 228), some told their managers that they did not work off-the-clock (Nessler Dep. (IL) 145-47, 255-56, Quiros Decl. ¶ 5 (Dkt. No. 46-11)), some worked for managers who directed that they accurately record their work time (Williams Dep. (NY) 150-51, Pikulin Dep. (NY) 127-28; Drews Dep. (IL) 129), some worked for managers who directed them to record *more* overtime (Wallace Dep. 180-81 & Ex. 18 (Dkt. No. 180-86), Linthorst 2014 Decl., Ex. 40 (CITI-RUIZ 173393) (Dkt No. 180-40), some over-reported their time and claimed overtime that they did not work (Ash Dep. 151-57 & Ex. 28 (Dkt. No. 180-60), Wong Decl. ¶ 3 (Dkt. No. 180-58), and some regularly recorded and were paid significant overtime in almost every pay period (Hammond 2014 Decl. ¶¶ 8-32) (Dkt. No. 180-48)).

The testimony and evidence relating to one PB would not establish any element of liability or damages for any other PB, and whatever a trier of fact might determine in resolving a credibility dispute between one PB and her manager would not determine anything for any other PB. Citibank could not, consistent with Due Process, be precluded from seeking to establish that any particular class member did not work overtime, was not asked to work overtime, did not seek approval to work overtime, did not record the time on the timesheet, did not inform his or her manager that he or she worked overtime, did not complain of uncompensated work, cannot establish "specific facts" as to

---

[14]  Chu Decl. (NY) ¶ 10 (Dkt. No. 46-20); Mahlab Decl. (NY) ¶ 2; Viteri Decl. (NY) ¶ 14 (Dkt. No. 46-36); Khan Decl. (NY) ¶ 5; Tercero Decl. (NY) ¶¶ 3, 4, 11; Cardenas Decl. (IL) ¶¶ 3, 4; Lagmay Decl. (IL) ¶¶ 2, 8 (Dkt. No. 46-27); Brock Decl. (IL) ¶ 4; Barraza Decl. (IL) ¶¶ 3, 4; Herrell Decl. (DC) ¶ 4.

[15]  *See supra*, n.2.

when, and for how long, she performed the alleged off-the-clock tasks, or any of the other issues of

liability and damages outlined above that could defeat the claim of that PB.[16] .

This Court recently denied class certification of claims that personal bankers at another large

bank were forced to work-off the clock due to the bank's policies of "limiting available overtime

while also delegating 'onerous' responsibilities that could not be met in a 40-hour workweek."

*Fernandez*, 2013 WL 4540521, at *2, *6-9.  A number of other courts in this circuit have also held

that where there is a policy prohibiting work off-the-clock, commonality cannot be met where

resolution of who worked off the clock, for how long, and whether the manager knew about such

work required individualized inquiries.  *See, e.g., Hinterberger v. Catholic Health Sys.*, 2014 WL

1278919, at *30, *34 (W.D.N.Y. Mar. 27, 2014) (denying Rule 23 class certification due to lack of

commonality because "NYLL liability will come down to whether, on a department specific basis, a

particular supervisor did not follow CHS' directive"); *Gordon v. Kaleida Health*, -- F.R.D. --, 2014

WL 1279170, at *22, *25 (W.D.N.Y. Mar. 27, 2014) (denying motion for class certification in off-

the-clock case because there was no commonality under *Dukes*); *Romero*, 2012 WL 1514810, at *18

(holding there was no commonality because "whether putative class members worked overtime, and

whether Defendants failed to pay overtime … in violation of the NYLL – are important

considerations in this case.  But 'they are not common one[s]'"); *Brickey v. Dolgencorp, Inc.*, 272

F.R.D. 344, 3347-48 (W.D.N.Y. 2011) (denying class and conditional certification in off-the-clock

case despite allegations that limited number of hours allocated to store); *Eng-Hatcher v. Sprint

Nextel Corp.*, 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) (denying certification of proposed class

---

[16] *See, e.g.*, Desjardins-Raposa Decl. ¶ 7 (Dkt. No. 67-3) (NY Branch Manager disputing claim by NY putative class representative Ruiz); Botu Decl. ¶¶ 3-7 (Dkt. No. 180-45) (NY Branch Manager disputing claim by NY class member Myra Schornstein); Maldonado-Tirado Decl. ¶¶ 2-5 (Dkt. No. 180-50) (NY Branch Manager disputing claim by NY class member Paul Pikulin); Hearon Decl. ¶¶ 4-9 (Dkt. No. 180-49) (IL Branch Manager disputing claim by IL class member Pat Drews); Alicea Decl. ¶¶ 4-8 (Dkt. No. 180-44) (IL Branch Manager disputing claim by IL class member Edgardo Carrena); Polyakova Decl. ¶¶ 4-7 (Dkt. No. 180-54) (DC Branch Manager disputing claim by DC class member Anthony Lewis).

and collective action despite allegations that policies to maximize sales and minimize overtime "incentivized" managers to act illegally).[17]

### 3. The Factors That Plaintiffs Claim Resulted In Off-The-Clock Work By Some PBs Either Are Non-Existent Or Individualized.

#### a. Neither PB Sales Goals Nor Job Responsibilities Required Uncompensated Overtime.

There is no evidence that all PBs in NY, IL, and DC were required to work overtime to meet their sales goals and other job responsibilities, much less *uncompensated* overtime.  Putative class representative Winfield testified that whether any given PB could "meet their sales goals and perform all their duties in 40 hours or less" "[d]epended on the individual banker."  Winfield Dep. 96-97.[18]  Moreover, numerous PBs in NY, IL and DC testified that they were able to meet their sales goals without needing any overtime.[19]

---

[17] *See also Alix v. Wal-Mart Stores, Inc.*, 838 N.Y.S.2d 885, 893-94 (N.Y. Sup. Ct. 2007) (holding that in off-the-clock case, common issues did not predominate and so class certification was not warranted because "plaintiffs must adduce specific evidence as to which associates worked 'off the clock,' on what occasions, and for how long. Moreover, plaintiffs must also demonstrate that defendant either knew or had reason to know that its employees were thus engaged."); *Vang v. Kohler Co.*, 488 F. App'x 146, 147 (7th Cir. 2012) (vacating for second time court's order granting class certification in off-the-clock case); *Koike v. Starbucks Corp.*, 378 F. App'x 659, 661 (9th Cir. 2010) (affirming district court order denying Rule 23 motion to certify off-the-clock class because although "business pressures existed that might lead [employees] to work off-the-clock[,]" individualized factual determinations would be required to determine whether the class members in fact engaged in off-the-clock work and whether the employer had actual constructive knowledge of the off-the-clock work); *Babineau v. Fed. Ex. Corp.*, 576 F.3d 1183, 1192-94 (11th Cir. 2009) (affirming district court order denying Rule 23 motion to certify off-the-clock class); *Ginsburg v. Comcast Cable Commc'ns Mgmt, LLC*, 2013 WL 1661483, at *8 (W.D. Wash. Apr. 17, 2013) (concluding that a Rule 23 class action for off-the-clock work was unmanageable based on a systematic efficiency pressure theory because it required individual inquiries about how often, how much, and why employees worked off-the-clock); *Smith v. Family Video Movie Club, Inc.*, 2013 WL 1628176, at *6-9, *11 (N.D. Ill. Apr. 15, 2013) (denying class certification in off-the-clock case because company's official policy prohibited off-the-clock work and any violations of that policy were perpetuated by individual managers and thus could not be proven by proof common to the class).

