Sam S. Shaulson (SS-0460)
sshaulson@morganlewis.com
Thomas A. Linthorst (TL-3345)
tlinthorst@morganlewis.com
Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6718 (Telephone)
(212) 309-6001 (Fax)
Attorneys for Defendant

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIGNA RUIZ, on behalf of herself and all others similarly situated, **:** | |
| **:** | |
| Plaintiff, **:** | **Civ. A. No. 10-cv-5950 (KPF) (RLE)** |
| **:** | |
| v. **:** | |
| **:** | |
| CITIBANK, N.A., **:** | |
| **:** | |
| Defendant **:** | |

| | |
|---|---|
| FREDERICK WINFIELD, on behalf of himself and all others similarly situated, **:** | |
| **:** | |
| Plaintiff, **:** | **Civ. A. No. 10-cv-7304 (KPF) (RLE)** |
| **:** | |
| v. **:** | |
| **:** | |
| CITIBANK, N.A., **:** | |
| **:** | |
| Defendant **:** | |

## REPLY IN SUPPORT OF DEFENDANT'S
## <u>MOTION TO DECERTIFY COLLECTIVE ACTION</u>

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ....................................................................................................... 1

    A.      Plaintiffs' Central Arguments For Certification Are Completely
            Unsupported ........................................................................................... 1

    B.      Plaintiffs Rely Extensively On Evidence Of Lawful Conduct ............................ 3

    C.      Plaintiffs Misstate The Law Applicable To Certification ........................... 6

    D.      Plaintiffs Ignore The Law Applicable To Their Claims ........................... 8

    E.      Plaintiffs' And Opt-Ins' Testimony Varied In Material Ways .............................. 10

    F.      Plaintiffs Offer No Common Evidence To Determine Actual Time Worked ........ 11

    G.      None Of The Alternatives Mentioned By Plaintiffs Is Viable ............................... 15

III.    CONCLUSION ................................................................................................... 15

## TABLE OF AUTHORITIES

CASES                                                                                              PAGE(S)

*Alonso v. Uncle Jack's Steakhouse, Inc.*,
    2011 WL 4389636 (S.D.N.Y. Sept. 21, 2011) ........................................................................7

*Anderson v. Mt. Clemens Pottery*,
    328 U.S. 680 (1946) ......................................................................................................9, 10

*Anglada v. Linens 'N Things, Inc.*,
    2007 WL 1552511 (S.D.N.Y. Apr. 26, 2007) .....................................................................8

*Ayers v. SGS Control Servs., Inc.*,
    2007 WL 646326 (S.D.N.Y. Feb. 27, 2007) .......................................................................7

*Brown v. ScriptPro, LLC*,
    700 F.3d 1222 (10th Cir. 2012) ..................................................................................9, 12

*Chao v. Gotham Registry, Inc.*,
    514 F.3d 280 (2d Cir. 2008) ..........................................................................................3, 8

*Cuevas v. Citizens Fin. Grp., Inc.*,
    526 F. App'x 19 (2d Cir. 2013) ..........................................................................................7

*Cuzco v. Orion Builders Inc.*,
    262 F.R.D. 325 (S.D.N.Y. 2009) ......................................................................................7

*Damassia v. Duane Reade, Inc.*,
    2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006) ......................................................................7

*DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*,
    2014 WL 2534833 (E.D.N.Y. June 5, 2014) ..............................................................6, 7, 9

*Falcon v. Starbucks Corp.*,
    580 F. Supp. 2d 528 (S.D. Tex. 2008) ...............................................................................7

*Fernandez v. Wells Fargo Bank, N.A.*,
    2013 WL 4540521 (S.D.N.Y. Aug. 28, 2013) ..............................................................4, 10

*Hinojos v. Home Depot, Inc.*,
    2006 WL 3712944 (D. Nev. Dec. 1, 2006) ......................................................................14

*Hinterberger v. Catholic Health Sys.*,
    2014 WL 1278919 (W.D.N.Y. Mar. 27, 2014) .........................................................6, 7, 8, 9

*Iglesia-Mendoza v. La Belle Farm, Inc.*,
    239 F.R.D. 363 (S.D.N.Y. 2007) ......................................................................................6

ii

*In re Bank of Am. Wage & Hour Emp. Lit.*,
 286 F.R.D. 572 (D. Kan. 2012) .............................................................................9, 13

*Johnson v. Wave Comm GR LLC*,
 2014 WL 988512 (N.D.N.Y. Mar. 14, 2014) ................................................................7

*Joza v. WW JFK LLC*,
 2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ....................................................3, 9, 12

*Morangelli v. Chemed Corp.*,
 922 F. Supp. 2d 278 (E.D.N.Y. 2013) ................................................................6, 14

*Morano v. Intercont'l Capital Grp., Inc.*,
 2012 WL 2952893 (S.D.N.Y. July 17, 2012) ...........................................................7, 8

*Pefanis v. Westway Diner Inc.*,
 2010 WL 3564426 (S.D.N.Y. Sept. 7, 2010)...............................................................7

*Pryor v. Aerotek Scientific, LLC*,
 278 F.R.D. 516 (C.D. Cal. 2011) ...............................................................................13

*Raniere v. Citigroup Inc.*,
 533 F. App'x 11 (2d Cir. 2013) ..................................................................................15

*Seever v. Carrols Corp.*,
 528 F. Supp. 2d 159 (W.D.N.Y. 2007) .............................................................9, 10, 12

*Seward v. IBM*,
 2012 WL 860363 (S.D.N.Y. Mar. 9, 2012) ..................................................................7

*Williams v. Sup. Ct.*,
 165 Cal. Rptr. 3d 340 (Cal. Ct. App. 2013) .................................................................7

*Wilson v. Nakiva Capital Group, LLC*,
 2014 WL 223211 (S.D. Tex. Jan. 17, 2014) ................................................................7