[18] *See also* Muniz Dep. (IL) 74 ("if you had a really good branch it didn't matter if you work so many hours or less hours"); Ruiz Dep. (NY) 92-93 (whether PB could meet their sales goals without working overtime "depends [on] the circumstances" such as "[t]he clients, their needs, and even the ability of the employee"); Ho Dep. (NY) 82-83, 148, 160-62 & Ex. 11 (was "so easy" to meet sales goals that she often doubled or tripled them, and received over $182,000 in incentive compensation and reward trips to Mexico, Hawaii, and Florida); Pikulin Dep. (NY) 54-56, 68-69 (regularly met sales goal and often doubled and tripled it, and whether it was met not tied to hours worked); Peragine Dep. 124-125 (it was "easy" to meet sales goal and often doubled and tripled it).

[19] Williams Dep. (NY) 83-84 (did not feel that she needed to work more than 40 hours to meet her sales goal); Drews Dep. (IL) 81 (did not need to work more than 40 hours to meet her sales goal); Mahlab Decl. (NY) ¶ 7; Viteri Decl. (NY) ¶ 1 (Dkt. No. 46-36); Chu Decl. (NY) ¶¶ 5-6 (Dkt. No. 46-20); Khan Decl. (NY) ¶ 6 (Dkt. No. 46-26); Lagmay Decl. (IL) ¶¶ 5, 8 (Dkt. No. 46-27); Herrera Decl. (DC) ¶ 8.

Sales goals were established individually based on factors that changed year-to-year, such as the salary of the PB, the age of the branch, and the length of employment by the PB. Sorrells Decl. ¶ 9 & Ex. F at 10, 19 (Dkt. No. 180-56); *see also id.* at Exs. G-J. And the sales goals varied widely, by as much as 28%, 55%, 123%, even 353%.[20] In fact, the *Ruiz* Complaint specifically alleges that *only* PBs with high salaries had sales goals that were so high they required the PBs to work overtime. Ruiz Complaint ¶ 25 ("[M]ore experienced and more senior Personal Bankers were assigned higher sales goals which were routinely so high that they could not reasonably be achieved in forty hours").

Those Plaintiffs who testified to their purported need to work overtime pointed to aberrational job circumstances as the cause. Ruiz had documented time management problems, and was overwhelmed by service duties because she was the only Spanish-speaking PB in a branch with a significant Spanish-speaking customer base. Ruiz Dep. 52, 56, 70-71, 77, 83, 88, 196. Winfield did not need to work overtime until his manager left and he had to assume duties for "running the [financial] center." Winfield Dep. 197-98. Muniz had a branch in a bad location that did not get much walk-in traffic, and was in a low income area with a less affluent customer base than other branches. Muniz Dep. 70, 74. Whether PBs could meet their sales goals depended on a variety of factors unrelated to the number of hours worked, as described in detail in Citibank's motion for decertification. *See* Decert. Br. (Dkt. No. 179) pp. 21-22.

And even for those individuals who had difficulty meeting their sales goals, there was no nationwide uniform policy that required specific disciplinary steps leading to termination. Rather, as NY, IL and DC PBs themselves testified and demonstrated, discipline was at the discretion of the individual branch managers. Winfield made his monthly sales goals only in two months out of two

---

[20] In January 2009, Opt-In Ash's sales goal was $*Redacted* and Ruiz's (NY) sales goal was $*Redacted*, over 55% higher. Costa 2011 Decl., Ex. 1 (Dkt. No. 46-12). In March 2010, Opt-In Sanchez's sales goal was $*Redacted* and Opt-In Ho's (NY) sales goal was $*Redacted*, over 123% higher. *Id.*; Costa 2014 Decl, Ex. A (Dkt. No. 180-46). In June 2011, Opt-In Lewis' (DC) sales goal was $▮▮▮, while Opt-In Drews' (IL) sales goal was $*Redacted*, over 353% higher. Costa 2014 Decl, Ex. A (Dkt. No. 180-46). In January 2012, Opt-In Massey's goal was $▮▮▮ and Opt-In Williams' (NY) goal was $▮▮▮, over 28% higher. *Id.*

years, yet he was never disciplined or terminated for such failures.  Winfield Dep. 108, 178; Drews

Dep. (IL) 113-15 (manager had discretion to decide when to impose discipline; one manager applied

written discipline policy to her, while other manager did not); Drago Dep. (NY) 15; 167-68 (at first

branch, district manager used her discretion to remove final warning from his file regarding missed

sales goals; at second branch, was not disciplined despite missing sales goals all six months).  Other

PBs failed to meet a *single* sales goal during their employment,[21] or failed to meet their goals for

long stretches, but were never disciplined.[22]  A number of PBs testified that they were not aware of

any discipline policy for failing to meet their sales goals.[23]

In support of the purported uniform need work overtime, Plaintiffs offer a single email from

one Branch Manager who stated that  Redacted                    Pls' Br.

6, Ex. 55, CR-7925.  However, Plaintiffs omit the portions of this email that make clear that  Redacted

*Id.*  This communication

does not reflect that NY, IL, and DC class members uniformly needed to work overtime, much less

uncompensated overtime.  Rather, it is another example of Citibank *overpaying* employees.

---

[21]  Massey Dep. 187-188 & Costa 2014 Decl. Ex. A (Dkt. No. 180-46) (never met his hurdles for his entire period of employment and was never disciplined or told that his employment was in jeopardy for poor sales)

[22]  *Compare* Williams Dep. (NY) 82-83, Costa 2014 Decl. Ex. A (Dkt. No. 180-46)  (was never disciplined for not meeting sales goals 6 times between February-August 2011 and 4 months straight for June-September 2013); Carreno Dep. (IL) 209-10 & Costa 2014 Decl., Ex. A (Dkt. No. 180-46) (was never disciplined for failing to meet goals even though missed hurdle nine months straight, from July 2009 until March 2010); Hurler Dep. (NY) 251-52, 110-12 & Ex. 10 (never received a disciplinary action despite missing goal 8 times in last 13 months of employment); *with* Pls' Ex. 27.

[23]  *See* Burgos Dep. (NY) 140-41 (not aware of any discipline policy for missing sales goals); Lewis Dep. (IL) 190-91; Costa 2014 Decl. Ex. A (Dkt. No. 180-46) (Lewis missed hurdle 3 out of 4 months and was not aware of any discipline policy for missing sales goals, nor was he ever told that if he missed his sales goals he could be disciplined).

### b.  Plaintiffs' Claim Of A "National 'No Overtime' Directive" Is An Unsupported Fiction.

Plaintiffs claim repeatedly that there was a "no overtime" policy and a "national 'no overtime' directive."  Pls' Br. 11.  This is a fiction created by Plaintiffs and their counsel.  There was no such policy, as is confirmed by the facts that (1) Citibank pays PBs millions of dollars of overtime each year, and almost $13 million since 2009[24]; (2) each of the Plaintiffs and Opt-Ins who participated in discovery in this case were paid overtime[25]; and (3) many class members have testified that they were paid for all time worked.[26]  Plaintiffs support their claim of a "no overtime" policy with the testimony of PBs who were paid extensive overtime.[27]

Plaintiffs quote the testimony from Peragine that Citibank's policies requiring payment for all time worked is "not what occurred in branches across the country."  Pls' Br. 12.  Peragine was a Florida PB who worked in *one* branch.  Peragine Dep. 31, 34.  Peragine also testified that what he referred to a "no overtime" policy actually was that his manager would approve overtime to be worked if circumstances warranted it, such as when he had to stay late to help a customer or if the branch was short staffed.  Peragine Dep. 100, 109.  Similarly, Ruiz testified that it was "pretty much up to the manager to determine" whether to approve overtime to be worked "based on the circumstances," and that different managers approved overtime for different reasons.  Ruiz Dep. 234 ("Q.  So if the manager thought it was warranted and something they wanted you to do, they could approve the overtime?  A.  Exactly.").  Winfield also testified that local managers had "discretion" to approve overtime to be worked, and different managers exercised their discretion differently.