*Winfield v. Citibank, N.A.*,
 843 F. Supp. 2d 397 (S.D.N.Y. 2012)......................................................................7, 8

*Zivali v. AT&T Mobility, LLC*,
 784 F. Supp. 2d 456 (S.D.N.Y. 2011)..........................................................6, 7, 9, 14

**FEDERAL STATUTES**

29 U.S.C. § 216(b) ............................................................................................................15

**REGULATIONS**

29 C.F.R. § 785.27 ..............................................................................................................5

## I.      INTRODUCTION

Plaintiffs have failed their burden to demonstrate by a preponderance of admissible evidence that they and all of the Opt-Ins are similarly situated.  Plaintiffs do not identify a single element of liability or damages that can be proven for each of the hundreds of Opt-Ins by common proof.  Instead, they ask the Court to maintain certification under a low and erroneous standard, to disregard the consistent line of authority in this Circuit decertifying cases under similar circumstances, to ignore Citibank's evidence, and to trample on the Due Process rights of Citibank and the Opt-Ins.  Because the adjudication of claims in this case would require an individual trial for each Opt-In, the Court should decertify the collective, and dismiss the claims of all Opt-Ins without prejudice.

## II.     ARGUMENT

### A.      Plaintiffs' Central Arguments For Certification Are Completely Unsupported.

Plaintiffs' Motion for Class Certification was premised on a "national 'no overtime' directive."  Pls' Br. 11.  Because that claim was flatly refuted by the payment of millions of dollars of overtime to PBs every year, Plaintiffs have now changed the alleged national policy to a "national directive aimed at drastically reducing overtime."  Pls' Opp. 3.  Their new allegation fares no better because actual payments to PBs show there was no such "drastic reduction."  Plaintiffs rely on testimony from a single California manager that there was a "focus on expense management" "after March 2011" – which focus was on managing expenses generally (as "a normal course of business") and not "drastically reducing" anything, much less PB overtime.  Deloney Dep. 119-120.  Plaintiffs also cite to an August 4, 2011 email stating that "adherence to the staffing model and limiting OT are critical" – but the email also says that "[n]on-revenue producing jobs will be scrutinized" and PBs are a revenue producing job and not among those to be "scrutinized."  Pls' Ex. 70; Deloney Dep. 136.  Not only is this evidence about an alleged directive in 2011 insufficient to bind together a collective action going back to 2009 (much less a class action in New York going back to 2004), but the actual data of

overtime spent for PBs shows that it was not reduced at all, much less "drastically" so.  In fact, after

these supposed directives came down in 2011, overtime paid to PBs *increased* by 9% in 2012, and

increased again *by 80%* in 2013.  Hammond 4.14 Decl. ¶ 4 (Dkt. 180-48).[1]  The purported "national

directive aimed at drastically reducing overtime" simply never happened.[2]

  Plaintiffs also claim that concurrent with the (nonexistent) "directive" to "drastically" reduce

overtime, Citibank "was laying off thousands of employees, including PBs."  Pls' Opp. 5.  But there is

no evidence in the record that a single PB was laid off; at most, a lone California manager testified that

in 2010 headcount in certain positions may have been reduced through attrition, not layoffs, and that

"could have" included PBs.  Deloney Dep. 183.  Plaintiffs do not offer testimony from Plaintiffs or

Opt-Ins that there were fewer PBs in their branch after 2010 due to headcount reductions achieved

through attrition, or that this caused them to work overtime, much less *uncompensated* overtime.

Rather, several Plaintiffs testified that there were *too many* PBs at their branch and this made it more

difficult to meet sales goals because it diluted sales opportunity.  Steffensen Dep. 48, 102-03, 107-09;

Moline Dep. 47-49, 91-92, 170; Foley Dep. 125; Kenney Dep. 151.

  There is no competent evidence that all PBs were required to work overtime, much less

uncompensated overtime, to meet sales goals or otherwise.  There is only the anecdotal testimony of a

small number of Plaintiffs, many with documented time management problems, that they needed to

---

[1]  Plaintiffs accuse Citibank of "conveniently exclud[ing] years from the relevant period, which extends back to 2007."
Notice in this case was sent in 2012, so most of the Opt-Ins have potentially timely claims only back to 2009; only 6
Plaintiffs or Opt-Ins have claims potentially going back to 2007.  Linthorst 6.14 Decl. ¶ 2.  In any event, Citibank has
produced the overtime data going back to 2007 and there was no "drastic" reduction in overtime.  Hammond 6.14 Decl. ¶ 4;
Hammond 4.14 Decl. ¶ 4(Dkt. 180-48).  Moreover, it is Plaintiffs' burden to prove that there was a "drastic" reduction in
overtime, not Citibank's burden to disprove it.  Plaintiffs further suggest that the increase in overtime paid to PBs in 2013
was caused by this lawsuit being filed in 2010.  Pls' Opp. 27.  As with so many of the Plaintiffs' assertions, this one lacks
any evidence in support.  This claim is belied by the fact that overtime increased by 8% in 2009, the year before this case
was filed.  Hammond 6.14 Decl. ¶ 4.  Even if Plaintiffs' suggestion were true, which it is not, it would simply mean that
PBs in 2013 are not similarly situated to those who worked in previous years.