---

[24]  Hammond 2014 Decl. ¶ 4 (Dkt. No. 180-48).

[25]  *Id.* ¶ 6.

[26]  *Supra* n.2.

[27]  Pikulin (NY) (paid overtime in 97% of pay periods), Kosiba (99%), Dabrowski (94%), Foley (83%), Lewis (DC) (80%), Moline (85%), Sanchez (85%), Ho (NY) (64%), Ruiz (NY) (63%); Ash (62%); Drago (NY) (45%), Janik (IL) (47%), Winfield (DC) (42%) , Schornstein (NY) (41%).  Hammond 2011 Decl. ¶¶ 7,11 (Dkt. No. 46-13); Hammond 2014 Decl. (Dkt. No. 180-48) & Supp. Hammond Decl.¶ 4..

Winfield Dep. 249; *see* Hearon Decl. ¶ 7 (IL Branch Manager; "I could approve as much overtime to be worked as I thought was warranted").  In support of their claim that the purported "no overtime" directive came from unnamed "upper management," Plaintiffs cite the double-hearsay testimony of one PB who worked in Florida.  Pls' Br. 12 & n.60.  That PB, Kosiba, was paid overtime in 75 of her 76 pay periods (99%).  Hammond 2014 Decl. ¶ 20 (Dkt. No. 180-48).

### c.  Plaintiffs' Claim That PB Layoffs Created Pressure For Uncompensated Overtime Is Baseless.

A central part of Plaintiffs' theory of the case is that the pressure to work overtime was caused in significant part because Citibank "laid off thousands of employees, including PBs."  Pls' Br. 1, 7.  Plaintiffs cite to two newspaper articles discussing management layoffs in 2007 and 2008 that do not support the claim that a single person laid off was a PB, and testimony by a California manager that in 2010 headcount in certain positions may have been reduced through attrition, not layoffs, and that "could have" included PBs.  *See*  Pls' Br. 7, n. 29 and Deloney Dep. 183.  Plaintiffs do not offer any testimony from PBs that PB staffing in their branch was reduced or that this caused them to work overtime, much less *uncompensated* overtime.  To the contrary, several Plaintiffs testified that there were *too many* PBs at their branch and this made it more difficult to meet sales goals because it diluted the sales opportunity.  Steffensen Dep. 48, 102-03, 107-09; Moline Dep. 47-49, 91-92, 170; Foley Dep. 125; Kenney Dep. 151.  Thus, what Plaintiffs claim was a significant factor pressuring PBs to work overtime is, at best, unsupported and, at worst, actually would have had the opposite effect of making it easier for a PB to meet his or her sales goals.

### d.  Plaintiffs Exaggerate Citibank's Focus On Controlling PB Overtime.

Plaintiffs' claims that Citibank was focused on overtime are greatly exaggerated.  Citibank produced over 23,000 pages of emails focused on overtime from over 130 custodians, including senior managers who at various times had responsibility for almost all of the approximately 1,000

branches operated by Citibank nationwide.  Supp. Linthorst 2011 Decl. ¶¶ 2-4 (Dkt. No. 67); Perez

Decl. ¶¶ 10-13 (Dkt. No. 67-2); Putman Decl. ¶ 7 (Dkt. No. 46-10); Linthorst 2014 Decl. ¶¶ 8-9

(Dkt. No. 180).  From this record, Plaintiffs cite to less than 50 manager emails about overtime, and

less than half of these (only 24) even pertain to the NY, IL or DC classes sought to be certified.[28]

Plaintiffs rely heavily on emails relating only to branches in California (mostly under the direction of

a single manager – Syed Rauf) that have no bearing on the classes sought to be certified in NY, DC,

and IL.[29]  *See Fernandez*, 2013 WL 4540521, at *7 (discussing that it is inappropriate to rely on

evidence having no application to states in question).  And even when Plaintiffs actually reference an

email from NY, IL, or DC, it pertains to one manager at one time, and does not purport to cover the

hundreds of branches or thousands of PBs over the course of up to almost 10 years for the classes

that Plaintiffs seek to certify.[30]

     The emails Plaintiffs rely on reflect efforts to control the amount of overtime *worked*, which

are both completely lawful and the responsibility of managers.  29 C.F.R. § 785.13 (“[I]t is the duty

of the management to exercise its control and see that the work is not performed if it does not want it

to be performed.”); *Joza*, 2010 WL 3619551 (“the concern of any well-managed business enterprise

to avoid needless overtime” does not reflect a “workplace culture of hostility toward overtime”);

*Fernandez*, 2013 WL 4540521, at *7 (“Evidence that defendants endeavored to arrange employees’

work schedules to reduce overtime when possible is not, without more, evidence of a policy to

---

[28]  *See* Supp. Sorrells Decl. at ¶¶ 4-21 (providing location information on managers whose emails Plaintiffs cite, where not otherwise apparent).

[29]  The following Plaintiffs’ Exhibits relate only to California:  Ex. 48, 50 & 105 (same email), 56, 79-81, 85, 94-95, 97, 101, 105, 106 (relating only to a business, not personal, banker), 111-113.  *See* Supp. Sorrells Decl. ¶¶ 9-17.

[30]  For example, the single email specific to DC (Pls’ Ex. 98) was sent in 2008, and none of the emails address any of the other five-and-a-half years for which Plaintiffs seek liability.  The six emails relating to Illinois (Pls’ Ex 55, 77-78, 87, 96, 117) were sent only during 2009-11, and none of the emails address the other three-and-a-half years in the liability period.  Finally, almost half the emails relating to New York (6 out of 16) are from a single manager in Manhattan – Thomas Sebok – in only 2006-2007, and some of these exhibits merely are duplicates.  *See* Pls’ Exhibit 59 & 73 (same email from Sebok).  There is not a single email from a New York manager for the period from 2004-2005, 2008 or 2012-14.  *See Fernandez*, 2013 WL 4540521, at *9 (plaintiffs failed to establish commonality for each of two putative classes in part where they “often lumped together evidence” from the two classes).

require uncompensated overtime.").  Indeed, the purpose of the overtime requirement is to incent

employers to avoid having overtime worked.  *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535

(2d Cir. 2009) ("The overtime requirements of the FLSA were meant to apply financial pressure to

'spread employment to avoid the extra wage'").

Plaintiffs claim that "Citibank circulated weekly business reports with detailed comparisons

of overtime expenditures," citing to routine business reports that simply summarize the economic

performance of the retail branch business.  The example attached by Plaintiffs is a 24-page report;

the overtime report appears on page 22, and is only one of three expenses listed on the page.  Pls' Ex.

89, p. 22.  And the page simply lists overtime expense per full-time equivalent (FTE) by division – it

does not contain any overtime budget, or targets for reduction.  Deloney Decl. ¶¶ 5-7.  Similarly,

Plaintiffs cite evidence that the NATA system *allowed* managers to run certain overtime reports, and

cite one email from California in 2007 which purports to attach such a report (although it is not

included) (Pls' Ex. 65), but offer no evidence that managers did run or review such reports.

Plaintiffs also reference the "Workforce Management" software program in support of the

claim that Citibank was attempting to minimize overtime.  Pl's Br. 10.  Workforce Management is a

scheduling tool that helps managers makes sure workers are scheduled when customer volume is

greatest so that Citibank can provide excellent client service.  Deloney Dep. 92-93; Deloney Decl.