[2]  Plaintiffs' claim of a classwide failure to pay overtime is further belied by the fact that notice of this case was sent to
6,000 PBs and, given the chance to submit a claim with almost no effort, only 436 did so and 156 of those have claims that
are completely time-barred.  Linthorst 4.14 Decl. ¶¶ 2-3 (Dkt. 180).  And many of those who joined the case have little
interest in actually pursuing a claim – more than half of those selected by Citibank to participate in discovery refused to do
so (and refused even to communicate with their counsel).  *Id.* at ¶ 6 (Dkt. 180).

work overtime to meet their sales goals, but even they point to aberrational job duties and circumstances as the cause.  Def's Br. 18-22.[3]  Sales goals varied widely by individual, as did the opportunities to meet them.  *Id.*  Plaintiffs allege only that sales goals "generally" could not be met without working overtime (Pls' Opp. 1), not that it was necessarily so for each PB.  *See* Winfield Dep. 196-97 ("Q.  Was it possible for a personal banker . . . to meet their sales goals and perform all of their duties in 40 hours or less?  A.  Depended on the individual banker.").[4]

The central theories of Plaintiffs' arguments for certification – that PBs necessarily had to work overtime, and that there was a "drastic reduction" in overtime paid at a time when Citibank was laying off PBs – are completely unsupported and refuted by the indisputable record evidence.

**B.      Plaintiffs Rely Extensively On Evidence Of Lawful Conduct.**

In support of their allegation that a collective action can be maintained where facially lawful policies are "implemented in an unlawful manner," Plaintiffs rely on extensive evidence that Citibank's polices were implemented *lawfully*.  Evidence that managers wanted to limit the amount of overtime worked is evidence of lawful conduct.  *Joza v. WW JFK LLC*, 2010 WL 3619551, at *4 (E.D.N.Y. Sept. 10, 2010) ("the concern of any well-managed business enterprise to avoid needless overtime" does not reflect "a workplace culture of hostility toward overtime").  Evidence that managers required pre-approval before working overtime, or disciplined employees who worked overtime without pre-approval, is lawful conduct.  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291 (2d Cir. 2008) (if employer wanted to prevent overtime, it could "discipline nurses who violate the [pre-approval] rule" or "announc[e] a policy that it does not, under any circumstances, employ a

---

[3]  Nor do Plaintiffs and Opt-Ins contend that they worked the same number of hours.  Linthorst 6.14 Decl. ¶ 13, Exs. 26, 31 & 18, Rog. 2 (Dkt. No. 180-26, -31 & -18) (Pendergraph estimated that he worked "1-2 hours of overtime every work week"; Schorenstein estimated between 5-15 hours of overtime a week, and Lewis estimated 8-10 hours per week).

[4]  Plaintiffs claim that "[Opt-In] Williams['] testimony is particularly significant because she is a current employee of Citibank who testified that she had to work more than 40 hours per week to meet her sales goals."  Pls' Opp. 6 n.17.  In fact, Williams testified as follows:  **"Q.  Did you feel that you needed to work more than 40 hours in order to be able to make your sales goals?  A.  No**."  Williams Dep. 84 (emphasis added).

nurse for more than 40 hours in a week").  Evidence that when PBs worked beyond their scheduled

hours one day, managers adjusted their hours for the rest of the week so they did not work overtime is

lawful conduct.  *Fernandez v. Wells Fargo Bank, N.A.*, 2013 WL 4540521, at *7 (S.D.N.Y. Aug. 28,

2013) ("Evidence that defendants endeavored to arrange employees' work schedules to reduce

overtime when possible is not, without more, evidence of a policy to require uncompensated

overtime.").  Evidence that managers used software (Workforce Management) to schedule efficiently

for customer demand, and thereby reduce the need for employees work beyond their schedule, is

evidence of lawful conduct.  Deloney Dep. 92-93, 97-99; Deloney Decl. ¶¶ 2-3 (Dkt. 191-8).  The

record is full of additional evidence of managers implementing Citibank's policies in a lawful

manner,[5] including instructing Plaintiffs and Opt-Ins to record *more* time.[6]

---

[5]  Ex. 135 (CR258695) ▮▮▮REDACTED▮▮▮ Ex.
127 (CR200782) ▮▮▮REDACTED▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Pls' Ex. 79 (CR198143-44) ▮▮▮REDACTED▮▮▮ Ex. 41
Ex. 128 (CR203261) ▮▮▮REDACTED▮▮▮ Ex. 41
(CR203488-90) (Dkt. 180-41) ▮▮▮REDACTED▮▮▮ (bold in original); Ex. 133
(CR258248-49) ▮▮▮REDACTED▮▮▮ Ex. 134(CR258394-95)
▮▮▮REDACTED▮▮▮ Ex. 129
(CR203486) ▮▮▮REDACTED▮▮▮
▮▮▮▮ Ex. 116 (CR173540)("This must be part of your daily routine.  If you do not enter your time daily, you
may not be accurate.  How can you remember what time you **actually** came in, went to lunch and left.  To make sure
you are entering the correct times, please incorporate this into your daily routine."); Ex. 132 (CR251527-28) ▮▮REDACTED▮▮
▮▮▮ Ex. 124 (CR174021) ▮▮▮REDACTED▮▮▮ Ex.
117 (CR173550)("Ed,  You need to make sure that you are entering your time accurately.  You are not imputing your
time of arrival correctly.  You are documenting 8:30 everyday and we know not everyday you arrive here at 8:30"); Ex.
120 (CR173645) ("As required by our policies and guidelines you must enter your time every morning you come in, the
time you take your lunch break (out and back) and the time you leave for the day"); Ex. 115 (CR173533) ("It is very
important that you enter your time daily to ensure it is accurate"); Ex. 118 (CR173562) ▮▮▮REDACTED▮▮▮
▮▮▮ Ex. 121 (CR173650) ▮▮▮REDACTED▮▮▮ Ex. 131
(CR248738) ▮▮▮REDACTED▮▮▮
Ex. 125 (CR194739-41) ▮▮▮REDACTED▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮  see also Pls' Ex. 80 (CR 8668), Ex. 113 (CR8835), Pls' Ex. 81(CR-11325)
(same).