¶¶ 2-3.  By informing managers as to when to staff workers consistent with customer need, it also

reduced the amount of overtime *worked* by reducing inefficient scheduling.  Deloney Dep. 97-99;

Deloney Decl. ¶ 3.  Thus, rather than being any part of the cause of alleged uncompensated overtime,

Workforce Management reduced the need for PBs to work overtime.

Similarly, while Plaintiffs repeatedly talk about a practice of attempting to reduce overtime

"down to zero" (Pls' Br. 7, 9, 23), they do not cite any communication affecting PBs in NY, IL or

DC, but rather a single email sent only to managers in Dallas, and Plaintiffs omit other key portions

of the email acknowledging: ████████████ Redacted ████████████

████████████████████████ Pls' Exs. 67, 86 (same email).

Similarly, in support of their claim that "Citibank was directing that overtime be minimized at all costs," Plaintiffs only cite the double-hearsay testimony of a single PB in Florida (Peragine).  Pls' Br. 7 & Ex. 41 at 98.  None of the emails by Citibank managers indicates that overtime was to be reduced "at all costs."  To the contrary, they sought to lawfully control the amount of overtime worked and many included express reminders that PBs must be paid for all time worked.[31]

Even among the few anecdotal emails Plaintiffs have plucked from the masses, Plaintiffs omit the critical part of the messages that confirm that all time worked must be accurately recorded and paid, such as the following:



Redacted

Pls' Ex. 80 at CR 8668, Ex. 113 at 8835 (emphasis added)[32]; see also Pls' Ex. 81(CR-11325) (same); Pls' Ex. 79 (CR198143-44) (stating ████████████ Redacted ████████████

████████████████████████; Pls' Ex. 112 ████████ Redacted ████████

████████████████; Pls' Ex 67 & 86 ████████ Redacted ████████[33]

---

[31] *See also Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, -- F.R.D. --, 2014 WL 1452048, at *7 (E.D.N.Y. Apr. 15, 2014) (Plaintiffs must "put forth sufficient **admissible** evidence—in the form of 'affidavits, documents, or testimony'—to show that Rule 23's requirements have been met.") (emphasis in original).  Citibank objects to the admissibility of inadmissible hearsay or statements with no foundation that cannot be used to support Plaintiffs' evidentiary burden.  *See, e.g.,* Pls' Brief p. 11-12, 14, 16, Ex. 52, Nessler Dep. 246;  Pls' Ex. 42, Foley Dep. 251, 200; Pls' Ex 53, Kosiba Dep. 195-96; Pls' Ex. 47, Muniz Dep. 141; Pls' Ex. 36, Steffensen Dep. 161-64, 171; Pls' Ex. 32, Winfield Dep. 189; Pls' Ex. 41, Peragine Dep. 164, 131; Pls' Ex. 40, Adler Dep. 41-42; Pls' Ex. 9, Schornstein Dep. 134-35.

[32]  This warning was also on the second page of the email at Pls' Ex. 112 (CR-8826) that Plaintiffs excluded from the exhibit.  Reiss Decl. ¶ 6 & Ex. 3.

[33] ████████████ Redacted ████████████

████████████████████████

Plaintiffs also take out of context a portion of an agenda from Jean Desjardin-Raposa, a Branch Manager in New York.  Although the agenda states that "[i]f you have OT that is not approved, you will not be paid for it," in context, the rest of that paragraph makes clear that if they worked beyond their scheduled shift one day without approval, she would ask them to adjust their remaining hours for the week, so that the total hours they worked would be forty or less and no overtime pay would be due.  Pls' Ex. 110 at 7651 (stating that if they have OT they should see her "to work out the rest of the weeks hours"); *see also* Desjardin Decl. ¶ 6 (Dkt. No. 67-3).[34]  Moreover, Plaintiffs again fail to quote the portion of that same memo that appears just two sentences earlier, which explains:  "**Falsifying timesheets can lead to termination.  Make sure you are entering the correct times that you come in, break for lunch, and leave for the day.**"  *Id.* at 7651. (emphasis added).  As Desjardin testified, she had just taken over a branch where a number of employees had performance issues, and her goal was to make it clear that if they stayed beyond their scheduled shift, they had to make productive use of their time, **but her policy was that all PBs were paid for all time worked regardless of preapproval**.  Desjardin Decl. ¶¶ 3-8 (Dkt. No. 67-3).

Similarly, Plaintiffs rely heavily on the claim that "managers set impossible standards for pre-approval [of overtime], for instance, requiring seventy-two hours advance notice and pre-approval for emergency overtime."  Pls' Br. 13, 29.  In support of this supposedly common requirement applicable to the classes they seek to certify in NY, IL, and DC Plaintiff cite again to a single email by a manager in California.  Pls' Br. 13 n.68 (citing Pls' Ex. 111).  Class members in NY, IL, and DC, however, testified that their manager had no pre-approval requirement at all.[35]

---

████████████████ Redacted ████████████████ Deloney Dep. 136.  None of the putative class representatives even was employed at the time this email was sent.

[34]  A policy requiring pre-approval of overtime is completely lawful.  *See Newton*, 47 F.3d at 749 (reversing judgment for plaintiff where plaintiff was told to obtain preapproval for overtime, but instead worked unauthorized overtime and turned in timesheets that did not include overtime).

[35]  *See, e.g.*, Viteri Decl. (NY) ¶¶ 12-13 (Dkt. No. 46-36) (no need for pre-approval of overtime); Cardenas Decl. (IL) ¶ 5; Herrell Decl. (DC) ¶ 9; *see also* Steffensen Dep. 144.

Plaintiffs' claim of an extreme focus on overtime is belied by the fact that Citibank policies and practices provided for PBs to be paid overtime even when not required by law.  For example, in calculating overtime pay, up until 2013, Citibank counted planned and paid days off as hours worked, and paid overtime if the total, including the paid days off, exceeded forty.[36]  Sorrells Decl. ¶ 5, Ex. C, p. 24, 27, Ex. B p. 27, 30, Ex. A p. 32 (Dkt. No. 180-56).

None of this anecdotal evidence (of lawful activity) is sufficient to establish commonality in any of the three putative classes.  *Fernandez*, 2013 WL 4540521, at *5 ("Limited, anecdotal evidence concerning a de facto compensation policy is insufficient to establish commonality.").

### 4.    Citibank Investigated And Remediated Allegations Of Off-the-Clock Work.

Plaintiffs claim that Citibank knew that PBs worked unpaid overtime "but did not address the problem."  Pls' Br. 17.  The examples Plaintiffs rely upon, however, demonstrate just the opposite. In June 2009, Branch Manager Diane Bissu-Oumadatt at Richmond Hill, NY uncovered that certain employees in the branch purportedly had not been paid for overtime hours worked under the prior manager.  Henderson Decl. ¶¶ 4-5 (Dkt. No. 67- 1).  She promptly reported these allegations and vowed that "[t]his [failure to record all time worked] will cease immediately and will not occur in the future."  Pls' Ex. 124.  Deborah Henderson, an HR professional, interviewed each PB involved and asked them to estimate how many hours they had worked without being paid.  Henderson Decl. ¶ 7 (Dkt. No 67-1).  Citibank paid each of the PBs the highest number of hours estimated by any of them – 300 hours of overtime.  *Id.* ¶ 9.  Because the prior manager was no longer employed by Citibank, no discipline was possible.  *Id.* ¶ 11.