[6]  Ex. 114 (Citi-Winfield 1325)(manager to Shen:  "last Thursday night you worked late with me, but signed out for 5:30.
Please correct for the actual time you left"); Ex. 40 (CR173393) (Dkt. 180-40) ▮▮▮REDACTED▮▮▮

4

Plaintiffs cite to several emails they claim are evidence that "Citibank managers specifically told PBs they had to engage in work activities, but would not be compensated overtime for this work," Pls' Opp. 13.  None of these emails support a claim of unpaid work.  *See* Pls' Ex. 118 (email requesting volunteers to support an annual charity walk in Staten Island benefiting the Leukemia & Lymphoma Society; Citibank is not required to compensate employees who volunteer for such events);[7] Pls' Ex. 115 █████████████ REDACTED █████████████

███████████████████████████████████████████████████████████

██████████████████.[8]  Plaintiffs also cite an email from Opt-In Lindsey's branch manager stating that six of her team members would attend a meeting with no overtime.  Pls' Ex. 116. Plaintiffs fail to mention that the branch manager adjusted the branch schedule so that PBs would be paid for the meeting without *working* overtime, and Lindsey testified *that her manager allowed her to record the time she spent at this meeting*.  Ex. 130 (CR216586); Lindsey Dep. 103-04.[9]

Plaintiffs claim that "Citibank facilitated the manipulation and underreporting" of time by PBs because its timekeeping system allowed managers to change the time entries of subordinates.



█████ REDACTED █████ ;Ex. 122 (CR173772)(manager to Wallace:  "Thank you for completing your time sheet :)  I approved it but changed the time you inputted on Friday 9/10 from 5 to 6pm… this gave you an hour of overtime."); Ex. 119 (CR173583)(manager asking PB to "check that the time card is correct" because it reflected a 2 hour lunch in error; PB corrected and was paid for additional hour).

[7]  *See* Department of Labor Opinion Letter 2006-4 ("employers may encourage their employees to volunteer their services for public or charitable purposes outside of normal working hours without incurring an obligation to treat that time as hours worked so long as participation is optional").

[8]  Plaintiffs' Exhibit 117 ████████████ REDACTED ████████████

██████████ 29 C.F.R. § 785.27 ("Attendance at … meetings … need not be counted as working time" if certain criteria are met); *id.* at § 785.45 (optional time spent by employees making suggestions outside of working hours is not compensable).  In any event, the email makes clear that the ████████ REDACTED ████████ Pls' Ex. 117.

[9]  ███████████████ REDACTED ███████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████ *Id.*

This is absurd.  Citibank's timekeeping system is indisputably lawful and provides no basis for certification.  *DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*, 2014 WL 2534833, at *5; (E.D.N.Y. June 5, 2014) (granting decertification; timekeeping system was lawful even though unpaid meal period was automatically deducted and "only supervisors have the ability to approve overtime and adjust the employee's work hours and pay"); *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 461 (S.D.N.Y. 2011).

Plaintiffs have not demonstrated that Citibank's lawful policies were implemented unlawfully on a uniform or classwide basis.  The evidence of unlawful action consists exclusively of the Opt-Ins' own testimony about their own manager's conduct, which is vigorously disputed.  As such, adjudication of liability will require a determination of whether each manager violated Citibank's lawful policies, and decertification is appropriate.  *DeSilva*, 2014 WL 2534833, at *10; *Hinterberger v. Catholic Health Sys.*, 2014 WL 1278919, at *29-30 (W.D.N.Y. Mar. 27, 2014).

### C.    Plaintiffs Misstate The Law Applicable To Certification.

Plaintiffs rely on cases deciding *conditional* certification, misclassification cases, and cases involving a small number of locations.  Although one judge claimed that misclassification claims by low-paid duck feeders at a poultry processing facility presented "about the most perfect questions for class treatment," *Iglesia-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 372 (S.D.N.Y. 2007), off-the-clock claims like those in this case "often" are not suitable for certification.  *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 306 (E.D.N.Y. 2013) ("Off-the-clock cases can present challenges for class-wide determination that often preclude certification.").

Plaintiffs cite extensively to cases deciding *conditional* certification, including the Court's prior decision in this case.  At the conditional certification stage, however, Plaintiffs had only a "minimal burden" to show that notice should be issued, and the Court considered only Plaintiffs' evidence.  *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 405, 407 & n.6 (S.D.N.Y. 2012).  *See*

*also Damassia v. Duane Reade, Inc.*, 2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006) (deciding *conditional* certification in a misclassification case).  Plaintiffs even rely on a conditional certification decision without disclosing that the court subsequently decertified that case.  Pls' Opp. 28 (citing *Creely v. HCR ManorCare, inc*., 789 F. Supp. 2d 819 (N.D. Ohio 2011)), *but see* 920 F. Supp. 2d 846, 857 (N.D. Ohio 2013) (decertifying collective action where "[t]hese individuals had different experiences and worked under different managers who may have implemented Defendant's policy in different ways").[10]  Plaintiffs also rely on numerous cases that did not involve off-the-clock claims or are easily distinguishable.[11]

The Court should follow the recent in-circuit authority decertifying off-the-clock claims under circumstances similar to this case, including the decisions in *DeSilva*, *Hinterberger*, *Zivali*, *Morano v. Intercont'l Capital Grp., Inc.,* 2012 WL 2952893 (S.D.N.Y. July 17, 2012), and *Seward v. IBM*, 2012 WL 860363 (S.D.N.Y. Mar. 9, 2012).  *See* Def's Br. 15-17.[12]

---

[10]  Similarly, Plaintiffs' reliance on *Wilson v. Nakiva Capital Group, LLC*, 2014 WL 223211 (S.D. Tex. Jan. 17, 2014), is misplaced because the court has since decertified that case.  2014 WL 2534904, at *6 (S.D. Tex. June 4, 2014) (plaintiffs' trial plan "ask[s] the Court to allow the case to proceed as 42 'mini-trials'").