Similarly, when it came to light that individuals at the Montague Street branch may have been under-reporting their time under a prior branch manager, Employee Relations thoroughly

---

[36]  *See* DOL Opinion Letter, 1986 DOLWH LEXIS 79, *3-4 (May 30, 1986) ("FLSA does not require that vacation hours be counted in determining the hours that an employee has actually worked for the purpose of determining overtime pay under the standards discussed above.").

investigated, including interviewing all the employees (including Opt-In Schornstein) to see if they believed they had worked hours they had not recorded, and if so, how many.  Droz Decl. ¶¶ 3-5.  Each employee was paid fully for all the overtime hours they estimated they worked, Citibank paid over $[Redacted] in back overtime to five individuals, and Schornstein was paid almost $[Redacted] for [Redacted] hours of overtime.  *Id.* at ¶ 5.  Schornstein acknowledged in writing that this was "in full satisfaction of all the overtime compensation owed to me for this Period [from January 1, 2008 until March 31, 2010] and I do not have any other claims against Citibank for overtime compensation," and she further confirmed in her deposition that this amount paid her for all time worked.  Schornstein Dep. (NY) 183, 186 & Ex. 15 (Dkt. No. 180-81).  The examples at Richmond Hill and Montague Street reflect that when allegations of off-the-clock worked are raised, they are promptly investigated and remediated.

Plaintiffs also cite to testimony from Nessler and Moline (neither of whom worked in NY, IL, or DC) claiming that both complained to HR that their timesheets were being altered to remove overtime and nothing happened.  Pls' Br. at 17.  In fact, Moline did not allege that she reported anything about her manager altering her time to HR.  Rather, she claims she told HR that her manager Daniel Plazola got mad at her when she worked too much overtime.  Moline Dep. 162-65.  She testified that HR told her in response that she had to record her overtime accurately.  Pls' Ex. 54 at 164.  Plazola further testified that on instances where he saw Moline working late at the branch without his approval, if he did not see this time on her timesheet, he specifically instructed her to correct her timesheet to add the additional time that she was working.  Plazola Decl. ¶ 6 (Dkt. No. 180-53).

As for Nessler, the only record of a complaint by her to the employee hotline reflects that she did not report that her timesheets were being altered; rather, she merely asked about the policy on time off and floater holidays, and ER reviewed the policy with her.  Green Decl. ¶¶ 4-6.

23

**5.    Computer Audit Logs And Alarm Records Do Not Show Actual Time
Worked.**

Plaintiffs claim that "[a]ctual time worked by PBs was captured by Citibank's computer

systems," referring to the "audit logs." Pls' Br. 16. In fact, audit logs are neither proof of time

worked, nor are they evidence that managers had actual knowledge of unpaid overtime, and they

certainly are not "common proof." Audit logs are reports that contain a log of teller assignments and

certain other audited teller transactions, but also include certain computer login/logout times for

branch personnel. Bodt Dep. 31; *see also id.* at 24, 47, 60, 64, 69. The logs do not reflect when a PB

starts work, or stops work, and numerous PBs testified that they worked before their first login and

after their last logout. Ruiz Dep. (NY) 338-39; Winfield Dep. (DC) 317-18; Carreno Dep. (IL) 203-

04; Nessler Dep. (IL) 174-78; Lindsey Dep. 120-21. The audit logs also do not reflect when or for

how long a PB takes an unpaid lunch break, and do not reflect an accurate logout time where the PB

failed or forgot to log out. Bodt Dep. 68-70. Plaintiffs and Opt-Ins testified consistently that audit

logs are not an accurate reflection of actual time worked. Peragine Dep. 154-55 ("[T]hese records

are a highly inaccurate way of judging when someone is working and when they're not.").[37]

Likewise, the alarm records do not reflect actual hours worked. At most, **if** the PB was

assigned a specific alarm code, and **if** the PB was designated to open the branch and disarm the

alarm, or close the branch and arm the alarm, then there may be a record of the time they did so.

However, not all PBs had a specific alarm code assigned to them such that they could be identified –

it would be up to their branch manager. Pls' Ex. 120, Wolter Dep. 44. Even for those PBs that did

have such unique code, they could give their code to other employees, and the information would be

---

[37] *See, e.g.,* Adler Dep. (NY) 148-49, 152 (noting that he didn't log out of the computer to go to lunch, and always left computers on at the end of the day, that the audit log of his branch did not accurately reflect the times he was working, and that the timesheets, not audit logs, were used to keep track of his time); Hurler Dep. (NY) 241 (agreeing that computer log in and log out records may not reflect all the time that he worked on a given day); Foley Dep. 182 ("audit log report does not accurately reflect all [her] hours worked"); Kenney Dep. 249-50, 265 (audit log report is not accurate as to all time worked; did not use computer logging in and logging out as a means to keep track of the hours that he worked; NATA was the only means used to keep track of his time).

only sporadic, since responsibility for arming or disarming the alarm rotated among branch employees.  Wolter Dep. 43-44.  Moreover, a PB would not open and close the branch, so the alarm record would only show either disarming or arming the alarm, it would not show their start and stop work times at the beginning and end of the day, or for their unpaid lunch break.  As with the audit logs, PBs testified that these are not accurate records of hours worked.  *See* Jeudy Dep. 144-145, 149-50 (NATA entries more accurate than alarm records), Lindsey Dep. 139:8-16 (same).

Confirming that the audit logs and alarm records are not accurate records of hours worked, despite these records, none of the Plaintiffs or Opt-Ins could identify the dates and times they allegedly worked off-the-clock.  Linthorst 2014 Decl. ¶ 13 & Exs. 1-37 (Dkt. No. 180).  Moreover, even if the day-by-day system hits for one PB established anything for that PB, which they do not, they would not establish anything for anyone else.  These reports are the opposite of "common proof."  For these reasons, numerous courts have held that computer login/logout records do not satisfy plaintiff's burden under Rule 23.  *See, e.g., In re Bank of Am.*, 286 F.R.D. at 585-86, 588 (denying Rule 23 class certification to class of personal bankers and other bank branch employees; holding that expert analysis comparing computer records reflecting bank employee's transactions with their time records was insufficient "common evidence" of off-the-clock work, as this analysis was "substantially flawed" in that it failed to account for the fact that employees, who entered their own time worked, may have voluntarily rounded their time); *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 534-36 (C.D. Cal. 2011) (denying Rule 23 class certification, and holding that computer logs were not common evidence establishing off-the-clock work because "some putative class members have stated that they logged into their computers upon arriving at work but then spent time eating breakfast or socializing with friends" before beginning working, which would make the time non-compensable, while others testified that they rounded their time, which would create further individualized inquiries that could not be resolved by the computer records alone); *see also Zivali,*

25

784 F. Supp. 2d at 464-65 & n.12, 16 & 33 (decertifying collective action despite purportedly "common" records reflecting off-duty phone calls and text messages as well as purportedly "common" records reflecting any management edits to employees' time).  The same is true here, as many Plaintiffs and Opt-ins testified that they would login and then get a cup of coffee or go to the break room,[38] and others would perform work while not logged in to the computer at all,[39] while still others testified that they rounded their time on their timesheets.[40]

Courts likewise decline to infer employer knowledge of off-the-clock work based on records outside the employer's timekeeping process.  Courts have "expressly declined to place the onus on employers to ferret out work that is not reported under its reasonable procedures." *Hinterberger*, 2014 WL 1278919, at *23.  The mere fact that managers may have had access to non-payroll records (such as computer records) that could have alerted them that employees were not following the employer's reasonable time reporting procedures is not sufficient to establish constructive knowledge.  *Id.*  Indeed, several courts of appeals have held:

> The FLSA's standard for constructive knowledge in the overtime context is whether the [employer] 'should have known,' not whether it could have known. … It would not be reasonable to require that the [employer] weed through non-payroll … records to determine whether or not its employees were working beyond their scheduled hours.  This is particularly true [where the employer] has an established procedure for overtime claims that Plaintiffs regularly used.