[11]  In addition to the cases distinguished in Citibank's Opposition to Class Certification, *see Johnson v. Wave Comm GR LLC*, 2014 WL 988512, at *4 (N.D.N.Y. Mar. 14, 2014) (denying decertification on overtime claims  where "all of the class members worked out of the same office" and "were subjected to unified policies which violated the FLSA"); *Alonso v. Uncle Jack's Steakhouse, Inc.*, 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011) (denying decertification for claims involving only three restaurants); *Pefanis v. Westway Diner Inc.*, 2010 WL 3564426 (S.D.N.Y. Sept. 7, 2010) (denying decertification for claims at one restaurant); *Cuzco v. Orion Builders Inc.,* 262 F.R.D. 325 (S.D.N.Y. 2009) (granting class certification of New York claims where employees were never paid an overtime premium); *Ayers v. SGS Control Servs., Inc.*, 2007 WL 646326 (S.D.N.Y. Feb. 27, 2007) (denying decertification where claims involved written companywide policies that violated the FLSA); *see also Williams v. Sup. Ct.*, 165 Cal. Rptr. 3d 340, 342-43 (Cal. Ct. App. 2013) (affirming class certification under California rules where employer did not maintain any timekeeping system, but recognizing that "under federal class action rules, differences in method of calculating damages arising from individualized damages may defeat certification of class") (citing *Comcast*); *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tex. 2008) (denying decertification where employer reclassified assistant managers as non-exempt but did not increase labor budgets, and managers' bonuses were based in part on labor hours).

[12]  Plaintiffs ask the Court to disregard declarations by PBs from around the country that they were paid for all time worked, citing exclusively to *conditional* certification decisions.  Pls' Opp. 27-28.  Nothing in these decisions permits the Court to disregard the defendant's evidence on decertification.  *See Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 21 (2d Cir. 2013) (district judge abused discretion by certifying overtime class where it "declined to address all of the evidence before it," specifically declarations submitted by the employer from putative class members; district court must consider and resolve "factual disputes [that] are relevant to the determination whether Cuevas has presented a claim that is capable of classwide resolution"); *see also Anglada v. Linens 'N Things, Inc.*, 2007 WL 1552511, at *7 (S.D.N.Y. Apr. 26, 2007) ("merits-based arguments are best considered by the Court after discovery has been conducted upon a motion for decertification").  These declarations are relevant even if such individuals are not Opt-Ins because they demonstrate

**D.      Plaintiffs Ignore The Law Applicable To Their Claims.**

A uniform line of authority has developed holding that where the employer's overtime policies establish a reasonable means for the employee to report his or her time, there is no liability to an employee that fails to report her time.  *See, e.g.*, *Hinterberger*, 2014 WL 1278919, at *23 ("Several Circuit Courts, in addition to the Sixth Circuit in *White,* have . . . expressly declined to place the onus on employers to ferret out work that is not reported under its reasonable procedures."); Def's Br. n.6.  Although an employee's failure to use the timekeeping system may not defeat a claim where the supervisor caused the employee's failure, or otherwise knew or should have known of the work, that simply begs the questions of why the employee failed to record his or her time, and whether the supervisor had knowledge of the uncompensated work.  In such circumstances, courts look at (a) whether and to what extent the employee recorded and was paid for overtime; (b) whether any manager asked the employee to work any of the allegedly unpaid overtime hours; (c) whether any manager instructed or encouraged the employee to falsely report the time; (d) whether the employee took steps to prevent the manager from learning about the overtime; and (e) whether the employee complained about the off-the-clock work.  *See* Def's Br. 12-14; *Hinterberger*, 2014 WL 1278919, at *14 ("The relevant knowledge is not 'I know the employee was working,' but 'I know the employee was working and not reporting his time.'") (quotation omitted); *Morano*, 2012 WL 2952893, at *6-9 (decertifying collective action in part because "[t]he inquiry for the plaintiffs who turned in timesheets showing overtime work is different from the inquiry for plaintiffs who turned in timesheets that did not reflect the overtime they now claim to have worked."); *cf. Chao*, 514 F.3d at 287 (employer had actual knowledge of overtime because hours

---

the lack of any uniform policy or practice, and show that any Opt-In who did not participate in discovery could testify that they too were paid for all time worked, or Citibank may be able to establish that fact through manager testimony or other evidence.  *Winfield*, 843 F. Supp. 2d at 407 n.6.  Plaintiffs have now had ample opportunity to depose such individuals but chose not to do so.  Moreover, Judge Ellis's Order does not preclude the Court's consideration of this evidence because it was limited to discovery from the Opt-Ins, and was "WITHOUT PREJUDICE to the parties' rights to seek discovery from parties and individuals other than the Opt-In Plaintiffs."  Dkt. 123, p. 2.

were recorded on the time sheets).  These are not "fabricated" elements as Plaintiffs claim, but the

facts on which courts repeatedly have relied to adjudicate off-the-clock claims where the employer

has a lawful timekeeping procedure that allows for payment of all time worked.  Plaintiffs offer no

basis on which to adjudicate these issues on a classwide basis and, under similar circumstances,

numerous courts in this Circuit have decertified collective actions.  *See, e.g.*, *DeSilva*, 2014 WL

2534833, at *8; *Hinterberger*, 2014 WL 1278919, at *20-21, 29-30; *Zivali*, 784 F. Supp. 2d at 459-

69; *cf. In re Bank of Am. Wage & Hour Emp. Lit.*, 286 F.R.D. 572, 588-89 (D. Kan. 2012) (denying

certification; "Even assuming that the Bank had an unofficial policy requiring off-the-clock work,

the Bank is only liable to those putative class members who were subjected to the policy.  And no

common proof exists that might demonstrate that each class member was subject to the policy").[13]

        Similarly, recognizing that they have not met the standard for identifying "specific facts

establishing when, and for how long, [they] performed the off-the-clock tasks for which [they] now

seek[] compensation,"[14] Plaintiffs argue that such a standard will not apply under *Anderson v. Mt.