*White,* 699 F. 3d at 874 (quoting *Hertz v. Woodbury Cnty.*, 566 F.3d 775, 781-82 (8th Cir. 2009) (employer access to dispatch records did not impute knowledge of uncompensated overtime)); *see also Newton*, 47 F.3d at 749 (employer access to non-payroll records with uncompensated overtime

---

[38]  Williams Dep. (NY) 126-29 (admitted that audit log records do not accurately reflect the time she began working because due to bus schedule, she arrived at branch a half hour early, logged onto her computer upon arrival, and then went to the break room to drink her coffee and eat her breakfast while she waited for her shift to begin).

[39]  Nessler Dep. (IL) at 199-200 (stating that audit logs would not have accurately reflected her time worked, for example, during the month she was in training she never logged in or out of her computer); Schornstein Dep. (NY) at 149-51 (stating that she could have worked beyond the computer sign-off).

[40]  Kenney Dep. 193-95 (sometimes rounded his time, which could explain why alarm record shows him arming alarm before the end work time he entered on his timesheet).

hours did not impute knowledge of uncompensated overtime); *Boelk v. AT&T Teleholdings, Inc*., 2013 WL 3777251 (W.D. Wis. July 19, 2013) (granting summary judgment for employer and rejecting argument that defendant could have used its GPS system to track employees' time worked).

Plaintiffs also claim that audit logs *were* used to check PBs' time.  Pls' Br. 29-30, n.99.  In support they cite *one* instance where a manager at Richmond Hill asked her assistant to do a comparison when she first started at a new branch (as discussed *supra*), and testimony of Siobhan Bodt, Citibank's Rule 30(b)(6) witness on audit logs, who said that it was physically possible to manually compare audit logs and timesheets of an individual.  Bodt testified, however, that Citibank managers are *not* supposed to spend their time attempting to compare timesheets of each employee with their audit logs and she never testified that any differences would be evidence of actual time worked,.  Bodt Dep. 62 (there is currently no policy of comparing audit logs and time sheets).[41]

The audit logs and alarm record do not reflect actual time worked, and are not common proof by which the claims of the putative class representatives could adjudicate the claims of the absent class members *in abstencia* consistent with Due Process.[42]

---

[41]  Elsewhere, Plaintiffs also cite to the inadmissible hearsay deposition testimony of opt-in Adler (Pls' Br. at 17 n. 89), who said he thought that "compliance" used audit logs to check the accuracy of PB timesheets, but agreed that he did not have any firsthand knowledge of that, and did not remember who told him about it (Adler Dep. (NY) 41-42), and to the testimony of Schornstein that she thought perhaps the audit logs "was for the ops to keep track of us.  If they were.  I don't know if they were."  Schornstein Dep. 134-35.

[42]  Similarly, Plaintiffs' claim that some managers altered the time records of some PBs does not provide any basis for certification.  Class representative Ruiz and many putative class members testified that their managers never changed their time entries and they were paid for all time worked.  *See* Decert. Br. (Dkt. No. 179) p. 25 and *supra*  n.2.  Moreover, managers dispute these claims and testified that any changes were to correct inaccuracies by the PB.  *See, e.g.*, Alicea Decl. ¶ 7 ("I never made changes to Mr. Carrena's time entries to remove overtime; the only time I may have changed his time entries would have been to correct an inaccurate time entry."); Nguyen Decl. ¶ 5 ("The only time I instructed Mr. Massey to change his time card was when it was inaccurate."); *see also* Massey Dep. 196 (there were times when he made legitimate mistakes on his timesheet and his manager sent it back to him to correct the mistakes); *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 310-11 (E.D.N.Y. 2013) (granting decertification because "many manual deletions and alterations can occur for innocuous reasons" and "Defendants' right to proffer innocent explanations for modified time entries, whether through other record evidence or testimony, will almost inevitably result in mini-trials on each instance of alleged time-shaving."); *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *1-3 (D. Nev. Dec. 1, 2006) (denying certification despite evidence that some employee time records were modified to reduce the amount of recorded time because "[w]ith respect to the time shaving allegations, defendant would be entitled to show that any changes to time records were made for appropriate reasons such as legitimate errors made by employees or supervisors").

6.      **Plaintiffs' Cases Are Distinguishable and Do Not Support A Finding of Commonality In This Case.**

The examples of post-*Wal-Mart* Rule 23 class certification in wage and hour cases cited by Plaintiff are all distinguishable and not persuasive. *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611 (S.D.N.Y. 2012) (approval of a *settlement* class that was sought and agreed to by both parties); *Youngblood v. Family Dollar Stores, Inc.*, 2011 WL 4597555 (S.D.N.Y. Oct. 4, 2011) (case involving a purportedly illegal policy of misclassifying store managers, which is of questionable persuasive value after *Cuevas*); *Jackson v. Bloomberg, L.P.*, -- F.R.D. --, 2014 WL 1088001, *2, *8 (S.D.N.Y Mar. 19, 2014) (case involved question of whether plaintiffs were entitled to pay for specific preliminary/postliminary activities before logging in and after their shift, or whether they were covered by administrative exemption); *Jacks v. Directsat USA, LLC*, 2012 WL 2374444, *1, *4 (N.D. Ill. June 19, 2012) (case seeking compensation for travel time and preliminary/ postliminary tasks that they were required to do at home by their employer's written policy and official policy was that these tasks were uncompensated). In addition, the pre-*Wal-Mart* case on commonality cited from this district is similarly distinguishable. *Espinoza v. 953 Assocs., LLC*, 280 F.R.D. 113, 120, 126 (S.D.N.Y. 2011) (case involving class at a single restaurant location claiming that there was an illegal one-hour auto-deduct policy for lunch even if the employee did not clock out and that all servers had to clock out before spending time on uncompensated postliminary activities).[43]

Plaintiffs also argue that the certification of a California class of PBs in *Davis* is evidence that certification of NY, IL, and DC classes is proper here. *Davis* was a state court action governed

---

[43]   The court in *Espinoza* cited *Velez v. Majik Cleaning Servs., Inc.*, 2005 WL 106895, at *1 (S.D.N.Y. Jan. 19, 2005), in which the motion to certify *was unopposed* and granted for liability purposes only. Nor are the cases Plaintiffs cite from other districts persuasive. *See, e.g., Whitlock v. FSL Mgmt.*, 2012 WL 3274973, at *6-8 (W.D. Ky. Aug. 10, 2012) (case where there were only three nightclubs at issue, and all three were controlled by the same Director of Operations, and the allegations involved an illegal mandatory tip pool and that the Director was requiring class members to participate in specific unpaid promotion activities); *Jimenez v. Allstate Ins. Co.*, 2012 WL 1366052, at *4 (C.D. Cal. Apr. 18, 2012) (case where plaintiff claims adjustors did not keep time sheet or punch time clocks, but where their *managers* were the ones responsible for preparing time records, the default records were set to 8 hours a day 40 hours a week, and policy was that changes to the default times were not made without the claims adjustor's request even if the manager was aware of additional time worked).

by state court procedure, which languished for almost five years until it was about to be forced to trial under California's five-year rule.  Reiss Decl. ¶¶ 2-3.  Less than six weeks before trial, the court rushed out a short decision certifying a class under state law.  *Id.* at ¶¶ 3-4.  The certification order contains only three paragraphs of discussion and lacks the "rigorous analysis" required by the Supreme Court under Rule 23.  *Id.* at ¶ 4 & Ex. 2.  The decision had the foreseeable effect of causing a settlement.  *Id.* at ¶ 5.  Nothing in the *Davis* order supports certification under Rule 23 based on the record in this case.