Clemens Pottery*, 328 U.S. 680, 687 (1946), because "branch managers instructed PBs not to record

overtime, going as far as altering time records to show only 40 hours."  Pls' Opp. 32.  But putative

class representative Ruiz and many Opt-Ins admitted that their branch manager *did not* instruct them

not to record overtime, and *did not* alter their time records.  Ruiz Dep. 160, 222; Ash Dep. at 121-23,

126; Kosiba Dep. 158-59, 169-70; Lewis Dep. 95; Peragine Dep. 109-112.  Thus, *Anderson* will not

apply to such individuals and they are not similarly situated to those who might be able to establish

that the *Anderson* standard applies to them.  *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1230-31 (10th

Cir. Nov. 27, 2012) (declining to "relax the plaintiff's burden to show the amount of overtime

---

[13]  Plaintiffs attempt to distinguish *Joza* as "a case where there was **no** evidence that the employer played any role in the plaintiff's failure to record overtime." Pls' Opp. 31 (bold in original).  In fact, Joza made the same arguments Ruiz and many others make in this case, but the court found "that the snippets of dialogue plaintiff claims created a culture hostile to legitimate overtime claims are no more than customary management admonitions to supervisors to watch and maintain control of work assignments in order to avoid unnecessary overtime."  *Joza*, 2010 WL 3619551, at *2.

[14]  *Joza*, 2010 WL 3619551, at *7 (quoting *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 169-70 (W.D.N.Y. 2007)).

worked" employee failed "to comply with [employer's] timekeeping system").  Even as to those who claim their manager instructed them not to record overtime or altered their records, Citibank managers dispute those allegations, Def's Br. 29, and a resolution of the dispute between the PB and the manager would not resolve the issue for any other PB.[15]  And even if the burden was shifted to Citibank under *Anderson* as to any PB, Citibank still must have the opportunity to offer contrary evidence to negate the inference raised by the PB's evidence.  *Seever*, 528 F. Supp. 2d at 171-72.

### E.   Plaintiffs' And Opt-Ins' Testimony Varied In Material Ways.

It is unremarkable that Plaintiffs can cull a few lines of self-serving testimony from Opt-Ins who tailored their testimony to fit their counsel's desired narrative.[16]  All of the testimony is limited to interactions with local managers, and much of the testimony is absurd on its face.  Winfield claims he was told "I'm not going to pay you over 40 hours.  Simple as that."  Winfield Dep. 189.  Obviously, it was not as "simple as that" because Winfield was paid overtime in 42% of his paychecks.  Hammond Decl. ¶ 11 (Dkt. 46-13).  Opt-In Drago claims he was a "ghost" when he worked overtime because he was not allowed to record it (Pls' Opp. 12), except that he was not a "ghost" in the 45% of his pay periods for which he recorded and was paid overtime.  Hammond 4.14 Decl. ¶ 12 (Dkt. 180-48).[17]  *See Fernandez*, 2013 WL 4540521, at *15 ("[P]laintiffs posit that sometimes they received full and lawful compensation, and sometimes they did not.  They suggest no theory as to why these variations in compensation arose, make no concrete representations as to how often they occurred, and propose no class-wide metric for assessing damages.").

Not cited by Plaintiffs, however, are the admissions by Plaintiffs and Opt-Ins on cross-examination that demonstrate material differences.  Some testified that they were never told to work

---

[15]  Contrary to Plaintiffs' claims, Pls' Opp. 20, the Wong and Nguyen declarations could not be more clear that those managers paid PBs for all time worked.  Wong Decl. ¶ 4 (Dkt. 180-58); Nguyen Decl. ¶ 3 (Dkt. 180-52).

[16]  The Court should strike Plaintiffs' 15-page "Supplemental Testimony Chart" as a violation of the page limitations.

[17]  Tellingly, despite devoting five pages of their brief to a chart of allegedly similar testimony by Plaintiffs and Opt-Ins, Plaintiffs did not include any testimony in the chart from the putative NY class representative Ruiz.  Pls' Opp. 6-11.

off-the-clock, while others testified that their manager told them not to record their time. Some testified that they were paid for all time they recorded, while others testified that their managers altered their time records. Some testified that they never informed their manager or complained about uncompensated work, while others allege that they did complain. Some testified that their managers would have no knowledge of their uncompensated work, and some admitted hiding the alleged work, while others claim their managers did know. Some testified that they could not recall ever working uncompensated overtime, and many PBs testified that they were paid for all time worked. *See* Def's Br. 22-28. Not only does this divergent testimony on material elements of liability establish that the Plaintiffs and Opt-Ins who participated in discovery are not similarly situated to each other, but it provides no basis to adjudicate the elements of liability and damages for the hundreds of Opt-Ins who were not subject to discovery. Would absent Opt-In John Doe testify like Ruiz that he never was told not to record all time worked, he was paid for all time he recorded, he took active steps to hide his alleged off-the-clock work from his manager, and it would have been "almost impossible" for his manager to know what hours he actually worked? Or would John Doe testify like Muniz that he recorded his work time and his manager removed the time? Or would Doe testify – or could Citibank establish through manager testimony or documents specific to Mr. Doe – that Doe was never told or pressured to work off-the-clock, his manager instructed him to record all time worked, and he recorded and was paid for all time worked – the way so many other PBs have testified in this case. Def's Br. 18-28. The only way to adjudicate the claims of the hundreds of absent Opt-Ins would be to conduct mini-trials for each one.