Finally, the fact that other lawsuits have been filed against Citibank – only *Davis* involved PBs and none involved any determination on the merits – is not sufficient to warrant certification. *See, e.g., Eng-Hatcher*, 2009 WL 7311383, at *3 n. 4 (denying certification where the plaintiff cited six other lawsuits against Sprint with similar off-the-clock allegations as "these citations do not add to the showing required here for certification"); *Hinojos*, 2006 WL 3712944, at *3 (denying conditional certification where plaintiffs "rely heavily on three actions from other districts where a few Home Depot employees have alleged that they worked off the clock or that they had their time improperly reduced"; such "complaints do not suggest a common nationwide practice").

For all of the foregoing reasons, Plaintiffs have failed their burden of demonstrating commonality and typicality for each of the putative NY, IL, and DC classes.

**D.    Ruiz, Winfield, And Muniz Are Not Adequate Class Representatives.**

An adequacy determination under Fed. R. Civ. P. 23(a)(4) includes assessing the credibility of the proposed class representatives and whether there are any potential conflicts of interest between them and proposed class members.  *See, e.g., Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949).  Where a class representative's credibility is significantly vulnerable to attack, they are not adequate representatives.  *Kline v. Wolf*, 702 F.2d 400, 402-03 (2d Cir. 1983).  Ruiz, Winfield, and Muniz are not adequate representatives.

Ruiz is not an adequate class representative because she is likely to lose her claim based on her admissions cited above.  *See, e.g., In re Cmty. Bank of N. Va.*, 622 F.3d 275, 294 (3d Cir. 2010) (reversing class certification due to potential inadequacy of class representatives because "named plaintiffs may be inadequate representatives if their claims are extremely weak as compared to the rest of the class.").

Winfield is not an adequate representative because he has significant credibility and character issues.  Winfield gave wildly inconsistent testimony, testifying at one point that it was physically impossible to submit more than 40 hours in a workweek in the timekeeping system, and that he never once was paid overtime, even though he submitted and was paid for overtime in over 42% of his paychecks.  Winfield Dep. 221-23; Hammond 2011 Decl. ¶ 11 (Dkt. No. 46-13).  In addition, although Winfield had little success in generating sales for Citibank, he was prolific in generating complaints from female co-workers and customers about his comments and conduct.  Winfield Dep. 72-73, 284-88 & Ex. 11; Anwar Decl. ¶¶ 4, 7, 9 (Dkt. No. 46-14).

Muniz is not an adequate representative as she also has significant credibility and character issues.  Although Muniz testified she gave up submitting overtime after being reprimanded by her manager for having done so (Muniz Dep. 48-49), her contemporaneous time and payroll records actually reflect that she continued submitting and being paid for overtime up to and including her final month of work in April 2010.  Hammond 2011 Decl. ¶ 8 & Ex. A (Dkt. No. 46-13).  Muniz's employment was terminated for forging her husband's signature on a check from a closed account that she attempted to deposit into her overdrawn Citibank account.  Muniz Dep. 166-67, 171-72.

### E.     Plaintiffs Have Failed To Prove That Common Issues Will Predominate Over Individual Issues Under Rule 23(b)(3).

To certify a class under Fed. R. Civ. P. 23(b)(3), Plaintiffs must prove by a preponderance of the evidence that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy."  "Rule 23(b)(3)'s predominance

criterion is even more demanding than Rule 23(a)," requiring the court to take a "close look" at

"whether common questions predominate over individual ones."  *Comcast,* 133 S. Ct. at 1432

(quotation omitted); *see also RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013) (vacating a Seventh

Circuit decision that had affirmed Rule 23 certification of overtime claims in light of *Comcast*).

　　　In an off-the-clock case alleging that restrictions on overtime made it impossible to meet

sales goals, predominance is not met where "determination of liability turns on a highly

individualized, employee-by-employee analysis of what they were told by management and how any

time-recording practices were applied" which is the case where plaintiffs "sometimes received

overtime pay, but sometimes did not."  *Fernandez,* 2013 WL 4540521, at *14; *see also Burkhart-

Deal*, 2010 WL 457122, at*4-5 (denying Rule 23 certification because "[c]onflict between sales

quotas and a policy of discouraging overtime ... does not necessarily raise a predominant issue

appropriate for class treatment").[44]

　　　Here, Citibank pays millions of dollars in overtime to PBs every year, all Plaintiffs and

discovery Opt-Ins were paid overtime, and numerous putative class members testified that they were

paid for *all* time worked, including overtime.  *See supra* n.2.  Plaintiffs and Opt-Ins further testified

that they were paid for all time worked, including overtime, at some branches but not others, or

under some managers but not others for a number of different reasons, belying any claim of a

consistent policy or practice, and precluding a finding of predominance.  *See, e.g.*, Williams Dep.

---

[44] The cases cited by Plaintiffs are not to the contrary.  The Court in *Romero*, 2012 WL 1514810, at *19, ruled that the plaintiffs did *not* meet the predominance standard and *denied* class certification.  Nor do Plaintiffs' cites to *La Fleur v. Dollar Tree Stores, Inc.*, 2014 WL 934379 (E.D. Va. Mar. 7, 2014), or *Reich v. S. N.E. Telecomm'ns Corp.*, 121 F.3d 58 (2d Cir. 1997), aid their cause.  *La Fleur* said representative testimony could be appropriate where it was impossible for employees to enter their time accurately in the timekeeping system and there was no way for them to report their time worked off the clock.  *La Fleur*, 2014 WL 934379, at *7.  *Reich* involved a uniform policy of requiring workers remain on site during their lunch break to provide security but not paying for that time, which defendant did not dispute and thus involved "an admitted policy of the employer that was consistently applied" and, as to damages, "the periods at issue were the employees' lunch hours which are predictable daily-recurring periods of uniform and predetermined duration."  *Reich*, 121 F.3d at 63, 68.

(NY) 150-51, 160-61; 178-79 (made a "personal choice" to work off-the-clock during limited time period until current manager joined branch and instructed her not to work off-the-clock); Burgos Dep. (NY) 183-84 (paid for all time worked from 2008 to 2013 after receiving instruction to record all time); Drago Dep. (NY) 15, 57 (was paid for all time worked from hire in February 2009 through mid-2011; claims he worked off-the-clock only during last six months of employment after transfer to new branch where manager told him to "manage his time to 40 hours"); Winfield Dep. 249 (one manager would not pay overtime but another manager paid overtime because overtime was left to the manager's discretion). *See also* Decert. Br. (Dkt. No. 179) p. 26.

Adjudicating this case will necessarily require highly individualized mini-trials for each class member to determine whether and to what extent he or she worked overtime, whether the overtime work was requested, approved, recorded, and/or paid, whether the PB's manager had knowledge of the allegedly uncompensated work, whether the work was compensable under applicable standards, whether any failure to pay overtime was in good faith or was willful, whether Citibank has any other defense to the claim (such as a release or statute of limitations), and whether the PB can meet his or her burden to provide specific facts establishing when, and for how long, he or she performed the off-the-clock tasks for which she now seeks compensation.