### F.   Plaintiffs Offer No Common Evidence To Determine Actual Time Worked.

Plaintiffs claim that "Citibank's computer systems regularly recorded actual time worked by PBs on its computer systems," referring to the audit logs and alarm records, and that Citibank "keeps records of alterations to PB time entries." Pls' Opp. 14-15. Citibank has produced all of the audit

11

logs, alarm records, and time edit reports that could be located for the Opt-Ins who participated in discovery (over 115,000 pages), Linthorst 6.14 Decl. ¶ 3, yet Plaintiffs have not put these records into evidence before the Court, or demonstrated the actual time worked or damages claimed by the Plaintiffs and Opt-In using such records.  Plaintiffs simply ask the Court to imagine what they might show.  Plaintiffs cannot satisfy their burden with such rank speculation.

This is consistent with Plaintiffs' inability throughout discovery, despite these records, to provide any details around actual time worked (when or specifically how much), or damages, because it would be "unduly burdensome" to do so.  Linthorst 4.14 Decl. ¶ 13 (Dkt. No. 180).  Instead, Plaintiffs provided only extremely general estimates unsupported by any records – e.g., "Opt-in Plaintiff states that he worked an estimated 1 to 2 hours of overtime every work week" – a response that does not even identify the alleged *uncompensated* overtime and plainly fails the standard for identifying "specific facts establishing when, and for how long, she performed the off-the-clock tasks for which she now seeks compensation."[18]  Linthorst 4.14 Decl. ¶ 13, Ex. 26, Rog. No. 2 (Dkt. 180-26).  Plaintiffs claim that they objected to providing "a more precise damages calculation" as "premature" because "at that time, Citibank had not produced all relevant and necessary records."  Pls' Opp. 31.  But all of those records have long since been produced to Plaintiffs – Citibank asked Plaintiffs to supplement their responses after those records were produced and Plaintiffs refused. Linthorst 6.14 Decl. ¶¶ 51-54 & Exs. 136-137.

In any event, as set forth in Defendant's Opposition to Class Certification (Def's Opp. 24-27), the audit logs do not reflect actual time worked, because (1) they reflect computer logon and logoff times, not work times; (2) many Plaintiffs testified that their login or logout times did not reflect their start or stop work times[19]; (3) they do not record when or for how long a PB takes an unpaid lunch

---

[18]  *Joza*, 2010 WL 3619551, at *7 (quoting *Seever*, 528 F. Supp. 2d at  169-70); *Brown*, 700 F.3d at 1230-31.

[19]  Ruiz Dep. 338-39; Winfield Dep. 317-18; Carreno Dep. 203-04; Nessler Dep. 174-78; Lindsey Dep. 120-21.

break and do not reflect an accurate logout time where the PB failed or forgot to log out (Bodt Dep. 68-70); and (4) Plaintiffs and Opt-Ins testified consistently that audit logs are not an accurate reflection of actual time worked.[20]  Indeed, the lone audit log Plaintiffs have submitted to the Court – for Opt-In Sanchez (then Cuzco) on May 13, 2010, Ex. 119 – demonstrates the point.  That day, Sanchez (Cuzco) recorded her start work time as 8:30 a.m. on her time sheet, but the audit log shows her first log in was 8:46 a.m.  Sanchez Dep. 129; Pls' Ex. 119, p. 1.  She recorded her stop work time as 6:15 p.m., but the audit log shows that she logged out at 5:48 p.m.  Sanchez Dep. 129-31; Pls' Ex. 119, p. 7.  According to the audit log, Sanchez was *overpaid* for 43 minutes that day.  But Sanchez claims that the audit log is not an accurate record of her time worked, Sanchez Dep. 130-31, so an individualized inquiry for that day would be required.

Alarm records offer even less because (1) many PBs did not use an alarm code specific to them, or may have shared codes with other PBs, Pls' Ex. 120, Wolter Dep. 43-44; (2) information would only be sporadic and would not show actual start and stop work times for each day (including unpaid breaks) of a week, since responsibility for arming or disarming the alarm rotated among branch employees; and (3) as with the audit logs, PBs testified that these are not accurate records of hours worked (Jeudy Dep. 144-45, 149-50; Lindsey Dep. 139:8-16).  Moreover, such records are individualized and would not establish anything for any other individual.

Courts have consistently rejected records such as these as a basis for certification, even where plaintiffs actually submit and analyze the records, unlike Plaintiffs in this case.  *In re Bank of Am. Wage & Hour Emp. Lit.*, 286 F.R.D. at 585-86 (denying certification where expert reviewed records for over 12,000 employees and concluded that almost 95% of employees "performed off-the-clock work"; analysis was "substantially flawed" because a record of performing work outside the employee's recorded hours does not equate to performing work without pay); *Pryor v. Aerotek*

---

[20]  *See, e.g.*, Peragine Dep. 154-55 ("[T]hese records are a highly inaccurate way of judging when someone is working and when they're not."); Adler Dep. 148-49, 152; Hurler Dep. 241; Foley Dep. 182; Kenney Dep. 249-50, 265.

*Scientific, LLC*, 278 F.R.D. 516, 534-36 (C.D. Cal. 2011) (denying certification because analysis was "fraught with problems" in part because "the computer logins time may differ significantly from the time an employee actually began work for which he or she was entitled to be compensated").[21]

Similarly, the time edit reports provide no basis for certification. Pls' Opp. 14-15. Many Plaintiffs and Opt-Ins testified that their time records never were altered and they were paid for all time they recorded. Def's Br. 25 n.2. Moreover, managers testified that any changes were made to correct inaccuracies by the PB. *See, e.g.*, Alicea Decl. ¶ 7 (Dkt. 180-44); Nguyen Decl. ¶ 5 (Dkt. 180-52); *see also* Massey Dep. 196 (made legitimate mistakes on his timesheet and his manager sent it back to him to correct the mistakes). Courts have consistently rejected time edit records as a basis for certification. *See, e.g.*, *Morangelli*, 922 F. Supp. 2d at 310-11 (granting decertification because "Defendants' right to proffer innocent explanations for modified time entries, whether through other record evidence or testimony, will almost inevitably result in mini-trials on each instance of alleged time-shaving"); *Zivali*, 784 F. Supp. 2d at 467 & n.33 (expert report showed that almost 400,000 days of time records (26.2%) were edited but court found this to be insufficient to avoid decertification because there was "a wide range in the frequency of adjustments"); *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *1-3 (D. Nev. Dec. 1, 2006).