In addition, there can be no predominance where, as here, there is "no class-wide metric for assessing damages." *Fernandez*, 2013 WL 4540521, at *14-15 (denying class certification of overtime claims under Rule 23(b)(3) where "plaintiffs have not come forward with a meaningful approach to gauging damages on a class-wide basis") (citing *Comcast*, 133 S. Ct. at 1433). As in *Fernandez*, "[i]n essence, plaintiffs posit that sometimes they received full and lawful compensation, and sometimes they did not. They suggest no theory as to why these variations in compensation arose, make no concrete representations as to how often they occurred, and propose no class-wide metric for assessing damages." *Id.*

Plaintiffs claim that "[o]vertime is a simple mathematical equation," and that audit logs and alarm records can be compared to time records for purposes of calculating damages. Pls' Br. 31. However, as discussed above, numerous courts have rejected such records as a basis for certification, and even the Plaintiffs concede that "audit logs and alarm records may not capture every minute of unpaid overtime." *Id*. Not one Plaintiff or Opt-In testified that the audit logs or alarm records reflect their start and stop times, and many testified to the contrary. Peragine Dep. 154-55 ("[T]hese records are a highly inaccurate way of judging when someone is working and when they're not."). The fact that damages for any particular PB are not a "simple mathematical equation" is confirmed by the fact that not one class representative, or any other Plaintiff or discovery Opt-In, has been able to identify the dates or amounts of alleged unpaid overtime or calculate damages *for themselves*, claiming it would be "unduly burdensome" to do so. Linthorst 2014 Decl. ¶ 13 & Exs. 1-37 (Dkt. No. 180).

Plaintiffs argue that *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946), stands for the proposition that once an employee proves an FLSA violation by "just and reasonable inference," the burden then shifts to the employer to show the amount of work performed off the clock. But where an employee's time records are inaccurate "solely due to the [employee]'s deliberate failure to accurately report the time she worked," similar to putative class representative Ruiz, *Mt. Clemens* does not apply, and that employee must "provide specific facts establishing when, and for how long, she performed the off-the-clock tasks for which she now seeks compensation." *Joza*, 2010 WL 3619551, at *7 (quotations omitted); *Seever*, 528 F. Supp. 2d at 171 (finding that burden did not shift under *Mt. Clemens* despite the allegation that manager instructed plaintiffs to omit certain time from their timesheets because plaintiffs had the ability to record the time on the timesheet). The failure of a plaintiff to provide such "specific facts" precludes any recovery. *Seever*, 528 F. Supp. 2d at 170-72. As a result, an individual inquiry will be needed with respect to each PB as to whether his or her time records are inaccurate due to his or her failure to accurately report the time worked, like Ruiz,

Peragine, and many other PBs who testified in this case, and, if so, whether he or she can provide the requisite "specific facts" (which Ruiz, Peragine, and every other Plaintiff or Opt-In who testified in this case was unable to do).  *See, e.g.*, Ruiz Dep. 161, 201-05, 252; Peragine Dep. 125-26; Muniz Dep. 152-57; Winfield Dep. 281-82; Linthorst 2014 Decl. ¶ 13 & Exs. 1-37 (Dkt. No. 180).  These damages issues are not just a question of amount – but are an essential element for any liability.

Moreover, even if the burden was shifted to Citibank under *Mt. Clemens*, Citibank still must have the opportunity to offer contrary evidence to negate the inference raised by the PB's evidence. *Seever*, 528 F. Supp. 2d at 171-72 (finding that even if the burden shifted to the employer under Anderson, the employer met its burden to negate the inference of off-the-clock work).

Plaintiffs offer no tenable proposal for measuring damages on a classwide basis, and Plaintiffs do not identify any subclasses that could cure their failure to meet the Rule 23 elements. *See Comcast*, 133 S. Ct. at 1432-33 (reversing district court's grant of Rule 23 class certification in part because "respondents' [damages] model falls far short of establishing that damages are capable of measurement on a classwide basis" and "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class").  The cases cited by Plaintiffs that *Comcast* does not require differences in damages to defeat Rule 23(b)(3) certification, actually confirm that the plaintiff still must demonstrate a single methodology that can be used to calculate damages.  *See, e.g.*, *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 512-14 (9th Cir. 2013) (undisputed time-rounding policy and exclusion of nondiscretionary bonuses from overtime rates, which if found to be unlawful could be addressed with a specific formula applied to the payroll and overtime records).[45]

---

[45]  The remaining cases cited were toxic tort and product liability cases certified for liability purposes *only*, with damages to proceed in individual trials under Rule 23(c)(4), and noting in such cases that *Comcast* is inapplicable.  *In re Deepwater Horizon*, 739 F.3d 790, 816-17 (5th Cir. 2014); *Butler v. Sears & Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 859-60 (6th Cir. 2013).  As noted, Plaintiffs' failure to provide "specific facts" around their alleged off-the-clock work precludes any recovery at all, so the issues of damages are relevant to the determination of liability as well and cannot be bifurcated. Moreover, there are no similar common issues that predominate on liability in this case, nor have Plaintiffs requested certification for liability only, so such authority is inapposite.

Finally, class certification is not the superior method of adjudication, where plaintiffs can put forward no reasonable trial plan for adjudication of these individualized claims.  *See, e.g.*, *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773-76 (7th Cir. 2013) (in off-the-clock case affirming decertification of Rule 23 classes because "to extrapolate from the experiences of the 42 [proposed representatives] to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work and had been paid the same wage.  No one thinks there was such uniformity," and such a "small, unrepresentative sample" cannot "support an inference about the work time of thousands of workers"); *Burkhart-Deal*, 2010 WL 457122, at *3, *6 (holding there was no superiority in an off-the-clock case alleging restricted overtime and unreasonable sales goals because "where common proof is not available, thus requiring individualized 'mini-trials' courts have found that the 'staggering problems of logistics thus created' make the case unmanageable as a class action"); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 354-55 (N.D. Ill. 2012) (denying certification of off-the-clock meal break claims as unmanageable since plaintiff did not propose a trial plan "to allay the Court's manageability and fairness concerns, especially given the plethora of individualized factual issues in this case").

In addition, putative class members also have an efficient, inexpensive, and effective forum to resolve any individual disputes through state administrative remedies.  *Alix v. Wal-Mart Stores, Inc.*, 868 N.Y.S.2d 372, 376 (3d Dep't 2008) (affirming denial of class certification in part because "[t]he availability of this administrative process, and its focus on the particulars applicable to each employee's claim, make it in many ways a superior method by which the claims made by plaintiffs, and the proposed members of the class, can be pursued against defendant.").

## IV.    CONCLUSION

Because Plaintiffs have failed to meet their burden to satisfy each element as to each of the three classes they seek to certify, Plaintiffs' motion should be denied in its entirety.

Dated: May 30, 2014                     MORGAN, LEWIS & BOCKIUS LLP

                                        /s/ *Stephanie R. Reiss*
                                        Stephanie R. Reiss *(admitted pro hac vice)*
                                        Sam S. Shaulson  (SS 0460)
                                        Thomas A. Linthorst (TL 3345)
                                        101 Park Avenue
                                        New York, NY  10178
                                        212.309.6718
                                        212.309.6001 (fax)
                                        sshaulson@morganlewis.com
                                        tlinthorst@morganlewis.com
                                        sreiss@morganlewis.com

                                        Attorneys for Defendant Citibank, N.A.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification was served via ECF, on this 30th day of May, 2014 as listed below:

Gregory M. Egleston, Esq.
GAINEY MCKENNA & EGLESTON
440 Park Avenue South, 5th Floor
New York, NY  10016

Murielle J. Steven Walsh, Esq.
Star M. Tyner, Esq.
POMERANTZ GROSSMAN HUFFORD
   DAHLSTROM & GROSS LLP
600 Third Avenue, 20th Floor
New York, NY  10016

Timothy J. MacFall, Esq.
RIGRODSKY & LONG, P.A.
825 East Gate Boulevard, Suite 300
Garden City, NY  11530

/s/ Stephanie R. Reiss