---

[21]  Plaintiffs cite to the unfounded testimony of Opt-Ins Adler and Schornstein for the proposition that "compliance used the computer log times to audit logs to check the accuracy of PBs' timesheets." Pls' Opp. 14 & n.36. Adler testified that someone (he could not recall who) "mentioned in passing" that "compliance . . . could always match" up his time records to computer records but had no other knowledge that they did (Adler Dep. 41-42), and Schornstein testified that perhaps the audit logs "was for the ops to keep track of us" but "I don't know if they were." Schornstein Dep. 134-35. Plaintiffs also claim that "Citibank's corporate representative testified that the bank used these audit logs for part of the relevant period to compare PBs' actual work times with the times reported on their time sheets." Pls' Opp. 14. Suomela testified that she had no knowledge of anyone ever comparing such records. Suomela Dep. 71. The other testimony Plaintiffs cite for Suomela refers solely to comparing of timesheets to security badge swipes, which do not exist for most PBs (and none of the Plaintiffs or discovery Opt-Ins). Bodt testified only that *prior* to the implementation of the electronic timekeeping system in July 2007 (and therefore completely outside the relevant period) a branch was expected to do a random sample comparison of *one* paper timesheet and log for each month to see if there were any glaring irregularities that might suggest an error in data entry (since employees were not entering their own time into the computer), and that such comparison was no longer necessary after NATA was implemented and employees were entering their own time. Bodt Dep. 62, 65-67. Bodt testified that the purpose of audit logs was so that managers had a record of tellers assignments and certain audited teller transactions. Bodt Dep. 24, 31, 46-47. Bodt also testified that login/logout times often had no relationship with actual time worked for a number of reasons, including when a user does not logoff the computer, and people can be logged into the system without working. Bodt Dep. 60, 69.

G.      **None Of The Alternatives Mentioned By Plaintiffs Is Viable.**

Finally, Plaintiffs claim that representative testimony, bifurcation, and subclasses could permit the Court to maintain certification in this case, but Plaintiffs do not explain how this is so.  Plaintiffs claim that "Citibank fully participated in a class certification discovery procedure using a representative sampling of Opt-Ins, a decision to which it is now bound."  Pls' Opp. 34.  But Citibank was precluded by Court Order from taking Opt-In discovery beyond the limited sample – it was not Citibank's "decision" to do so.  Dkt. 123.  Nor is there any indication that the small number of Opt-Ins who participated in discovery are representative of the rest.  Plaintiffs do not disclose how they selected Opt-Ins to participate, and over half of those selected by Citibank refused to participate.  Linthorst 4.14 Decl. ¶ 6 (Dkt. 180).  Plaintiffs claim that Judge Ellis "bifurcated" discovery between liability and damages, Pls' Opp. 33, but the discovery Order says no such thing and there is no common basis on which to litigate issues of liability *or* damages.  Dkt. 123.  And Plaintiffs do not identify any subclasses or explain how subclasses could include such a wide range of individual experiences as those involved in this case.

III.    **CONCLUSION**

The Court should decertify the case and dismiss the claims of the Opt-Ins without prejudice.  As demonstrated by the high rate of Opt-Ins who did not respond to their counsel when called upon to participate in discovery, many Opt-Ins do not have claims, or claims they care to pursue.  Individuals who wish to pursue claims can pursue them in an expeditious arbitration before the American Arbitration Association at Citibank's expense, Sorrells Decl. Ex. A p. 53-57(Dkt. 180-56), which can be held in the locale where the Opt-In worked and the witnesses reside.  *Raniere v. Citigroup Inc.*, 533 F. App'x 11 (2d Cir. 2013) (enforcing Citibank's arbitration program).  The FLSA provides sufficient remedies to incent individuals to pursue such claims, including double damages and attorneys' fees.  29 U.S.C. § 216(b).  For all of the foregoing reasons, Citibank respectfully requests that the Court grant its motion, decertify the action, and dismiss the claims of all Opt-Ins.

15

Dated: June 20, 2014                    MORGAN, LEWIS & BOCKIUS LLP


                                        /s/ Thomas A. Linthorst
                                        Sam S. Shaulson  (SS 0460)
                                        Thomas A. Linthorst (TL 3345)
                                        101 Park Avenue
                                        New York, NY  10178
                                        212.309.6000
                                        212.309.6001 (fax)
                                        sshaulson@morganlewis.com
                                        tlinthorst@morganlewis.com

                                        Attorneys for Defendant Citibank, N.A.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Reply in Support of Defendant's Motion to Decertify Collective Action was served via ECF, on this 20th day of June, 2014 as listed below:

Gregory M. Egleston, Esq.

GAINEY MCKENNA & EGLESTON

440 Park Avenue South, 5th Floor

New York, NY  10016

Murielle J. Steven Walsh, Esq.

Star M. Tyner, Esq.

POMERANTZ GROSSMAN HUFFORD

   DAHLSTROM & GROSS LLP

600 Third Avenue, 20th Floor

New York, NY  10016

Timothy J. MacFall, Esq.

RIGRODSKY & LONG, P.A.

825 East Gate Boulevard, Suite 300

Garden City, NY  11530


/s/ Thomas A. Linthorst